United States v. Shacar

21-cr-30028-MGM

EXHIBIT "16"



# National Crime Agency inspection

An inspection of the National Crime Agency's criminal intelligence function

# Contents

**Summary**                                              **1**

**Introduction**                                         **5**

**Findings**                                             **8**

    Intelligence structure                          8

    Intelligence strategy                           9

    Information technology                          10

    Intelligence management                        10

    County Lines Coordination Centre               12

    Co-location with partners                      12

    Forensic capability                            12

    Alignment with national strategies             13

    Single authoritative assessment                13

    Threats to life                                15

    Sensitive intelligence management              15

    International intelligence                      16

**Recommendations**                                     **17**

**Conclusion**                                          **18**

# Summary

We examined the National Crime Agency's (NCA) effectiveness at meeting one of its two core responsibilities, the criminal intelligence function.

The terms of reference were to answer the question: How well does the NCA discharge its criminal intelligence function? This included inspecting its:

- current capabilities;
- resourcing;
- alignment with the Serious and Organised Crime Strategy and the National Strategic Assessment;
- ability to provide a single, authoritative, strategic assessment of the threat from serious and organised crime; and
- compliance with national intelligence standards and existing legislation.

This is generally a positive report. Our main findings are summarised below.

## The NCA has the capability to discharge its criminal intelligence function

We found that the NCA has the capability to discharge its criminal intelligence function. However, there are areas it should improve, including:

- the way it receives, collates and assesses intelligence; and
- how it shares intelligence within and beyond its organisation.

The NCA has already recognised the need for development in these areas. It launched a change programme in 2018 to better manage the receipt, processing and sharing of information and intelligence. The programme is based on a gateway concept.[1]

The new gateway will provide a common standard for receiving information, data and intelligence, as well as help the NCA to comply with its legal responsibilities. The restructuring of the intelligence capability, using illicit finance funding and increasing the intelligence directorate's budget have resulted in the recruitment of more intelligence staff.

We found that the NCA has problems with short-term funding streams, legacy information technology systems and an increase in demand on its resources

---

[1] *Making best use of integration, automation and processes (robotics and AI): delivering an improved national capability, NCA Intelligence Directorate Strategy 2018–21.* NCA briefing pack, 14 February 2018.

linked to the scale and complexity of the threat from serious and organised crime. These problems are recognised by the NCA senior command team and are being addressed through the change programme.

## Resourcing of the intelligence management capability

We found that the intelligence directorate's senior management were well resourced. But there are problems with recruiting and retaining staff in other parts of the directorate. The NCA has made a large effort to ensure that new units such as the National Targeting Centre and National Data Exploitation Centre (NDEC) are appropriately staffed. But the recruitment and retention problems result in specialist posts not being filled and associated problems with training and developing staff. For example, we found that there were 112 vacancies in the intelligence directorate and 32 vacancies in the forensics unit.[2] However, we also noted that the NCA has reconfigured some of its internationally based roles to meet changing needs and demands.

From interviews, we found that in some cases access to the Police National Database (PND) isn't readily available to the staff who need it. This can result in less comprehensive intelligence assessments being undertaken. The reason for this problem is that PND licences haven't been transferred when staff move on. This affects the accuracy and completeness of intelligence checks. The NCA has responded by realigning licences to the right staff and computers.

## The NCA has prioritised activity in line with the Serious and Organised Crime Strategy and the National Strategic Assessment

The NCA is aligning its intelligence management capability and structures to meet the requirements of the 2018 Serious and Organised Crime Strategy. It is putting more resources into core intelligence units, including the National Targeting Centre and NDEC, in response to the National Strategic Assessment.

The agency has been developing working practices with other organisations to improve its response to tackling organised crime. For example, sharing information and intelligence associated with child sexual exploitation and abuse. However, these practices aren't yet consistent across the NCA. The co-location of some NCA teams with regional organised crime units (ROCUs) is good practice but is limited to a small number of regions.

We were pleased to see that the NCA's information technology systems had improved since our last inspection. For example, improvements in its ability to process and analyse bulk data, and investment in mobile digital devices that help staff securely communicate more effectively. The NCA should continue to invest in technology if it wishes to keep pace with the growth in bulk data. For example, technology able to better assess intelligence generated from the new ways in which organised criminals communicate.

---

[2] As at 31 December 2019, there were 320 vacancies within the intelligence directorate and 58 vacancies in digital forensics.

## The NCA is effective at providing a single, authoritative assessment of the threat from serious and organised crime

The NCA has strong links with ROCUs, police forces and other national agencies. It also has links with the Police Service of Northern Ireland (PSNI) and Police Scotland. It requests information and intelligence from them when producing the National Strategic Assessment to make an informed assessment of the national threat from serious and organised crime. However, our inspection found occasions when intelligence was not collected, completed or submitted on time, which could result in gaps in its National Strategic Assessment.

We found that the relationship between the NCA's intelligence and investigation commands is good. It helps make sure that intelligence is included in the tasking process and is applied to investigative or disruption activity.

## The NCA's intelligence processes are good

We found that overall the NCA's intelligence processes are good. They are compliant with national intelligence standards and current legislation.

The NCA is developing a 'dare to share' policy to widen its range of intelligence sharing (both internally and externally) from 'need to know'. As part of the change programme, it will set the right balance between 'need to know' and 'dare to share' which will improve the intelligence that it collects and will reduce the risk of intelligence not being shared appropriately. This will be similar to the processes used in counter-terrorism policing, and will result in changes to structures, policy and training. This is a cultural shift for many in the NCA, especially those who have always preferred to keep intelligence sharing to a minimum. Effective leadership and training are needed to help the organisation adopt this new culture.

We have made four recommendations to improve the effectiveness of the NCA's criminal intelligence function.

**Recommendations**

- With immediate effect, the NCA should review and consolidate its Police National Database (PND) licences so that intelligence staff can quickly use this essential intelligence database when they need to.

- By 30 April 2020 the NCA should review its training for managing sensitive intelligence so that staff can manage and supervise the new protocols. The reason for the change in protocol should be adequately communicated to staff.

- By 31 May 2020 the NCA should consider further investment in its premises, staff training and intelligence systems. This will mean it can continue to operate efficiently and effectively at all intelligence classifications and effectively manage all forms of intelligence.

- With immediate effect, the NCA should make sure that all regional strategic assessments are co-ordinated and submitted effectively to inform the National Strategic Assessment.

# Introduction

## Our commission

Her Majesty's Inspectorate of Constabulary and Fire & Rescue Services (HMICFRS) is an independent inspectorate. It is required under the Crime and Courts Act 2013 to inspect the National Crime Agency (also referred to as the NCA or 'the agency').[3] Following an inspection, HMICFRS must report to the Home Secretary on the efficiency and effectiveness of the NCA.[4]

This inspection, our sixth inspection of the NCA, examines its criminal intelligence function. Our terms of reference contain several questions about its intelligence management.

## About the National Crime Agency

The NCA is the UK law enforcement agency responsible for leading, supporting and co-ordinating the response to serious and organised crime. This includes human, weapons and drug trafficking, cybercrime and economic crime that cross regional, national and international borders. It has more than 4,000 officers, some of whom provide an international liaison function across and beyond Europe.

The agency has two functions specified in statute:

1. crime reduction; and
2. criminal intelligence.

The focus of this inspection is on criminal intelligence.

Serious and organised crime is planned, co-ordinated and committed by criminals working together on a continuing basis. They are often motivated by financial gain and their crimes characterised by violence, or the threat of violence. The NCA assesses the threat from and effect of serious and organised crime, including border security, and reports on it in the National Strategic Assessment.

The NCA can be tasked to investigate any crime. However, its capability is generally used to target the highest levels of serious and organised crime, and the organised crime groups involved in such offences. The current National Strategic Assessment highlights (among other crime types):

- cyber crime;
- child sexual exploitation and abuse;

---

[3] Section 11(1) of the Crime and Courts Act 2013.
[4] Section 11(3) of the Crime and Courts Act 2013.

- human trafficking and modern slavery; and
- the criminal use of firearms.

The NCA has a strategic role to analyse how criminals operate across the UK, and how they can be disrupted. It works closely with a range of organisations including ROCUs, the serious and organised crime system (which includes UK law enforcement and criminal justice bodies), the UK intelligence community, government departments, overseas law enforcement agencies, private and third sectors, and regulatory and professional bodies.

## Managing intelligence

Intelligence is information that has been assessed and can be developed for action. It is classified according to the Government Security Classifications policy. In simple terms, it may be classified as non-sensitive or sensitive. There may also be specific requirements for its recording and use.

Collecting, developing and disseminating intelligence allows the NCA to set priorities and tactical options. Intelligence collection and evaluation is a constant process – it should continue throughout any prevention or enforcement work.

## Terms of reference

We consulted the director general of the NCA and representatives from the Home Office when creating the terms of reference for this inspection.

Our terms of reference were to consider the following questions in relation to the NCA's responsibility to lead, support or co-ordinate the national law enforcement response to serious and organised crime (not including terrorism):

- How well does the NCA discharge its criminal intelligence function?
- Do the capabilities currently available, along with the NCA's forward plans, enable the organisation to discharge its criminal intelligence functions?
- Are the NCA's intelligence management capabilities effectively resourced?
- Do the NCA's intelligence management capabilities and structure align with the 2018 Serious and Organised Crime Strategy, and the threats outlined by the National Strategic Assessment of Serious and Organised Crime and the Serious and Organised Crime Capability Strategy?
- How effective is the NCA in providing the single authoritative strategic assessment of the threat from serious and organised crime?
- Are the NCA's intelligence processes compliant with national intelligence standards and existing legislation?

## Methodology

Pre-inspection planning took place between April and May 2019; the fieldwork took place between June and July 2019.

We reviewed NCA documents before fieldwork started, including:

- the NCA's draft force management statement;
- the National Strategic Assessment 2019;
- the 2018 Serious and Organised Crime Strategy; and
- other documents relating to NCA intelligence and operating procedures.

We also reviewed presentations given by NCA senior investigating officers for several current investigations.

We observed and interviewed NCA staff and held focus groups with them. Some gave presentations and briefings on their organisation and transformation programme. We also interviewed officers from the PSNI, Police Scotland and their counterparts in the NCA. We also interviewed and ran focus groups with officers from the ROCUs.

ROCUs form a critical part of the national policing network. They support forces with a range of specialist policing capabilities, which helps them tackle serious and organised crime effectively. Police Scotland and the PSNI provide similar, specialist policing capabilities in Scotland and Northern Ireland.

The last group of staff we interviewed and held focus groups with were from the National Intelligence Hub, comprising the National Assessment Centre and other specialist departments of the NCA.

We visited the NCA centres across England – in the North West, North East, South West and Yorkshire. In each place, we ran a focus group with intelligence staff from the corresponding ROCU. At the NCA centres in the West Midlands and North West, we interviewed senior managers and other staff in the intelligence and investigations directorates. We also visited NCA centres in the PSNI and Police Scotland to inspect the intelligence arrangements.

Finally, we interviewed the deputy directors and the director of the intelligence directorate.

# Findings

## Intelligence structure

The NCA has a statutory responsibility to lead, support and co-ordinate the fight against serious and organised crime for the UK.

At the time of the inspection, the NCA had 1,537 staff in its intelligence directorate (also called the intelligence command/intelligence function) based around the UK. There were 112 vacancies. The NCA also has 130 international liaison officers deployed in other countries.[5] The intelligence directorate has the lowest turnover of staff in the NCA with a staff attrition rate of 7.9 percent.

Most intelligence staff are located at the NCA's main operational centres in London, the North West and the West Midlands. The directorate comprises one director of intelligence and six deputy directors. Each deputy director is responsible for one of its intelligence portfolios: Collection, National Intelligence Hub, International, Tracer, National Tasking and Co-ordination, and NDEC.

Senior leaders in the directorate understand where and how they fit into the organisation's role and purpose. They are an active part of the NCA's transformation and restructure programme, which has been developed but not fully implemented. We focused the inspection on the current position, including any changes that have been implemented. We look forward to seeing how the proposed changes are put into practice, and how they become part of business as usual, at a future inspection.

Part of the programme was to move the NCA's tasking function – that is, where it assesses and prioritises activity, and ensures the most suitable law enforcement agency acts – into the intelligence directorate.[6] This has streamlined the way operations are managed, including operational decision making, and made the process of securing authorisations for covert policing activities more efficient. (The policing activities referred to here are authorised under several enactments including the Regulation of Investigative Powers Act 2000 and the Police and Criminal Evidence Act 1984.) We see this as good practice.

We found evidence that the NCA organises its resources based on priorities, and that deployments are based on targets of choice, not targets of opportunity. This means that decisions made on the prioritisation of investigations and the deployment of

---

[5] As at 31 December 2019, the intelligence directorate FTE establishment is 1,984 (2,074 posts accounting for shared/part time posts), comprising 1,689 staff and 320 vacancies. Of these, 168 vacancies (38 Brexit, 35 NDEC, 41 Tracer and 54 if funded) are new posts with new funding, including difficult to recruit or specialist roles. The NCA now has 141 officers based overseas.
[6] The NCA's function of assessing and prioritising necessary activity and ensuring that action is taken by the most suitable law enforcement capability.

resources are based on threat, risk and harm – not because there is a good opportunity for an arrest or judicial outcome.

The National Targeting Centre and the NDEC gained staff from other intelligence-gathering roles in the NCA when they were established at the beginning of the programme. Now, staff from intelligence development roles work with intelligence staff to support current investigations and colleagues in dedicated investigation teams. We believe that establishing the National Targeting Centre and NDEC is a positive step for the agency that complements the work of the National Assessment Centre. The NCA should evaluate their work as the directorate progresses.

The advantage and benefits of these changes haven't yet been fully realised. We look forward to seeing how these functions develop in future inspections.

## Intelligence strategy

The NCA's *Intelligence Directorate Strategy 2018–2021* sees many staff move to intelligence functions in the National Targeting Centre, National Assessment Centre and NDEC.

These combined functions will:

- enable more effective use of specialist investigative capabilities;
- increase intelligence gathering;
- provide a clearer understanding of the threat from serious and organised crime;
- enhance prioritisation of disruption activity;
- increase automated analysis;
- allow the NCA to provide a single authoritative view of serious and organised crime; and
- reduce time to efficiently process and understand data.[7]

The strategy aims to ensure that intelligence management supports all the NCA's investigative activity.[8] Intelligence should drive and direct its response (and the response of other law enforcement agencies) to the highest priority serious and organised crimes threats.

In 2017 the NCA undertook a review of its international network. The review resulted in some efficiencies and a more balanced global coverage across all of the threat areas. The number of international liaison officers has been increased so that the UK's political, security, law enforcement, diplomatic, development, defence relationships and financial priorities are better co-ordinated. Staff from traditional threat areas have been moved to emerging threat areas in accordance with strategic priorities. This shows that the NCA has the flexibility to use its international resources effectively and in accordance with need.

---

[7] *NCA Intelligence Directorate Strategy 2018–2021, Initial IOM design,* 14 February 2018.
[8] As before.

However, it is proving difficult for the NCA to resource its intelligence functions. About 10 percent of its workforce is lost each year through people leaving the organisation. Increasing the number of staff in intelligence functions means hiring new recruits and relocating existing staff. Both options come with risk, which is highlighted in the NCA risk register. For the NCA to fully realise the potential of these changes to its intelligence capability, it needs to be fully resourced.

## Information technology

The NCA can communicate at official sensitive level now that more of its staff have access to digital mobile devices. This is an improvement since our 2015 inspection. However, many intelligence staff still cannot access the PND.

The PND is the national intelligence database for law enforcement in the UK. It allows law enforcement agencies and police forces to see what intelligence other agencies hold. Access to the PND is essential to any intelligence assessment.

NCA intelligence staff told us that getting access to the PND is difficult, which means that PND checks happen late in the intelligence collection cycle. A PND check should take place very early in any intelligence collection strategy. The NCA is addressing this problem by making sure that staff who need a licence have one.

**Recommendation**
- With immediate effect, the NCA should review and consolidate its Police National Database (PND) licences so that intelligence staff can quickly use this essential intelligence database when they need to.

It is important that the NCA stays at the vanguard of intelligence collection. It aims to achieve this by establishing a threat and risk assessment, capability and research function, the 'Tracer' project, which helps law enforcement agencies keep pace with advances in communications technology and access technical communication intelligence.

'Tracer' is managed by the Office for Security and Counter Terrorism and is funded on a 12-month recurring basis. The lack of clear long-term, sustainable funding is a problem for planning. We also found a similar sustainable funding problem with the NDEC. This concerns us.

## Intelligence management

Intelligence management at the NCA isn't as efficient as it should be.

The agency has too many systems and processes to manage information efficiently. We also found that its capacity for sharing intelligence is sometimes inefficient.

It collects a significant volume of information, but that information isn't always transferred into tactical activity because there is no consolidated intelligence picture. The gateway concept that the NCA is introducing (part of its change programme) seeks to address this but hasn't yet realised any benefits.

After the terrorist attack in Salisbury in March 2018, the NCA began Operation Accordable at the request of the Home Secretary. We examined the agency's work in detail. Its response was outstanding.

We found that effective intelligence management informed all deployments, which were carefully thought through and limited to where they were needed.

The operation presented unique intelligence and operational difficulties, which taught the NCA a lot about intelligence handling, especially the most sensitive type of intelligence. It now operates regularly and confidently when managing intelligence up to and including secret level.

> **Recommendation**
> - By 31 May 2020 the NCA should consider further investment in its premises, staff training and intelligence systems. This will mean it can continue to operate efficiently and effectively at all intelligence classifications and effectively manage all forms of intelligence.

Operation Habitance is the NCA's project tackling child sexual exploitation offending on the dark web.[9] At any one time there are approximately 70 dark web sites accessible. Working with partners, the NCA has identified a significant number of unique global internet protocol (IP) addresses on dark web sites; at least 5 percent of these IP addresses are believed to be in the UK.

The NCA's approach has been to focus on high harm offenders. While undertaking this work, the NCA has provided evidence to the internet industry to place pressure on it to make changes to reduce offending. The NCA is also supporting the implementation of a cross government strategy, which intends to reduce demand by preventing offending.

The current strategic action plan has 47 activities, of which 34 percent are pursue, 36 percent prevent and 30 percent protect and prepare.[10]

The pursue response is significant, with co-ordinated activity by the NCA and police forces against online child sex abuse resulting in 520 arrests and 700 children safeguarded each month, compared with 417 arrests in the whole of 2009/10. This is an area that has seen significant improvement by the NCA.

Operation Habitance demonstrates a welcome improvement in the quality of intelligence distributed to partner agencies. However, the result has been a significant increase in the workload for ROCUs, forces and some NCA branches. The NCA recognises that there is a significant volume of intelligence in the system still to be tackled that will continue to create pressure for forces and ROCUs. The NCA and the National Police Chiefs' Council have ensured that police forces are briefed on the scale of this intelligence. In addition, it is anticipated that a significant proportion of the

---

[9] Dark web – encrypted online content that is not indexed by conventional search engines.
[10] These terms describe policing activity designed to reduce the impact of serious and organised crime. Pursue: to investigate crimes; Prevent: to stop people becoming involved in serious and organised crime; Protect: to strengthen our protection against serious and organised crime; and Prepare: to mitigate the impact of serious and organised crime.

£30m additional funding for 2020/21 to tackle child sexual abuse will be used to fund increased pursue capacity to tackle dark web offending.

## County Lines Coordination Centre

We visited the National County Lines Coordination Centre (NCLCC), a multi-agency team drawn from the NCA, police forces and ROCUs. The team develops a national intelligence picture of the threat from county lines crime to improve understanding of the complexity and scale of the problem.

We found that the centre produces effective intelligence products, which are sent to forces and ROCUs. But we didn't find evidence that the NCLCC always fully knew the outcome and benefits of action taken as a result. The NCLCC is responsible for co-ordinating the response to county lines and managing the flow of intelligence to the police forces and ROCUs. It should continue to focus on understanding how that intelligence is prioritised and used.

## Co-location with partners

We visited several locations where the NCA shares accommodation with other agencies. The co-location of NCA and ROCU resources helps two organisations share intelligence effectively. We see this as good practice.

The benefits of co-location were recognised in the 2016 inspection of ROCUs. They will be the subject of a future NCA inspection which will look at its relationship with ROCUs.

## Forensic capability

The NCA's forensic capabilities are based in the intelligence directorate. (This is why they were included in this inspection.) The NCA must comply with International Standards Organisation (ISO) accreditation, as must all other law enforcement agencies and police forces. Compliance is important to the integrity of any evidence that may be presented in court.

At the time of our inspection, the NCA did not meet the ISO standards set by the forensic science regulator in some areas, including digital forensics. (It needs ISO 17020 and 17025 accreditations, which are awarded by the UK's National Accreditation Body (UKAS), for organisations that perform various types of testing and calibration, including forensic testing and digital analysis.)

Also at the time of our inspection, the forensic department was operating with 70 staff and 58 vacancies. There was only one deployable crime scene investigator and no covert forensic examiners available. This is an example of the recruitment and retention problems the NCA faces. The NCA has identified this as a corporate risk, which is being managed by its governance process.

The NCA is bringing all its forensic capabilities under one command structure, the Forensic Services Department. One of its objectives is to achieve accreditation by becoming more efficient and effective in its forensic management of physical and digital evidence.

The absence of appropriate ISO accreditation concerns us.

## Alignment with national strategies

The NCA has a strategic role to examine the national intelligence picture. It analyses how criminals and organised crime groups operate and develops effective disruption tactics.

The most recent National Strategic Assessment (in 2019) outlined threats including:

- child sexual exploitation and abuse;
- organised immigration crime;
- modern slavery and human trafficking;
- cybercrime; and
- firearms.

Two regions told us that their Regional Strategic Assessments were submitted after publication of the National Strategic Assessment and so were not considered.

In future, the NCA should make sure that all regions comply with collection plans in time for them to be reflected in the National Strategic Assessment. We were reassured that the introduction of the National Assessment Centre will improve the agency's ability to make a comprehensive strategic national assessment and co-ordinate responses from the regions.

**Recommendation**
- With immediate effect, the NCA should make sure that all regional strategic assessments are co-ordinated and submitted effectively to inform the National Strategic Assessment.

## Single authoritative assessment

The National Strategic Assessment of Serious and Organised Crime is the NCA's single, authoritative assessment of the threat from serious and organised crime. It is one of several intelligence products, or packages, that the National Assessment Centre produces. The NCA uses the assessment to set its strategic priorities each year, which are designed to help law enforcement agencies target the worst criminals.

While the assessment is a comprehensive national document with input from Police Scotland and the PSNI, the NCA should do more to ensure regional submissions come in on time. The NCA should also manage its sources better. It cannot make an authoritative assessment based on unreliable or out-of-date intelligence. Its gateway project should help with this.

In the meantime, some of the timescales the National Assessment Centre promises for other products are unrealistic. This is partly caused by the inefficiency that comes from staff not having access to all the intelligence systems they need.

The National Assessment Centre's role is to assess and understand the intelligence and information available across the whole serious and organised crime landscape, enabling a single authoritative threat picture. All their products start with comprehensive intelligence collection plans. We note, though, that some of the timescales to research and produce their finished products are unrealistic. This is because staff are without direct access to many significant sources of intelligence, such as the PND. This can result in repeated intelligence requests to ROCUs and police forces. This is inefficient. The NCA believe their intelligence programme, specifically the delivery of all source access, professionalisation, technology improvements and the Gateway, will address this.

The National Assessment Centre's National Strategic Assessment of Serious and Organised Crime has evolved over several years. This document is used by police forces, law enforcement agencies and government departments to allow them to respond effectively to serious and organised crime.

A single authoritative picture of the threat enables the NCA to set its strategic priorities. They are designed to enable law enforcement to target the high-harm, high-impact criminals and organised crime groups.

The priority is to identify and disrupt those at the high end of high harm, whatever the threat or threats, including:

- exploitation of the vulnerable;
- the impact of serious and organised crime on communities, specifically in relation to firearms, drugs and organised acquisitive crime; and
- harm to the UK's economy and institutions.[11]

We considered this document to be comprehensive across its various protectively marked versions. It contains a section that addressed the specific problems of drugs in Scotland and Northern Ireland. Those sections were written with the co-operation of Police Scotland and the PSNI. It reflects the priorities of the whole of the UK.

We found evidence that there are information technology barriers to accessing and monitoring all intelligence sources systematically with ease. This means that a single consolidated picture is difficult to achieve, and prioritising threats is complicated, especially alongside local policing priorities. The Gateway project will help reduce the number of routes into the NCA and will enable the consistent assessment of information and improve the consolidated intelligence picture. This will assist the agency's authorising officers who said they find decision making difficult with an often incomplete intelligence picture.[12]

---

[11] *National Strategic Assessment of Serious and Organised Crime 2019*, NCA, Crown Copyright 2019.
[12] Senior officers trained to authorised specific law enforcement activity under the Regulation of Investigatory Powers Act 2000.

## Threats to life

The NCA has considerable experience in managing threats to life. It defines a threat as:

- something that could engage Article 2 of the Human Rights Act 1998; and
- in other circumstances where as a result of a deliberate intention or the criminal act of another, the police or another law enforcement agency has identified a real and immediate threat that threatens to cause a loss of life, serious harm or injury to another (including sexual assault and rape).[13]

The NCA is committed to helping police forces and other UK law enforcement agencies, including those overseas, deal with threats to life or threats to cause serious harm or injury. Assistance takes several forms, but frequently involves passing on sensitive intelligence.

The agency also has considerable experience in safely managing complex threats to life. The policies that we examined were up to date and had been reviewed regularly. At the time of our inspection, the NCA was reviewing its policies following the report and recommendations of the independent public inquiry into the death of Anthony Grainger.[14]

We found that intelligence was used well to inform decision making during a threat-to-life investigation.

## Sensitive intelligence management

The NCA's Joint Operations Team is based in the North West and works well with other intelligence organisations to efficiently manage and exchange sensitive intelligence. It has clear operational terms of reference. We see this as an example of good practice.

The NCA is increasing the number of staff who have access to sensitive intelligence. This is a cultural shift for it in line with its new 'need to share' policy. We see widening access to intelligence as a positive shift, if done in a thoughtful and controlled way. There is the potential for increased risk, particularly in relation to sensitive intelligence.

Where the use of sensitive intelligence leads to criminal prosecution, that intelligence, and associated disclosure issues, must be properly managed in accordance with statute. A failure to do so could undermine a prosecution and, in certain circumstances, lead to a breach in legislation.

The NCA must make sure that its staff are trained to handle sensitive intelligence. This will ensure they are competent to bring offenders to justice, while reducing risks – for example, in operational security or during a criminal justice process.

---

[13] Ref: IV23 (v1) - Dealing with Threats to Life or to Cause Serious Injury, NCA, 2014.
[14] Report and recommendations of the independent public inquiry into the death of Anthony Grainger, chaired by His Honour Judge Teague QC, Home Office, 12 July 2019.

> **Recommendation**
> - By 30 April 2020 the NCA should review its training for managing sensitive intelligence so that staff can manage and supervise the new protocols. The reason for the change in protocol should be adequately communicated to staff.

We found that some staff were uncomfortable with this cultural shift and the new sensitive intelligence policy. The NCA should make sure that all staff know and understand why it has been introduced – some would benefit from being mentored.

The NCA should also review the intelligence training it delivers to police forces on behalf of the College of Policing.

## International intelligence

The NCA is the primary UK law enforcement agency with an international reach. It has a network of 141 international liaison officers and is responsible for many international functions, including working with Europol[15] and Interpol.[16]

The next year (2020) may see some changes in the way that the NCA operates with international law enforcement agencies. These changes are outside the terms of reference of this inspection.

Intelligence from international law enforcement comes to the NCA in several ways. In future, this will be co-ordinated through the International desks and Gateway. This will ensure that all relevant systems, including those at Europol, are checked when there are investigations with an international element.

Previously, some officers have had unfounded concerns over the possibility of compromising their investigations by carrying out these checks. This is being addressed and the NCA will ensure its managers and officers understand the value of, and trust in, the access they have to Europol systems and encourage full use of this intelligence facility.

---

[15] Europol is the European agency for law enforcement co-operation, based in The Hague.
[16] Interpol is the international policing organisation that facilitates worldwide police co-operation, based in Lyon.

# Recommendations

## Recommendations

- With immediate effect, the NCA should review and consolidate its Police National Database (PND) licences so that intelligence staff can quickly use this essential intelligence database when they need to.

- By 30 April 2020 the NCA should review its training for managing sensitive intelligence so that staff can manage and supervise the new protocols. The reason for the change in protocol should be adequately communicated to staff.

- By 31 May 2020 the NCA should consider further investment in its premises, staff training and intelligence systems. This will mean it can continue to operate efficiently and effectively at all intelligence classifications and effectively manage all forms of intelligence.

- With immediate effect, the NCA should make sure that all regional strategic assessments are co-ordinated and submitted effectively to inform the National Strategic Assessment.

# Conclusion

The NCA is a national law enforcement organisation, operating in a complex environment across local, regional and national boundaries. It began a major change programme in 2018, a large part of which focuses on its intelligence function.

We found that the NCA is meeting its statutory obligation to provide a criminal intelligence function. It has resources and systems in place to effectively manage information. We found evidence of good practice. For example, in the joint working arrangements between organisations and where there was co-location.

However, there are areas for concern and opportunities for improvement. For example, it doesn't monitor actions that follow the dissemination of intelligence related to county lines.

It also must ensure that it is sufficiently resourced.

The NCA has identified problems and introduced initiatives to resolve them. For example, its gateway project to manage the flow of intelligence in and across the organisation. It has also created a stand-alone forensic services department. Both initiatives were introduced to respond to problems the NCA had identified itself.

However, we were concerned that the agency does not yet have full accreditation for digital forensic analysis.

We have made four recommendations to improve the effectiveness of the NCA's criminal intelligence function.

We look forward to future inspections, where we can see the results of the change programme.

July 2020 | © HMICFRS 2020

www.justiceinspectorates.gov.uk/hmicfrs