United States v. Shacar

21-cr-30028-MGM

EXHIBIT "19"

# Department of Justice
# Criminal Division



Performance Budget

FY 2024 Congressional Submission



**Department of Justice**
Criminal Division

## Contents

Overview of the Criminal Division ........................................................................................................ 3
    Mission Statement ................................................................................................................................ 3
    Division Priorities ............................................................................................................................... 3
    Program Activities .............................................................................................................................. 4
    Investigating and Prosecuting Cases ................................................................................................. 4
    Providing Expert Guidance and Advice ............................................................................................ 6
    Reviewing the Use of Sensitive Law Enforcement Tools ................................................................ 8
    Engaging with Domestic Partners and Foreign Counterparts .......................................................... 9
    Challenges to Achieving Outcomes ................................................................................................ 12
Summary of Program Changes ............................................................................................................ 18
Appropriations Language and Analysis of Appropriations Language ................................................. 19
Performance Budget ............................................................................................................................. 19
    Enforcing Federal Criminal Law ..................................................................................................... 20
    Strategic Goal 1: Uphold the Rule of Law ..................................................................................... 21
    Strategic Goal 2: Keep Our Country Safe ...................................................................................... 23
    Strategic Goal 3: Protect Civil Rights ............................................................................................ 31
    Strategic Goal 4: Ensure Economic Opportunity and Fairness for All .......................................... 33
    Performance and Resource Tables ................................................................................................... 37
    Performance, Resources, and Strategies ......................................................................................... 38
    Performance and Resource Tables by Program Activities .............................................................. 42
Program Increases by Item .................................................................................................................. 44

**Exhibits**
    A. Organizational Chart
    B. Summary of Requirements
    C. FY 2024 Program Increases/Offsets by Decision Unit
    D. Resources by DOJ Strategic Goal/Objective
    E. Justification for Technical and Base Adjustments
    F. Crosswalk of 2022 Availability
    G. Crosswalk of 2023 Availability
    H. Summary of Reimbursable Resources



**Department of Justice**
Criminal Division

I. Detail of Permanent Positions by Category

J. Financial Analysis of Program Changes

K. Summary of Requirements by Object Class

L. Status of Congressionally Requested Studies, Reports, and Evaluation – N/A

M. Senior Executive Service Reporting – N/A

N. Modular Costs for New Positions

O. Information on Overseas Staffing

P. IT Investment Questionnaire – N/A

Q. Non-SES Awards Exhibits



# Overview of the Criminal Division

## *Mission Statement*

The Criminal Division's mission is to protect the American people from serious criminal activity, including transnational criminal organizations, violent gangs, drugs, cybercrime, child exploitation, corruption, fraud, and money laundering. The Criminal Division's specialized prosecution units develop and enforce federal criminal laws that target complex, international, and multi-district crime. The Division responds to critical and emerging national and international criminal threats and leads a coordinated, nationwide response to reduce those threats.[1]

To accomplish its mission, the Division joins with domestic and foreign law enforcement partners to pursue criminal investigations and prosecutions. The Division often partners with U.S. Attorneys' Offices in investigating and prosecuting criminal matters, particularly in complex multi-jurisdictional or international cases. The importance of the Division's centralized expertise and coordination has been recognized for decades: former Attorney General Robert H. Jackson noted that it is necessary "to promote uniformity of policy and action, to establish some standards of performance, and to make available specialized help." Attorney General Jackson emphasized a balance that "avoid[s] any lessening of the prestige and influence of the district attorneys," while proceeding "with that uniformity of policy which is necessary to the prestige of federal law."

The Division also plays a critical and unique role in fighting transnational crime. As the designated Central Authority for U.S. law enforcement interactions with other countries, the Division secures evidence critical to solving crimes against Americans and obtains the extradition of criminals from foreign countries to face justice in U.S. courts. No other organization within the Department of Justice or the United States Government is authorized to fulfill this critical international role.

**To sustain mission needs, the Criminal Division requests a total of 907 permanent positions (562 attorneys and 5 agents), 859 direct Full-Time Equivalent work years (FTE), and $256,655,000 in its Salaries and Expenses appropriation for Fiscal Year (FY) 2024.**

## *Division Priorities*

The Criminal Division has identified the following key strategic goals to address our country's most critical justice priorities:

- Disrupting and dismantling domestic and transnational criminal organizations and networks that threaten our country through violence, drug trafficking, human smuggling and immigration offenses, and computer crime;
- Ensuring trust and confidence in government institutions, by reducing public corruption at every level of government;

---

[1] Electronic copies of the Department of Justice's Congressional Budget Justifications and Capital Asset Plan and Business Case exhibits can be viewed or downloaded from the Internet using the Internet address: https://www.justice.gov/doj/budget-and-performance.



Department of Justice
Criminal Division

- Ensuring the stability and security of domestic and global markets, as well as the integrity of government programs, by reducing fraud, money laundering, and other economic crimes committed by both corporations and individuals;
- Combating cyber threats and attacks while assuring that agents and prosecutors across the country can obtain digital evidence critical to every sort of investigation;
- Protecting our children from exploitation and defending human rights;
- Securing evidence located abroad that is essential for successful U.S. prosecutions, and seeking international enforcement of U.S. asset forfeiture orders abroad;
- Assisting foreign law enforcement authorities to obtain evidence in the United States, thereby empowering them to interdict criminal actors on foreign soil before the threat can migrate to the United States;
- Ensuring accountability through extradition for criminals who seek safe haven abroad, while removing violent criminals and other fugitives from our communities to face justice in foreign courts;
- Strengthening justice-sector institutions in countries throughout the globe; and
- Supporting crime-fighting efforts across federal, state, and local governments.

The Criminal Division engages in several program activities to achieve its mission:

- Investigating and prosecuting cases;
- Providing expert guidance and advice to our prosecutorial and law enforcement partners;
- Authorizing the use of sensitive law enforcement tools; and
- Engaging with domestic partners and foreign counterparts to enforce the law, advance public safety, and achieve justice.

Every day, the Criminal Division performs these functions at the forefront of federal criminal law enforcement.


## *Program Activities*

### *Investigating and Prosecuting Cases*

- Investigating and prosecuting the most significant cases and matters; and
- Coordinating a wide range of criminal investigations and prosecutions that span jurisdictions and involve multiple law enforcement partners.



Department of Justice
Criminal Division

## Criminal Division Prosecutions and Investigations
## FY 2020-FY 2024



The Criminal Division supports its mission through the responsible and thorough investigation and prosecution of crime. The Division undertakes complex cases, including cases involving multiple jurisdictions and those that have an international component. In addition, for certain criminal statutes, the Division approves all federal charging instruments filed throughout the United States to ensure a consistent and coordinated approach to the nation's law enforcement priorities. The Division has a bird's-eye and comprehensive view of violent crime, organized crime, narcotics, money laundering, white-collar crime, public corruption, cybercrime, and other criminal activities. Consequently, the Division is uniquely able to ensure that crimes that occur, both in the United States and abroad, do not go undetected or ignored.

### *Select Recent Criminal Division Accomplishments in Investigating and Prosecuting Cases*

**Computer Crime and Intellectual Property Section (CCIPS)** – On February 8, 2022, law enforcement announced the seizure of cryptocurrency valued at over $3.6 billion, and the associated arrests of Ilya Lichtenstein and Heather Morgan relating to their alleged conspiracy to launder the proceeds of bitcoin stolen from Bitfinex, a cryptocurrency exchange. Law enforcement was able to lawfully seize and recover more than 94,000 bitcoin that had been stolen from Bitfinex. The recovered bitcoin was valued at over $3.6 billion at the time of seizure.

**Human Rights and Special Prosecutions Section (HRSP)** – Since Attorney General Garland announced the creation of Joint Task Force Alpha (JTFA) in June 2021, the initiative and its team members have served as a model for effective interagency task force operations. Led by the Division's HRSP, in coordination with other Criminal Division sections, U.S. Attorney's Offices, and federal law enforcement partners, JTFA has made tremendous progress in its effort to disrupt and dismantle the most dangerous human smuggling organizations operating in Mexico, Guatemala, Honduras, and El Salvador. JTFA continued to generate significant, impactful results, which, as of the close of FY 2022 included: 120 domestic and 38 international arrests; 54 convictions; 35 defendants sentenced, including significant jail time imposed; substantial asset forfeiture, including hundreds of thousands of dollars in cash, real property, vehicles, firearms, and ammunition; numerous defendants indicted under seal pending arrest; and multiple pending extradition requests against foreign leadership targets located in the Northern Triangle and Mexico. JTFA efforts have directly expedited action on foreign arrests, extradition requests, wiretaps, and enhanced collaboration with both domestic and foreign partners on the most serious and significant smuggling incidents, including the June 2022 San Antonio mass casualty human smuggling



incident involving the death of 53 migrants. HRSP also led investigation and prosecution efforts in several JTFA's cases during FY 2022, including an extensive Texas-based smuggling, transportation, and stash house network that subjected scores of migrants to extremely dangerous conditions. Although these types of complex cases often take years to build, careful coordination and focused efforts have enabled the team to accelerate investigations. The work of JTFA under HRSP's leadership has made a tremendous impact and almost certainly saved lives.

**Money Laundering and Asset Recovery Section (MLARS)** – MLARS's Bank Integrity Unit, along with the Division's Fraud Section and the U.S. Attorney's Office for the Eastern District of New York, investigated money laundering and bribery related to the 1Malaysia Development Berhad (1MDB) scheme culminating in charges against three individual defendants, including two Goldman Sachs bankers. One banker, Tim Leissner, pleaded guilty and cooperated with the government. On April 8, 2022, Ng Chong Hwa, a citizen of Malaysia and a former Managing Director of The Goldman Sachs Group, Inc., was convicted by a federal jury on all counts of a superseding indictment charging him with conspiring to launder billions of dollars embezzled from 1MDB, conspiring to violate the Foreign Corrupt Practices Act (FCPA) by paying bribes to a dozen government officials in Malaysia and Abu Dhabi, and conspiring to violate the FCPA by circumventing the internal accounting controls of Goldman Sachs. In total, Ng and other co-conspirators misappropriated more than $2.7 billion from 1MDB.

**Narcotic and Dangerous Drug Section (NDDS)** – On September 15, 2022, former Gulf Cartel leader Jorge Costilla-Sanchez, known as "El Cos," was sentenced to life in prison for conspiring to distribute cocaine and marijuana for unlawful importation into the United States. The sentence was the result of a multi-year investigation by NDDS and the DEA's Houston Office into the Gulf Cartel leadership. The sentencing of Costilla-Sanchez is perhaps the most important achievement of this nearly 15-year investigation, which included federal wiretaps lasting 27 months; more than 258,000 intercepted communications; the seizure of over $11 million in bulk currency, 47,755 pounds of marijuana, and 337 kilograms of cocaine in the United States; and the seizure of 14,200 kilograms of cocaine by Panamanian and Mexican authorities. As a result of the investigation, NDDS indicted 32 defendants. To date, NDDS has secured convictions against Costilla-Sanchez and six others, including five guilty pleas and one conviction at trial. Additional defendants are pending trial, fugitives, or detained abroad pending extradition.

## *Providing Expert Guidance and Advice*

- Developing and supporting effective crime reduction strategies and programs;
- Driving policy, legislative, and regulatory reforms; and
- Providing expert counsel and training in criminal enforcement matters to state, local, and federal and foreign enforcement partners.

The Criminal Division serves as the strategic hub of legal and enforcement expertise in the fight against national and international criminal threats. Consequently, its expert guidance and advice are crucial to the successful application of criminal law throughout the country. The Division leads the national effort to address emerging criminal trends, including the increasingly international scope of criminal activity. The guidance provided to U.S. Attorneys' Offices and other federal law enforcement partners promotes coordination, consistency, and the efficient use of resources while leveraging expertise and furthering the Department's mission to ensure justice.



## Expert Guidance and Legal Advice
## FY 2020-FY 2024



| | FY 2020 | FY 2021 | FY 2022 | FY 2023 (Target) | FY 2024 (Target) |
|---|---|---|---|---|---|
| Legislative and Policy Analysis Matters Completed | 17,646 | 28,440 | 29,848 | 25,727 | 27,001 |
| Legal Advisory Matters Completed | 9,607 | 11,773 | 12,439 | 10,569 | 11,167 |
| Programmatic Coordination Activities | 41,235 | 32,490 | 30,549 | 31,103 | 29,245 |
| Training Sessions/Presentations | 7,187 | 5,799 | 5,074 | 4,392 | 3,843 |

■ Legal Advisory Matters Completed ■ Legislative and Policy Analysis Matters Completed
■ Programmatic Coordination Activities ■ Training Sessions/Presentations

### *Select Recent Criminal Division Accomplishments in Providing Expert Guidance and Advice*

**Child Exploitation and Obscenity Section (CEOS)** – CEOS led change through legislative initiatives designed to fill gaps in the law that will enhance the ability to protect children and provide for child victim services. CEOS developed a comprehensive package of 20 legislative proposals that were transmitted to Congress to fill important gaps that CEOS identified in existing legislative authorities to better protect children from both online harms and those "in real life," ranging from sweeping approaches intended to spark cultural shifts, to technical amendments closing loopholes in criminal provisions. The legislative proposals generally fall into one of three categories: (1) a collection of proposals implementing change to protect children online and in person, (2) a collection of proposals that enhance the ability of the Department of Justice to deter and punish child sex offenses by amending existing criminal provisions, and (3) a collection of proposals that improve the efficiency and effectiveness of procedural provisions.



Department of Justice
Criminal Division

**Office of Enforcement Operations (OEO)** – In FY 2022, OEO continued to expand and diversify its training program despite challenges posed by COVID-19 restrictions. OEO's ability to effectively and efficiently evaluate requests for authorization to use law enforcement tools depends, in large part, on the quality of the submissions to OEO from the requesting federal prosecuting office or law enforcement agency. To improve the quality of those submissions, and to educate federal prosecutors and agents about the availability and use of the tools in OEO's portfolio, OEO maintained a robust training program, conducting 70 trainings that reached approximately 3,448 attendees. Additionally, OEO's Electronic Surveillance Unit continued its successful webinar program aimed at busy prosecutors and agents and resumed in-person training as soon as COVID conditions allowed. These in-person trainings provided an opportunity to learn more about the issues faced by the field and fostered ongoing discussions of how best to tackle those challenges. Training efforts resulted in improvements in the quality of submissions to OEO and fostered positive working relationships with the field. These relationships often result in more open lines of communication and a better understanding of issues impacting the field, allowing OEO to better serve the U.S. Attorneys' Offices and law enforcement community in ways that also preserve the integrity of the tools in OEO's portfolio.

**Office of Policy and Legislation (OPL)** – In FY 2022, OPL coordinated responses to over 3,400 requests from the Office of Management and Budget (OMB), the Department's Office of Legislative Affairs, and the Office of Legal Policy for views and analysis on a wide variety of legislative, regulatory, and diplomatic matters. OPL accomplished its work successfully by meeting – and engaging in other robust communications – with each Division section and office to identify, draft, and revise legislative proposals to be included in the Department's legislative agenda, as well as to respond to the volume of requests from leadership offices on the range of criminal justice issues facing Congress and the Department. A recent success was the December 2022 passing by Congress of the Justice for Victims of War Crimes Act. This landmark legislation expands the jurisdictional reach of the war crimes statute to allow U.S. prosecutors to indict perpetrators who are present in United States after committing war crimes elsewhere.

## *Reviewing the Use of Sensitive Law Enforcement Tools*

- Approving and overseeing the use of the most sophisticated investigative tools in the federal arsenal

The Criminal Division serves as the Department's "nerve center" for many critical legal and operational matters. It is the Division's responsibility to ensure that investigators are effectively and appropriately using available sensitive law enforcement tools. These tools include Title III wiretaps, electronic evidence-gathering authorities, correspondent banking subpoenas, and the Witness Security Program. Internationally, and as the designated Central Authority for the United States, the Division manages the Department's relations with foreign counterparts and coordinates all prisoner transfers, extraditions, and mutual legal assistance requests. Finally, the Division handles numerous requests for approval from U.S. Attorneys' Offices to use sensitive law enforcement techniques in conjunction with criminal statutes. For example, the Division reviews every racketeering indictment that is brought across the nation and is involved in every Foreign Corrupt Practices Act case. In these ways, the Division serves a critical and unique role in ensuring consistency across districts and continuity over time, as well as the even-handed application of statutes.



**Department of Justice**
Criminal Division



Selected Federal Law Enforcement Partners

***Select Recent Criminal Division Accomplishments in Reviewing the Use of Sensitive Law Enforcement Tools***

**Office of Enforcement Operations (OEO)** – In FY 2022, OEO's Electronic Surveillance Unit (OEO/ESU) continued to formalize and expand its litigation assistance in Title III matters. OEO/ESU responded to nearly 30 requests for assistance and reviewed 23 Title III motions and responses from 17 different U.S. Attorney's Offices and one Department component. This assistance ranged from responding to requests for legal guidance – where OEO/ESU was able to leverage its subject-matter expertise to provide timely and thorough responses – to providing ongoing assistance in more complicated matters at various levels of judicial review that had the potential to impact the implementation and effectiveness of Title III interceptions beyond the specific case. In addition to providing substantive feedback and legal research to help improve the government's final submission, OEO/ESU attorneys also ensured consistency in the government's arguments in Title III litigation.

**Office of International Affairs (OIA)** – On May 4, 2022, OIA secured the extradition of Dairo Antonio Usuga David, the alleged leader of the Clan del Golfo Drug Cartel from Colombia, to face drug trafficking and continuing criminal enterprise charges. Usuga David, widely considered the most wanted drug trafficker in Colombia and perhaps the world, was the alleged leader of Clan del Golfo. Formerly known as the Clan Usuga and Los Urabeños, Clan del Golfo is a major drug trafficking organization responsible for importing thousands of kilograms of cocaine from Colombia into Central America and Mexico for ultimate importation into the United States. Clan del Golfo allegedly used violence – including murder, kidnapping, and assault – to seize, maintain, and expand its drug trafficking territory. Usuga David was arrested on October 23, 2021, pursuant to U.S. provisional arrest requests, in a major operation by the Colombian National Police (CNP) and the Colombian military in a remote part of Colombia, during which one CNP officer was killed. Former Colombian President Ivan Duque called the arrest "the biggest blow against drug trafficking in our country this century," and compared it to the fall of Pablo Escobar. OIA coordinated the provisional arrest request with U.S. prosecutors and reviewed, approved, and submitted the extradition packages through the State Department to Colombian authorities within the treaty deadline.

## *Engaging with Domestic Partners and Foreign Counterparts*



- Helping international law enforcement partners build capacity to prosecute and investigate crime within their borders by providing training and assistance; and
- Coordinating with international criminal enforcement authorities to foster operational cooperation.

The Criminal Division's prosecutors and other personnel are located in countries around the world. Posts in ten countries are maintained to foster relationships and participate in operations with international law enforcement and prosecutors. The Division also has personnel who assist foreign governments in developing and maintaining viable criminal justice institutions. Two of the Division's sections, the International Criminal Investigative Training and Assistance Program (ICITAP) and the Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT), promote cooperation in transnational criminal matters and build the capacity in partner nations to provide modern professional law enforcement services based on democratic principles and respect for human rights.

The Office of International Affairs (OIA) also plays a critical role in strengthening U.S. partnerships with foreign countries, which is essential to ensuring justice in individual criminal cases and protecting our national security. In the past few years, OIA has given increased attention to requests from foreign counterparts seeking electronic records. Attorneys from OIA's specialized Cyber Unit provide critical support to partner countries seeking electronic records from the United States by training prosecutors and investigators on applicable U.S. legal standards.

### _Select Recent Criminal Division Accomplishments in Engaging with Domestic Partners and Foreign Counterparts to Enforce the Law, Advance Public Safety, and Achieve Justice_

**International Criminal Investigative Training Assistance Program (ICITAP)** – Despite the inherent security threats following Russia's unprovoked invasion of Ukraine in February 2022, the ICITAP-Ukraine mission remained engaged both on the periphery of the national boundaries as well as within Ukraine. Shortly after the Russian invasion, ICITAP was permitted to return to Kyiv with a principal focus of assisting the National Police of Ukraine in its collaboration with the Ukrainian Prosecutor General's Office to investigate and prosecute war crimes. Prior to the invasion, ICITAP had been instrumental in developing and implementing a pilot Evidence Management System (EMS), which ICITAP continued supporting and enhancing despite the relentless challenges of war. ICITAP received reports of the remarkable success and expansion of the EMS – which is the only one of its kind in Ukraine – with the entry of a significant number of new records related to narcotics, weapons, explosives, and war crimes. ICITAP provided equipment, software, and training, and established an effective QR barcode process for the inventory of evidence and developing an equipment orientation workshop to familiarize personnel at districts with the newly received EMS equipment. The equipment will enhance the capability of the Kyiv Police Department to control and maintain the chain of custody of electronic and physical evidence for their investigations, which are increasingly related to war crimes. The EMS project aims to advance reform efforts in Ukraine by focusing on compliance with international best practice standards among NPU, State Border Guard Service, Anti-Corruption Bureau, and other law enforcement personnel.

**Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT)** – In FY 2022, OPDAT built the capacity of foreign justice partners to combat corruption and transnational organized crime consistent with Administration priorities through its Resident Legal Advisor (RLA) programs.

- In Honduras, OPDAT-mentored specialized anti-corruption prosecutors filed an indictment against seven individuals, including public officials, in a multi-million-dollar fraudulent scheme



involving the purchase of face masks for the COVID-19 pandemic. In El Salvador, OPDAT-mentored prosecutors filed an indictment against nine defendants for embezzling $16 million. OPDAT-mentored anti-money laundering prosecutors also secured a money laundering conviction against Miguel Menéndez Avelar, a principal advisor to former Salvadoran President Mauricio Funes Cartagena.

- In Romania, OPDAT assisted in developing the country's 2021-2025 National Anticorruption Strategy, which was adopted by Parliament.
- In Latvia, OPDAT supported the newly established Economic Court that handles cases of corruption, money laundering, and financial crimes. It has already been commended by the European Union for "deal[ing] efficiently with its caseload."

In addition to its anti-corruption efforts, OPDAT also provided effective anti-human smuggling assistance through its RLA programs by building the capacity of prosecutors and strengthening cross-border coordination against human smuggling organizations (HSOs).

- OPDAT RLAs supported Joint Task Force Alpha by facilitating meetings, cooperation, and information sharing between task force members and foreign counterparts. In Mexico, OPDAT assistance resulted in an OPDAT-mentored unit taking down leaders of a HSO responsible for crossing migrants into the border area of Texas. In Guatemala, OPDAT-mentored prosecutors filed charges against 15 members of a major HSO and, as part of Operation Alpha Siete, oversaw the arrest of 19 members of an HSO, including four leaders, who are pending extradition to the United States for the death of an immigrant in Texas.
- In Colombia, an OPDAT-mentored prosecutor charged 15 defendants for their involvement in the "Los Coyotes" group.



**Department of Justice**
Criminal Division

**Criminal Division Overseas Presence Map – All Sources[2]**



## Challenges to Achieving Outcomes

Many factors, both external and internal, affect the Criminal Division's capacity to accomplish its goals. While some of these factors are beyond its control, the Division strives to navigate these obstacles successfully, with an effort to minimize the negative impact these factors have on the Division's critical mission.

### External Challenges

**Globalization of Crime**: The Criminal Division has included the globalization of crime in its challenges discussion for multiple budget cycles, and is doing so again because transnational criminal activity has grown to be the new norm; the ability to successfully prosecute global crime is at the very heart of the Division's mission of investigating and prosecuting complex cases, ensuring a consistent and coordinated

---

[2] Includes direct- and program-funded in-country federal positions or active programs as of December 31, 2022.



**Department of Justice**
Criminal Division

approach to the nation's law enforcement priorities, both domestically and internationally. The Division has a national perspective on white collar crime, public corruption, cybercrime, organized crime, narcotics trafficking, violent crime, and other criminal activities that makes its unique expertise in demand for global crime work.

The Criminal Division's transnational work has consistently increased, with recent examples to include: the Division's extensive support of Task Force KleptoCapture,[3] an interagency law enforcement task force dedicated to enforcing the sweeping sanctions, export restrictions, and economic countermeasures that the United States has imposed, along with allies and partners, in response to Russia's unprovoked military invasion of Ukraine; Joint Task Force Alpha,[4] created to investigate and prosecute the international networks responsible for dangerous and prolific human smuggling activities that exploit and victimize migrants; and the Northern Triangle Anticorruption Task Force,[5] committed to combatting official corruption in countries in Central America where conduct violates U.S. law and to consistently engage in the region to address the root causes of migration.

The Division has recognized and worked to address the complexities posed by global crime. In October 2021, Deputy Attorney General Monaco announced the creation of the Criminal Division's National Cryptocurrency Enforcement Team (NCET)[6] to combine and coordinate expertise across the Department to tackle complex investigations and prosecutions of criminal misuses of cryptocurrency, particularly crimes committed by virtual currency exchanges, mixing and tumbling services, and money laundering infrastructure actors.

However, workload continues to outpace efforts to address transnational crime. Global crime investigations and prosecutions typically require significant resources, including experts witnesses and investigators, coordination and communication across the Department, the federal government, and foreign countries, and specialized technology. While the Division has devised methods to overcome some aspects of the challenges that the globalization of crime has posed, it continues to work on overcoming challenges in this area.

One area that the Division continues to address is the ability and capacity to manage the ever-increasing demand for the return of evidence, assets, and fugitives worldwide.[7] While the Division has previously highlighted specialized and mandatory efforts that the Office of International Affairs (OIA) conducts in support of the entire federal government (and at times state and local partners), other Division sections also must be raised. The Money Laundering and Asset Recovery Section (MLARS) and Computer Crime and Intellectual Property Section (CCIPS) frequently partner with OIA on several fronts. For example,

---

[3] https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-launch-task-force-kleptocapture
[4] https://www.justice.gov/opa/pr/attorney-general-announces-initiatives-combat-human-smuggling-and-trafficking-and-fight
[5] https://www.justice.gov/opa/pr/justice-department-anticorruption-task-force-launches-new-measures-combat-corruption-central
[6] https://www.justice.gov/opa/pr/deputy-attorney-general-lisa-o-monaco-announces-national-cryptocurrency-enforcement-team
[7] For example, Joint Task Force Alpha (JTFA) has a dedicated Office of International Affairs attorney that works with Human Rights and Special Prosecutions Section leadership, numerous other participating Criminal Division components, and the Southwest Border United States Attorneys' Offices on the Task Force to pursue increased extraditions and evidence from Mexico, Guatemala, Honduras, and El Salvador in order to build and prosecute significant cases. Numerous JTFA extradition requests have been filed with these countries against leadership targets during this initiative and are awaiting action by foreign authorities.



**Department of Justice**
Criminal Division

MLARS's International Assistance Team, working closely with OIA, assists U.S. prosecutors in the restraint and forfeiture of assets located abroad, litigates in U.S. courts to assist foreign governments seeking restraint and forfeiture of assets in the United States, and authorizes certain actions to forfeit funds held in correspondent accounts. The International Assistance Team also represents the Department in multilateral organizations to raise international standards for combating financial crime and provides technical assistance to foreign governments on legislation, mutual legal assistance, and best practices in anti-money laundering and forfeiture. Additionally, MLARS's Kleptocracy Team is responsible for implementing the Department's Kleptocracy Asset Recovery Initiative through investigation and litigation to recover the proceeds of foreign official corruption, including assets located outside the United States. The Kleptocracy Team also collaborates closely with OIA to coordinate with foreign law enforcement authorities.

In January 2023, CCIPS, OIA, and MLARS collaborated to achieve an 89-month sentence of a Romanian national for his role in a transnational, multimillion-dollar scheme to defraud American victims. He was the 24th member of the organized criminal group to be sentenced (28 were charged). Members of this criminal organization collectively developed a process and offered a service by which co-conspirators based in the United States and abroad would launder the proceeds of online auction fraud. They posted false advertisements to popular online auction and sales websites, such as eBay, for goods that did not actually exist. Members of the conspiracy also created fictitious online accounts to post these advertisements and communicate with victims, sometimes using the stolen identities of Americans to do so. The advertisements typically marketed the sale of used vehicles or similar goods and targeted working-class Americans. Once victims sent a payment, members of the conspiracy engaged in a complex money laundering scheme, wherein U.S.-based conspirators received victim funds, converted those funds to cryptocurrency, and transferred proceeds in the form of cryptocurrency to foreign-based money launderers.

Frequently, press releases involving global crime include acknowledgment that "the Office of International Affairs provided indispensable assistance to the investigation." OIA is indispensable to the success of the Department in many facets of its work. As the designated Central Authority for the United States, OIA's many responsibilities include seeking the apprehension and lawful return of international fugitives and the transborder gathering of evidence for national security and criminal cases on behalf of all U.S. prosecutors, federal law enforcement agencies, and state and local authorities. OIA further ensures that the United States meets its reciprocal extradition and mutual legal assistance obligations to foreign countries by responding to foreign requests for the extradition of fugitives and the production of evidence located in the United States. OIA's work is not discretionary but, rather, a mandatory and essential element in the fight against transnational crime in the United States and abroad.

As the Criminal Division continues to seek solutions for OIA's workload challenges, the United States has begun to negotiate executive agreements authorized by the CLOUD Act. To date, the United States has completed agreements with the United Kingdom and Australia, with ongoing discussions with additional countries. CLOUD Act agreements aim to apply an efficient privacy and civil liberties-protective approach to ensure effective access to electronic data that lies beyond a requesting country's reach due to the revolution in electronic communication, recent innovations in the way global technology companies configure their systems, and the legacy of 20th century legal frameworks. OIA will serve as the U.S. Designated Authority to implement CLOUD Act agreements. This new mission and role will require OIA to shift personnel and resources that would normally support mutual legal assistance and extradition work to CLOUD Act implementation. At the same time, OIA will need to maintain sufficient staffing on the traditional work streams – mutual legal assistance, extradition, and international prisoner transfer – thereby stretching existing resources. Implementation of CLOUD Act agreements is yet another example of the



ever-expanding requirements the globalization of crime has put on the entire Criminal Division, especially OIA.

The combined effects of a broad and demanding mission, limited resources, new and competing requirements, and rising transnational workloads will continue to slow down the United States's response to the globalization of crime. This issue remains a major priority for the Criminal Division, which is fully engaged in finding ways to address this growing challenge.

**Rapidly Evolving Technology**: The Criminal Division's Computer Crime and Intellectual Property Section (CCIPS) leads the Department's work on cybercrime, ransomware, cybersecurity, intellectual property theft, and obtaining electronic evidence. No other Department component works on more computer intrusion cases, ransomware cases, cryptocurrency cases, or botnet cases than the Criminal Division. CCIPS's groundbreaking prosecutions provide an evidentiary basis for other federal agencies, such as the Treasury, Commerce, and Defense Departments, to deploy their authorities – including sanctions, against malicious actors – in furtherance of a whole-of-government strategy. In addition, CCIPS builds the Department's capacity to handle more cyber cases: it develops operational support around the world on cybercrime and digital evidence to better protect Americans from foreign-based crime; develops and coordinates electronic evidence legislation, policies and litigation; and promotes public-private cybersecurity partnerships at the highest levels of the country's most important industries. The demand for these functions continues to grow as technology and technology-enabled crime continue to evolve.

Addressing rapidly evolving technology requires significant resources to meet growing workloads across cybersecurity, cryptocurrency, intellectual property, and ransomware efforts. Resource-intensive work in these evolving areas is necessary to move the Department toward addressing many of its most pressing priorities. Meeting these demands without planned resource growth over time in these areas remains the largest challenge in this space.

New and rapidly changing technologies continue to present challenges to the Criminal Division on several fronts:

- Cybercriminals use infrastructure located around the world. A cyber actor may use a server in one country to disseminate ransomware, a server in a second country to hold stolen victim information, and an email account in a third country to negotiate with victims. To obtain relevant information, law enforcement investigators often need to make multiple requests for assistance from foreign law enforcement agencies, a process that can be cumbersome and time-consuming.

- Cybercriminals use sophisticated means to conceal their identities and criminal activities. Many criminal groups host their websites on the dark web, allowing them to communicate anonymously and resist efforts to take down their sites.

- Some countries provide safe havens for actors to engage in cybercrime abroad, so long as they remain "on call" for those countries' intelligence services.

- Criminals take advantage of web hosting services, e-mail accounts, online storage accounts, and other services offered by American companies, but those companies sometimes fail to meet their obligations when criminal investigators serve them with search warrants or preservation requests. Federal law requires companies to produce information when the government serves them with a search warrant. For example, if the government obtains a warrant to search a house, agents must



search that house within days of when the magistrate signs the warrant, and usually can. But when the government serves a search warrant on a tech company, it often takes weeks, if not months, to return data. And sometimes these companies do not produce any data because they failed to preserve the relevant account. These issues hinder investigations significantly and are a major factor in criminals' ability to escape detection and apprehension.

- Cryptocurrency technology plays a role in many of the most significant criminal and national security threats the United States faces. Cryptocurrencies are used by an increasing array of bad actors to profit from their crimes and conceal their ill-gotten gains. The success of many investigations and prosecutions of crimes involving cryptocurrency often hinges on the government's ability to trace transactions. However, some types of cryptocurrencies and blockchain-related technologies make it more difficult to trace transactions and recover assets for victims and forfeiture. As a result, effective tracing of cryptocurrencies requires increasingly sophisticated blockchain analysis tools.

**Keeping Pace with Department Workload:** Two of the Division's offices, OIA and OEO, provide examples of how the Division's work is directly affected by the work of other components. Seventy-four percent of OIA's pending U.S. requests for evidence and extraditions are from the U.S. Attorneys' Offices (USAOs) across the country. Increases in USAOs' prosecutions results in increased requests for evidence and extraditions to OIA.

Likewise, OEO's work comes exclusively from the USAOs and federal investigative agencies, which rely on OEO to review Title III (wiretap) applications for Criminal Division approval in a timely manner so they can conduct electronic surveillance and gather evidence that will be admissible in court. As the investigations reviewed by OEO have become more complex and involve a greater number of issues, the resources necessary for OEO to ensure a thorough and timely review have increased, with no additional personnel to review them. The average turnaround time, which USAOs and investigative agencies require to be as quick as possible due to the nature of the work, is closely tied to the number of applications each OEO employee must review.

**Gaps in Legislation**: As the Criminal Division fulfills its mission of investigating and prosecuting cases and providing expert guidance and advice, it identifies gaps in legislation that limit its ability to seek justice for the American people. For example, some human rights-related statutes are jurisdictionally or temporally limited, and the United States still lacks a crimes against humanity Title 18 statute. Efforts to enact "CEJA" (the Civilian Extraterritorial Jurisdiction Act), legislation that would provide jurisdiction when U.S. Government civilian personnel who are not covered by the Military Extraterritorial Jurisdiction Act ("MEJA") commit crimes overseas, have stalled in Congress. Immigration crimes often have short statutes of limitations, which is challenging in matters that can take many years to come to light. In the context of human smuggling crimes, the Criminal Division has expended substantial effort to work with the USAOs and interagency partners to pursue enhanced sentencing and statutory tools for pernicious smuggling activities. Achieving many of the Department and Division's priorities depends on legislation being enacted; new legislation can take significant time to pass in Congress and requires significant resource expenditure by the Department, including its leadership offices. Therefore, one persistent external challenge that the Division faces is limited statutory tools.

### *Internal Challenges*



**Department of Justice**
Criminal Division

**Managing Information Technology and Network Risk**: Demands on the Division's information technology systems and staff are ever-increasing; attaining and securing information technology (IT), modernizing legacy systems, enhancing and expanding service capabilities, and maintaining existing systems has become increasingly difficult due to growing demands in this area, limited resources where costs are usually significant, and the difficulty in recruiting and retaining experienced and high-performing professionals. Balancing the demands of meeting legal, regulatory and policy requirements to keep the Division's IT systems safe and secure has become an exercise in risk management.

The Criminal Division has taken several steps to address this challenge. It has reviewed all existing legacy systems to develop a replacement plan to ensure the most vital, high-impact systems are the priority and are replaced by systems that will be more dynamic, cost-effective, and able to respond to changing requirements and help meet mission objectives. This is critical to the Division, as several antiquated legacy systems must be replaced in the coming years. The capabilities of these systems are increasingly divergent from the needs of the Division and the agencies with which its sections and offices work, resulting in increasingly complex data management, excessive problem resolution times, delays in service provisioning, and insufficient ability to modernize and respond quickly to mission and business requirements. In addition, maintaining and securing outdated systems requires intensive resources, thus leaving fewer resources to pursue new systems. The Division has had successes in this area, completing and implementing a new Division-wide case management system in FY 2022. The Division is also in the planning stage to replace the 20-year-old Office of International Affairs Oracle-based system, which no longer meets basic mission needs.

The demands of significant legal requirements, regulations, and policies from multiple sources has become almost unsustainable, and meeting these requirements competes with other risk-based challenges, such as insider threats. With the added challenge of maintaining a professional IT workforce and the ever-increasing costs of information technology and modernization efforts, this area has become a significant concern for the Division. Ensuring resources to fulfill these plans remains a challenge and will likely remain a challenge moving forward. However, the Division will continue to manage its resources to address these issues to the best of its ability and strives to make as much progress in this area as possible.

**Hiring, Retention, and Increasing Diversity**: Human capital, the people who make up our workforce, is the Division's most valuable asset. However, like other components across the Department, the Division has faced challenges with its human capital. The Division has invested significant time into addressing the challenges of hiring, retention, and diversity to ensure that its workforce is the best it can be to accomplish the Division's mission. These issues are consistent with those highlighted in the Top Management and Performance Challenges Facing the Department of Justice – 2022.

In addition to utilizing USAJobs, the Criminal Division has enhanced its proactive recruitment efforts and leverage other non-competitive hiring opportunities, including Schedule A, Peace Corps, VRA, Cyber Scholar, and Boren to find candidates outside the normal vacancy posting process. The Division has partnered with state governments and universities to bring details on through the Intergovernmental Personnel Act Mobility Program (IPA), which allows the Division to gain valuable talent from state governments and universities. The Division also partnered with the Department on the Urban Alliance Internship Program, an initiative focused on building a diverse next-generation workforce by providing job skills training, mentoring, and paid work experience to young adults primarily in communities of color. This program looks to level the playing field for young people in the workforce by equipping them with the tools to overcome the systemic barriers that prevent equal access to economic opportunity. The



**Department of Justice**
Criminal Division

Criminal Division has committed to hosting Urban Alliance interns during the spring and summer of 2023.

Additionally, the Division takes recruiting a diverse workforce very seriously. This can be seen in the Division's support of its Diversity Committee, which includes representation across the Division and job types, and participates in outreach and recruitment activities. In addition, the Division is significantly involved in the Department's Strategic Plan Learning Agenda questions, "where are the gaps in the demographics of the Department's workforce that do not reflect the national labor force?" and "what barriers to hiring and retention might contribute to these gaps?" which will help better inform the Department and Division's hiring.

Similarly, the Division must devote resources to remaining an attractive place for existing employees, particularly those with significant experience and who are most marketable in the private sector. The Division has recently implemented several internal retention initiatives, including a post-pandemic Worklife Policy that provides additional work/life balance options. The Division continues to generate additional approaches to maintaining a high-performing and diverse workforce.

The Division will continue to work towards improving hiring, retention, and increasing diversity to mitigate these challenges.

## Summary of Program Changes

| Item Name | Description | Positions | FTE | Amount ($000) | Page |
|---|---|---|---|---|---|
| Combat Key Drivers of Violent Crime | This enhancement will improve the Division's litigation and appellate capabilities for violent crime, especially gun-related violent crime. Additional resources are needed as these cases and investigations require extensive RICO review, and requests for assistance have increased dramatically due to the Department's emphasis on gun-related crime and the recent increase in violent criminal cases the Department oversees due to updated jurisprudence. Funding will also assist the Appellate Section in addressing their expanded portfolio which includes a larger role in counseling Department leadership and advising investigators in high-profile cases. | 15 | 8 | $2,250 | 44 |



| | | | | |
|---|---|---|---|---|
| Support International Human Rights and Joint Task Force Alpha | The requested resources will enhance the HRSP's work in the enforcement of U.S. immigration laws, especially human smuggling laws, and of the War Crimes Act, including enhanced efforts stemming from Russia's unprovoked attack in Ukraine. The positions will support Joint Task Force Alpha, and their efforts to combat the most dangerous human smuggling and trafficking networks. | 57 | 29 | $10,000 | 52 |
| Prosecuting Cybercrime and Responding to Criminal Use of Cryptocurrency | The request includes resources for CCIPS and MLARS to enhance ongoing work against ransomware, other financially motivated cybercrime, and cybercrime against individuals, as well as its ongoing investigation and prosecution of intellectual property crimes, support on critical electronic evidence issues, and whole-of-government cybersecurity initiatives. MLARS and CCIPS together have led the Department's efforts to assess and respond, through criminal enforcement as well as proposals for legal and regulatory reform, to the explosive growth in the use of cryptocurrencies by criminal actors of all stripes, including the most significant ransomware actors. | 26 | 13 | $4,000 | 59 |

## Appropriations Language and Analysis of Appropriations Language

The Criminal Division is part of the General Legal Activities (GLA) sub-appropriation in the Department of Justice's appropriation. General Legal Activities language is displayed in the GLA rollup budget submission.

## Performance Budget

This budget demonstrates how the Criminal Division's resources directly support the achievement of the Department's priorities, both nationally and internationally. It is intended to meet the requirements of the Office of Management and Budget (OMB) Circular A-11, Part 6, Section 240 *Annual Performance Planning*. The Division reports all resources under its only decision unit, "Enforcing Federal Criminal Law." Total costs represent both direct and indirect costs, including administrative functions and systems. The performance/resources tables in this section provide further detail on the Division's performance-based budget.



**Department of Justice**
Criminal Division

| ***Enforcing Federal Criminal Law*** | Direct Positions | Estimated FTE | Amount ($000) |
|---|---|---|---|
| 2022 Enacted | 752 | 752 | $205,290 |
| 2023 Enacted | 808 | 787 | $228,042 |
| Adjustments to Base and Technical Adjustments | 1 | 22 | $12,363 |
| 2024 Current Services | 809 | 809 | $240,405 |
| 2024 Program Increases | 98 | 50 | $16,250 |
| 2024 Request | 907 | 859 | $256,655 |
| **Total Change 2023-2024** | **99** | **72** | **$28,613** |

## *Enforcing Federal Criminal Law*

## Program Description

The Criminal Division's mission is to protect the American people from serious criminal activity, including transnational criminal organizations, cybercrime, child exploitation, fraud, gangs, corruption, and money laundering. The Criminal Division's specialized prosecution units develop and enforce federal criminal laws that target complex, international, and multi-district crime. The Division responds to critical and emerging national and international criminal threats and leads a coordinated, nationwide response to reduce those threats. The Criminal Division is situated at headquarters in Washington, D.C. to work in partnership with both domestic and international law enforcement. While U.S. Attorney's and state and local prosecutors serve a specific jurisdiction, the Criminal Division addresses the need for centralized coordination, prosecution, and oversight.

The Division complements the work of its foreign and domestic law enforcement partners by centrally housing subject matter experts in all areas of federal criminal law, as reflected by the 17 Sections and Offices that make up the Division's Decision Unit "Enforcing Federal Criminal Laws:"

Office of the Assistant Attorney General (OAAG)
Office of Administration (ADM)
Appellate Section (APP)
Computer Crime and Intellectual Property Section (CCIPS)
Capital Case Section (CCS)
Child Exploitation and Obscenity Section (CEOS)
Fraud Section (FRD)
Human Rights and Special Prosecutions Section (HRSP)
International Criminal Investigative Training Assistance Program (ICITAP)
Money Laundering and Asset Recovery Section (MLARS)
Narcotic and Dangerous Drug Section (NDDS)
Organized Crime and Gang Section (OCGS)
Office of Enforcement Operations (OEO)
Office of International Affairs (OIA)
Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT)
Office of Policy and Legislation (OPL)
Public Integrity Section (PIN)



**Department of Justice**
Criminal Division

The concentration of formidable expertise, in a broad range of critical subject areas, strengthens and shapes the Department's efforts in bringing a broad perspective to areas of national and transnational criminal enforcement and prevention. To capture this range of expertise, the Division's Performance and Resource Table is organized into three functional categories: prosecutions and investigations; expert guidance and legal advice; and the review of critical law enforcement tools.



FY 2024 Request ($$$)
by Strategic Goals

Goal 3 4%
Goal 4 11%
Goal 1 20%
Goal 2 65%

The Criminal Division's work contributes significantly to the Department's FY 2022-2026 Strategic Plan. As demonstrated in the chart, the Division's FY 2024 Congressional request supports four of the five strategic goals. While the Divisions' support of the Department's Strategic Plan is extensive, it does not include each strategic objective in the plan. The discussion below includes only the strategic objectives that the Division directly supports.

## Strategic Goal 1: Uphold the Rule of Law

The Criminal Division's mission is to protect the American people from serious criminal activity. To accomplish its mission, the Division joins with domestic and foreign law enforcement partners to pursue criminal investigations and prosecutions and promote the Rule of Law.

In addition, the Department has vowed to take a strategic and innovative approach to updating its management structure, training, and collaboration; to modernizing its technology; and to promoting diversity and ensuring equal employment opportunity. The Criminal Division has taken steps to address infrastructure capability gaps by attaining secure information technology, modernizing legacy systems, enhancing and expanding service capabilities, and maintaining existing systems. The Division will continue to work to ensure that antiquated legacy systems are replaced by systems that will be more dynamic, cost-effective, and able to respond to changing requirements and help meet organizational demands. In addition, the Division's Office of Administration will continue to focus its efforts on recruiting and retaining a talented and inclusive workforce, as well as cultivating a fair, flexible work environment.

*Goal 1 Resources*

| Strategic Goal | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Uphold the Rule of Law | $42,066 | $48,152 | $51,716 |

*Program Changes Affecting This Goal*
- None



**Department of Justice**
Criminal Division

## Objective 1.1 – Protect Our Democratic Institutions

*Relevant Strategies to Achieve Objective 1.1*
- Strategy 1: Reaffirm and Strengthen Policies Foundational to the Rule of Law
- Strategy 2: Protect the Justice Department from Improper Influence
- Strategy 3: Protect Public Servants from Violence and Threats of Violence
- Strategy 4: Protect the Public Fisc from Fraud on Government Programs
- Strategy 5: Combat Foreign Interference in Democratic Processes
- Strategy 6: Ensure Effective Oversight and Public Accountability

*Objective 1.1 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Protect Our Democratic Institutions | $16,493 | $19,628 | $21,151 |

*Key Performance Measures*

- The number of criminal government program fraud cases where the proactive use of data led to the opening of an investigation by the Criminal Division.

This performance measure is targeted in FY 2023 at 50 cases. The Criminal Division developed baseline data for this measure in FY 2022, and the FY 2023 target is based on this baseline data.

- The number of U.S. Attorneys' Offices that received proactive data leads in criminal government fraud cases from the Criminal Division.

This performance measure is targeted in FY 2023 at 45 cases. The Criminal Division developed baseline data for this measure in FY 2022, and the FY 2023 target is based on this baseline data.

*Objective 1.1 Accomplishments*
- **Health Care Fraud** - The Fraud Section's Healthcare Fraud Unit (HCF) coordinated three separate, targeted enforcement actions during FY 2022: (1) COVID-19 Health Care Fraud; (2) Opioid Crimes; and (3) Telemedicine, Clinical Laboratory, and Durable Medical Equipment Fraud. These enforcement actions were conducted on April 20, May 4, and July 20, 2022, respectively. In the 2022 COVID-19 Health Care Fraud Enforcement Action, criminal charges were brought against 21 defendants for their alleged participation in various health care related fraud schemes that exploited the COVID-19 pandemic. These cases resulted in over $149 million in COVID-19-related false billings to federal programs and theft from federally funded pandemic assistance programs. In the 2022 Opioid Enforcement Action, criminal charges were brought against 14 defendants (12 medical professionals) for their alleged involvement in crimes related to the illegal distribution of approximately 6 million opioid pills, health care fraud related to urine drug screening, and other schemes. This included charges against a Kentucky dentist with the illegal distribution of opioids resulting in a death of his patient. In



**Department of Justice**
Criminal Division

the 2022 Telemedicine, Clinical Laboratory, and Durable Medical Enforcement Action, criminal charges were brought against 36 defendants for more than $1.2 billion in alleged fraudulent telemedicine, cardiovascular and cancer genetic testing, and durable medical equipment schemes.

- **Federal Programs Fraud** - The Fraud Section's Market Integrity and Major Frauds (MIMF) Unit continued to spearhead efforts to combat fraud involving federal programs. In FY 2022, CRM's MIMF prosecutors secured guilty pleas from seven defendants in three separate cases in schemes to defraud the Department of Veterans Affairs (VA) Post-9/11 GI Bill education benefits program. These efforts included guilty pleas by, among others, a CEO and Director-level employee of a VA-approved educational institution who defrauded the federal government of more than $100 million, which is the largest known Post-9/11 GI Bill fraud case ever brought by the Department. Separately, CRM's MIMF prosecutors secured guilty pleas from five defendants who conspired to defraud the Department of Education's financial-aid programs by creating an elaborate sham university, resulting in millions of dollars of losses to the federal government. In addition, MIMF continued its initiative to combat fraud in connection with CARES Act funds by leading prosecutions in a wide range of cases, including cases focused on large fraud rings. To date, CRM's Fraud Section and its law-enforcement partners have charged more than 192 defendants in cases related to CARES Act programs and seized more than $78 million in cash proceeds together with numerous real-estate properties and luxury items purchased with such proceeds.

### *Objective 1.2 – Promote Good Government*

*Relevant Strategies to Achieve Objective 1.2*
- Strategy 1: Achieve Department Management Excellence Through Innovation
- Strategy 2: Foster a High-Performing Workforce that Represents the Public We Serve
- Strategy 3: Implement Department-wide Data and Technology Modernization

*Objective 1.2 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
| --- | --- | --- | --- |
| Promote Good Government | $25,573 | $28,524 | $30,565 |

*Objective 1.2 Accomplishments*
- The Criminal Division's Office of Administration (ADM) completed a significant legacy IT system replacement by developing and rolling out a new Division-wide case management system. This modernized an antiquated system central to the organization's mission, offering updated and streamlined functionality for all Division users, replacing a system that was over 20 years old and could no longer be supported. The new case management system provides users with a simplified data entry process, easier system navigation, and standardized reporting functions. The Division also implemented a customized reporting function that will significantly improve abilities to produce data requested by sections or Division and Department leadership.

## *Strategic Goal 2: Keep Our Country Safe*



**Department of Justice**
Criminal Division

Protecting our national security from both foreign actors and insider threats remains one of the highest priorities of the Department of Justice. From combating the threat of international terrorism to prosecuting and coordinating complex money laundering and asset forfeiture cases, the Criminal Division plays a critical and substantial role in furthering this Department goal.

The Department recognizes that the most efficient and effective means of fighting terrorism is to communicate, coordinate, and cooperate with our partners, including foreign partners and multilateral organizations. The Division directly supports these efforts through the work of its international programs, ICITAP and OPDAT, which work with foreign governments to develop professional and transparent law enforcement institutions and to reform their justice systems with the goals of building the capacity of our foreign partners to combat transnational crime and terrorism before those threats reach our shores.

Beyond the Division's two international programs, a large portion of the Division's work has a strong national security nexus. OIA, the nerve center for international criminal law enforcement coordination, is vital to the Department's ability to fight terrorism in cooperation with our partners. Other sections in the Criminal Division share a national security nexus given the globalization of crime. A recent example of this is the October 24, 2022 sentencing of the Barrio Azteca gunmen directly responsible for the March 2010 murders in Juarez, Mexico of a U.S. Consulate employee, her husband, and the husband of another U.S. Consulate employee. Barrio Azteca was proven to be a transnational criminal organization engaged in money-laundering, racketeering, and drug-related activities in El Paso, Texas, and the two gang members were sentenced to life in prison after being convicted in February 2022 on all counts related to the murders. Several Criminal Division sections contributed to this case, including HRSP, OEO, OIA, and OCGS.

As technology rapidly develops, the digital threats our nation faces are more diverse, more sophisticated, and more dangerous. These threats require the Department to leverage our unique authorities and expand our capabilities, resources, and collaboration with partners to counter threat actors and enhance cybersecurity. In direct support of the Department's plan to develop investigations, prosecutions, and policy that complement and strengthen efforts to disrupt cyber threats, MLARS and CCIPS together have led the Department's efforts to respond — through criminal enforcement as well as proposals for legal and regulatory reform. The sections' work has been critical in bringing to justice those malicious cyber actors who commit digital attacks, as well as in dismantling the online infrastructures that facilitate those attacks.

*Goal 2 Resources*

| Strategic Goal | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
| --- | --- | --- | --- |
| Keep Our Country Safe | $133,889 | $145,370 | $166,783 |

*Program Changes Affecting This Goal*
- Combat Key Drivers of Violent Crime
- Support for International Human Rights and Task Force Alpha
- Prosecuting Cybercrime and Responding to Criminal Use of Cryptocurrency



**Department of Justice**
Criminal Division

*Objective 2.1 – Protect National Security*

*Relevant Strategies to Achieve Objective 2.1*
- Strategy 1: Combat Foreign Malign Influence
- Strategy 2: Counter Foreign Espionage
- Strategy 3: Prevent the Theft of Technology and Intellectual Property
- Strategy 4: Protect Sensitive Assets

*Objective 2.1 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Protect National Security | $6,255 | $6,632 | $7,877 |

*Objective 2.1 Accomplishments*
- On May 9, 2022, Xiaorong You, aka Shannon You, was sentenced to 168 months in prison for a scheme to steal trade secrets, engage in economic espionage and commit fraud. The defendant stole valuable trade secrets and intended to use them to benefit not only a foreign company, but also the government of China. The stolen trade secrets belonged to major chemical and coating companies and cost nearly $120 million to develop. You stole the trade secrets to set up a new BPA-free coating company in China. You and her Chinese corporate partner, Weihai Jinhong Group, received millions of dollars in Chinese government grants to support the new company (including a Thousand Talents Plan award). You's Thousand Talents Program application and other evidence presented at trial showed that she intended to benefit not only Weihai Jinhong Group, but also the governments of China, the Chinese province of Shandong, the Chinese city of Weihai and the Chinese Communist Party. This case was prosecuted by CCIPS in partnership with the Eastern District of Tennessee U.S. Attorney's Office and the National Security Division's Counterintelligence and Export Control Section.

- International Computer Hacking and Intellectual Property Advisors (ICHIPs), managed jointly by CCIPS and OPDAT, developed cross-border networks throughout the world to help foreign partners combat cybercrime and intellectual property violations, including those related to transnational organized crime. For example:

  o Members of the ICHIP U.S.-European Cryptocurrency Working Group traced more than 160,271 Bitcoins (equal to approximately $6 billion) related to criminal activity, issued four arrest warrants, and returned approximately $273,000 in restitution to victims of cybercrime. Current members include Bulgaria, Croatia, Estonia, Latvia, Lithuania, North Macedonia, Romania and Serbia.

  o A member of the ICHIP Africa Regional Pharma Crime Working Group reported seizures of over 1 million counterfeit Pregabalin and 200 kilograms of cocaine. Current members include Benin, Botswana, Burundi, Chad, Cote d'Ivoire, Democratic Republic of the Congo, Gabon, The Gambia, Ghana, Kenya, Liberia, Malawi, Morocco, Namibia, Niger, Nigeria, Republic of the Congo, Rwanda, Senegal, Sierra Leone, South Africa, Tanzania, Togo, Uganda, and Zambia.



o ICHIPs helped Uruguay and the Maldives join the G7 24-7 High Tech Crimes Digital Evidence Sharing Network – a worldwide an informal network that provides high-tech expert contacts to assist in preserving and sharing digital evidence.

### Objective 2.2 – Counter Foreign and Domestic Terrorism

*Relevant Strategies to Achieve Objective 2.2*
- Strategy 1: Deter, Disrupt, and Prosecute Terrorist Threats
- Strategy 2: Strengthen Federal, State, Local, Tribal, and International Counterterrorism Partnerships

*Objective 2.2 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Counter Foreign and Domestic Terrorism | $11,372 | $12,165 | $14,444 |

*Objective 2.2 Accomplishments*
- OPDAT is working with key partner countries to support civilian justice sector actors as they deal with the complexities of Foreign Terrorist Fighters returning on their own or through repatriation. OPDAT teams work with justice sector partners to utilize publicly available information as well as Collected Enemy Material / Battlefield Evidence (CEM/BE) pulled from conflict zones, terrorist safe havens, and attack sites globally so they are able to successfully identify, investigate, interdict, and prosecute terrorists operating or detained within their country. Through close coordination, training, and mentorship, OPDAT works with counterterrorism law enforcement teams and prosecutorial organizations to create an advanced cadre of data analysts, law enforcement personnel and criminal justice experts who can capably triage, share, investigate and prosecute terrorism crimes through use of evidence.

- In the Balkans, OPDAT-mentored prosecutors obtained 22 convictions of terrorists and foreign terrorist fighters, bringing the total number of convictions since 2015 to 272, including 33 women for their role in supporting or participating in terrorist activity. Critical to this effort was utilizing battlefield evidence (collected enemy material).

### Objective 2.3 – Combat Violent Crime and Gun Violence

*Relevant Strategies to Achieve Objective 2.3*
- Strategy 1: Target the Most Significant Violent Crime Problems
- Strategy 2: Enhance Partnerships with Federal, State, Local, and Tribal Law Enforcement
- Strategy 3: Invest in Community-Based Programs to Prevent Violence

*Objective 2.3 Resources*



**Department of Justice**
Criminal Division

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Combat Violent Crime and Gun Violence | $41,643 | $46,196 | $53,160 |

*Key Performance Measure*

- Percent of Federal violent crime defendants' cases favorably resolved.

This performance measure is targeted in FY 2023 at 90%. In FY 2022, the Division achieved 97% of this target.

*Objective 2.3 Accomplishments*
- On April 20, 2022, OCGS and the U.S. Attorney's Office for the Central District of California secured an indictment of 31 defendants for Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, Violent Crime in Aid of Racketeering (VICAR) Murder, VICAR attempted murder, VICAR assault, narcotics conspiracy, and associated firearms charges. The defendants were all members and associates of the Orange County Mexican Mafia, or La Eme, a powerful umbrella gang that controlled numerous other Southern California Sureños gangs. Often working from inside state prison, the defendants levied taxes to allow drug sales to occur in territories they controlled outside of prison, ordered intimidation of witnesses and suspected cooperators, ordered murders, and controlled the drug trade inside and outside of prison. The takedown took place on April 27, 2022.

- On August 28, 2022, OCGS and the U.S. Attorney's Office for the Southern District of Texas secured an indictment charging 10 defendants, all members and associates of La Mara Salvatrucha, or MS-13, with RICO conspiracy, VICAR murder, VICAR conspiracy to commit murder, use of a firearm resulting in death, and related crimes. Among other things, the indictment alleges that the defendants murdered seven people, including a 14- year-old girl, a 17-year-old boy, and an active HSI informant, all on behalf of the transnational criminal organization MS-13. Defendants include two leaders of the gang currently incarcerated in El Salvador.

### Objective 2.4 – Enhance Cybersecurity and Fight Cybercrime

*Relevant Strategies to Achieve Objective 2.4*
- Strategy 1: Deter, Disrupt, and Prosecute Cyber Threats
- Strategy 2: Strengthen Interagency, Intergovernmental, International, and Private Sector Partnerships
- Strategy 3: Safeguard Justice Department Systems
- Strategy 4: Enhance Cyber Resilience Outside the Department

*Objective 2.4 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Enhance Cybersecurity and Fight Cybercrime | $30,064 | $31,788 | $36,376 |



Department of Justice
Criminal Division

*Objective 2.4 Accomplishments*

- On October 4, 2022, Canadian national Sebastian Vachon-Desjardins, 35, of Gatineau, Quebec, was sentenced to 20 years in prison and ordered to forfeit $21,500,000 for his role in NetWalker ransomware attacks. According to court documents, Vachon-Desjardins participated in a sophisticated form of ransomware known as NetWalker. NetWalker ransomware has targeted dozens of victims all over the world, including companies, municipalities, hospitals, law enforcement, emergency services, school districts, colleges, and universities. Attacks have specifically targeted the healthcare sector during the COVID-19 pandemic, taking advantage of the global crisis to extort victims. Vachon-Desjardins was extradited to the United States pursuant to the extradition treaty between the United States and Canada. Pursuant to a request submitted by U.S. authorities, Canadian law enforcement officers arrested Vachon-Desjardins in Gatineau, Quebec, on Jan. 27, 2021, and executed a search warrant at Vachon-Desjardins's home in Gatineau. During the search, officers discovered and seized $742,840 in Canadian currency and 719 Bitcoin, valued at approximately $21,849,087 at the time of seizure and $14,463,993 as of the time of sentencing. This case was prosecuted by CCIPS in partnership with the U.S. Attorney's Office for the Middle District of Florida.

- On November 10, 2022, a dual Russian and Canadian national, Mikhail Vasiliev, was charged for their alleged participation in the LockBit global ransomware campaign. LockBit is a ransomware variant that first appeared in or around January 2020. It has become one of the most active and destructive ransomware variants in the world. Since first appearing, LockBit has been deployed against at least as many as 1,000 victims in the United States and around the world. LockBit members have made at least $100 million in ransom demands and have extracted tens of millions of dollars in actual ransom payments from their victims. The arrest is the result of over two-and-a-half-years investigation into the LockBit global ransomware group involving the Justice Department and international partners. This case is being prosecuted by CCIPS in partnership with the U.S. Attorneys' Offices for the Northern District of Georgia and Western District of Pennsylvania.

## Objective 2.5 – Combat Drug Trafficking and Prevent Overdose Deaths

*Relevant Strategies to Achieve Objective 2.5*

- Strategy 1: Disrupt and Dismantle Drug Trafficking Organizations
- Strategy 2: Reduce Deaths and Addiction Driven by Drug Crime
- Strategy 3: Expand Access to Evidence-Based Prevention and Treatment

*Objective 2.5 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Combat Drug Trafficking and Prevent Overdose Deaths | $29,386 | $31,753 | $35,857 |

*Objective 2.5 Accomplishments*

- NDDS continues to target the leadership structure of the Cártel de Jalisco Nueva Generación (CJNG), as well as CJNG's ability to obtain precursor chemicals and manufacture and import of



methamphetamine and fentanyl. In Operation Stir the Pot, on April 5, 2022 NDDS obtained a third superseding indictment against the leader of the CJNG, CPOT Nemesio Oseguera Cervantes, also known as "El Mencho," which added Continuing Criminal Enterprise (CCE) violations relating to the distribution and manufacture of fentanyl for importation into the United States and importation of a listed chemical for use in the manufacture of methamphetamine for unlawful importation into the U.S., and also added fentanyl to the substances charged in the Section 959(a) conspiracy count. The third superseding indictment charging El Mencho, which also includes firearms and other substantive drug-trafficking charges, now reflects the full scope of his criminal activity and is current through 2022.

- NDDS secured the extradition of Jose Gonzalez Valencia, also known as "Chepa," from Brazil in November 2021, and he is currently scheduled to be tried jointly with his brother Gerardo Gonzalez Valencia (extradited from Uruguay), also known as "Lalo," in the District of Columbia on cocaine-distribution conspiracy charges in January 2023. Gerardo and Jose Gonzalez Valencia—along with their brother CPOT Abigael—were leaders of the Mexican drug trafficking organization known as "Los Cuinis," which works closely with the CJNG.

### *Objective 2.6 – Protect Vulnerable Communities*

*Relevant Strategies to Achieve Objective 2.6*
- Strategy 1: Promote and Improve Programs for Victims of Crime
- Strategy 2: Combat Gender-Based Violence
- Strategy 3: Protect Children from Crime and Exploitation
- Strategy 4: Fight Elder Fraud, Abuse, and Exploitation
- Strategy 5: Promote Safety and Justice in Indian Country
- Strategy 6: Protect Communities from Hate Crimes

*Objective 2.6 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Protect Vulnerable Communities | $15,169 | $16,836 | $19,069 |

*Objective 2.6 Accomplishments*
- There are numerous sites operating openly and notoriously on Tor (a key anonymity network within the Dark Web) dedicated to child sexual abuse material (CSAM). Some of these sites are exclusively dedicated to the sexual abuse of infants and toddlers, or the violent, sadistic abuse of minors. The sites often expand rapidly, some obtaining tens of thousands of new members within weeks.

  To combat this threat, CEOS continued to lead and coordinate strategic enforcement operations and/or prosecutions including those involving Arlan Harrell, John Brinson, Moises Martinez, and Keith Lawniczak who were active members of several Tor-network-based child exploitation websites, including "BabyHeart," which was dedicated to the sexual exploitation of children under age five, and they repeatedly met together in California to sexually abuse children and produce child sexual abuse material (CSAM). Lawniczak was sentenced to 12 years imprisonment after pleading guilty to conspiracy to commit sex trafficking of a minor. Martinez pled guilty to engaging in a child



exploitation enterprise and was sentenced to 55 years imprisonment. Harrell and Brinson pled guilty to engaging in a child exploitation enterprise and were sentenced to lifetime imprisonment.

- Similarly, CEOS worked closely with the FBI, HSI and foreign partners to identify other potential Darkweb targets, quickly obtain necessary legal process to further investigative efforts, and identify and arrest offenders, to include:
    1) Robert Shouse, who is currently charged by CEOS and the U.S. Attorney's Office for the Southern District of Texas with production and possession of child pornography related to images he produced of a pubescent minor;
    2) James Umbaugh, a non-compliant sex offender who had previously been federally convicted for receiving child pornography, who is currently charged by CEOS and the U.S. Attorney's Office for the Northern District of Illinois with possession of child pornography, and was determined to have also been a global moderator of the Playpen website that was the subject of FBI Operation Pacifier;
    3) Brian Compton who was prosecuted by CEOS and the U.S. Attorney's Office for the District of New Mexico and sentenced in March 2022 to 84 months imprisonment to be followed by 10 years of supervised release for possession of child pornography;
    4) Robert Tallent who was prosecuted by CEOS and the U.S. Attorney's Office for the Eastern District of Tennessee and sentenced October 2021 to 78 months in prison to be followed by 15 years of supervised release for possessing child pornography;
    5) James Brennan who is being prosecuted by CEOS and the U.S. Attorney's Office for the District of Delaware and pled guilty in February 2022 to production of child pornography and is pending sentencing; and
    6) Korey Schulein who was prosecuted by CEOS and the U.S. Attorney's Office for the Southern District of Indiana and was sentenced in September 2021 to 151 months in prison for receiving child pornography. These investigations have also found and safeguarded multiple minor children, some of whom had themselves become users of these Tor network child exploitation forum and chat sites and were victims of exploitation by the site users.

- There has been a recent dramatic rise in the number of incidents in which children are caused by an offender, whether through deception, trickery, threats, enticement, or other means, to record, photograph, or livestream themselves engaging in sexual activity. Offenders use video-conference and web cam technology to sexually exploit children, such as through "live sex shows" where offenders gather on a platform to watch an adult sexually assault a minor and to make requests for particular acts; "virtual child sex trafficking" where offenders make online payments to adults overseas (often in the Philippines) who will then livestream a minor engaged in sexual conduct; "crowdsourced" child sexual exploitation in which conspirators leverage their numbers and collaborate to sexually exploit hundreds of children by posing as same-age peers and tricking tweens and teens into sharing sexually explicit material – oftentimes exploiting hundreds of children all over the world; and "sextortion" in which offenders coerce minors to engage in sex acts before a webcam. CEOS continued to lead investigative and prosecutorial efforts to address these crimes, including the one described below.
    o *United States v. Jacob Eric Blanco* (E.D. Ca.). Blanco was sentenced in October 2021 to 55 years of imprisonment after an earlier guilty plea to five counts of production and one count of receipt of child pornography. Blanco's activities initially came to light in 2017, when the parents of a then six-year-old minor discovered that the child had communicated with and created sexually explicit images at the request of another user on the social media application Musical.ly (now TikTok). Investigators identified the user as Blanco. Examination of Blanco's digital media revealed that he had successfully persuaded and



coerced multiple minors to produce sexually explicit material. Blanco accomplished this by using various methods of deception and enticement, including by pretending to be a modeling agent or a minor himself. Blanco used Snapchat, Kik, Musical.ly, and other applications to communicate with minor females for the purpose of having those minors create and transmit to him images of those minors engaged in sexually explicit conduct. In his interview with law enforcement, Blanco admitted that he communicated with at least 50 minors, which admission was corroborated by the communications and images stored on his digital media.

## Strategic Goal 3: Protect Civil Rights

### Goal 3 Resources

| Strategic Goal | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Protect Civil Rights | $8,575 | $9,330 | $10,481 |

### Program Changes Affecting This Goal
- None

### Objective 3.1 – Protect the Right to Vote

*Relevant Strategies to Achieve Objective 3.1*
- Strategy 1: Enforce Federal Laws that Protect Voting Rights
- Strategy 2: Safeguard Fair Elections
- Strategy 3: Increase Ballot Access for Eligible Voters

*Objective 3.1 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Protect the Right to Vote | $3,845 | $4,243 | $4,584 |

*Key Performance Measure*

- Percent of cases prosecuting threats of violence and intimidation against election officials that are favorably resolved.

This performance measure is targeted in FY 2023 at 75%. The Criminal Division developed baseline data for this measure in FY 2022, and the FY 2023 target is based on this baseline data.

*Objective 3.1 Accomplishments*



Department of Justice
Criminal Division

- On October 6, 2022, Travis Ford, from Nebraska, was sentenced to 18 months in prison for making multiple threatening posts on an Instagram page associated with an election official, the President of the United States, and with another public figure. This case is part of the Justice Department's Election Threats Task Force which is led by the Criminal Division's Public Integrity Section (PIN) and was established in June 2021. The Task Force has led the department's efforts to address threats of violence against election workers, and to ensure that all election workers — whether elected, appointed, or volunteer — are able to do their jobs free from threats and intimidation. The Task Force engages with the election community and state and local law enforcement to assess allegations and reports of threats against election workers, and has investigated and prosecuted these matters where appropriate, in partnership with FBI field offices and U.S. Attorneys' Offices throughout the country.

### *Objective 3.2 – Combat Discrimination and Hate Crimes*

*Relevant Strategies to Achieve Objective 3.2*
- Strategy 1: Enforce Federal Anti-Discrimination Laws
- Strategy 2: Deter and Prosecute Hate Crimes
- Strategy 3: Leverage Resources to Prevent Hate Crimes
- Strategy 4: Support State and Local Partners in Combating Discrimination and Hate

*Objective 3.2 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Combat Discrimination and Hate Crimes | $3,124 | $3,272 | $3,823 |

### *Objective 3.3 – Reform and Strengthen the Criminal and Juvenile Justice Systems*

*Relevant Strategies to Achieve Objective 3.3*
- Strategy 1: Promote Trust Between Communities and Law Enforcement
- Strategy 2: Improve Law Enforcement Transparency and Accountability
- Strategy 3: Reform Charging and Sentencing Practices
- Strategy 4: Promote Innovation and Reform in the Criminal and Juvenile Justice System

*Objective 3.3 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Reform and Strengthen the Criminal and Juvenile Justice Systems | $1,606 | $1,815 | $2,074 |



**Department of Justice**
Criminal Division

## *Strategic Goal 4: Ensure Economic Opportunity and Fairness for All*

One of the Department's top priorities is to ensure that all people living in the United States deserve safe communities and a fair economy free from unlawful corporate conduct. The Criminal Division furthers this Department's goal by prosecuting financial and corporate crime. The Fraud Section, which investigates and prosecutes complex white-collar crime cases throughout the country, is a national leader in the Department's fight against sophisticated economic crime.

*Goal 4 Resources*

| Strategic Goal | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Ensure Economic Opportunity and Fairness for All | $20,760 | $25,190 | $27,675 |

*Program Changes Affecting This Goal*
- Prosecuting Cybercrime and Responding to Criminal Use of Cryptocurrency

### *Objective 4.1 – Reinvigorate Antitrust Enforcement and Consumer Protection*

*Relevant Strategies to Achieve Objective 4.1*
- Strategy 1: Investigate and Prosecute Violations of the Antitrust Laws
- Strategy 2: Promote Competitive Markets
- Strategy 3: Reinvigorate Consumer Protection

*Objective 4.1 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Reinvigorate Antitrust Enforcement and Protect Consumers | $907 | $971 | $1,260 |

### *Objective 4.2 – Combat Corruption, Financial Crime, and Fraud*

*Relevant Strategies to Achieve Objective 4.2*
- Strategy 1: Deter and Prosecute Corporate Crime
- Strategy 2: Combat Public Corruption
- Strategy 3: Combat Corporate Corruption and Advance International Anti-Corruption Efforts



Department of Justice
Criminal Division

*Objective 4.2 Resources*

| Strategic Objective | FY 2022 Enacted ($$$) | FY 2023 Enacted ($$$) | FY 2024 Total Request ($$$) |
|---|---|---|---|
| Combat Corruption, Financial Crime, and Fraud | $19,853 | $24,219 | $26,415 |

*Key Performance Measures*

- Percent of corporate criminal resolutions containing compliance reporting obligations that are evaluated by DOJ at least annually.

This performance measure is targeted in FY 2023 at 95%. The Criminal Division developed baseline data for this measure in FY 2022, and the FY 2023 target is based on this baseline data.

- Percent of corporate criminal cases in which individual responsibility was evaluated.

This performance measure is targeted in FY 2023 at 95%. The Criminal Division developed baseline data for this measure in FY 2022, and the FY 2023 target is based on this baseline data.

*Objective 4.2 Accomplishments*

- **Commodities Fraud** - In FY 2022, the Fraud Section continued its emphasis on prosecuting fraud and manipulation in the commodities markets. In a high-profile trial in the U.S. Attorney's Office for the Northern District of Illinois, MIMF Unit prosecutors convicted two former director-level JPMorgan employees who participated in a scheme to manipulate the price of gold and silver futures contracts traded on the Chicago Mercantile Exchange. Their trial convictions followed earlier guilty pleas by two other former members of the same trading desk, as well as a related Deferred Prosecution Agreement entered in September 2020 in which JPMorgan agreed to pay approximately $920 million. Separately, the MIMF Unit and the U.S. Attorney's Office for the District of Connecticut secured a corporate guilty plea in the District of Connecticut from Glencore Ltd., the U.S. arm of one of the world's largest commodities mining and trading companies. In pleading guilty, Glencore admitted that its traders manipulated the benchmark price of fuel oil traded in two of the largest commercial ports in the U.S. and agreed to pay approximately $485 million. In addition, the MIMF Unit and the U.S. Attorney's Office for the District of Connecticut secured another corporate guilty plea in the District of Connecticut from NatWest, a U.K.-based global banking and financial-services firm. In pleading guilty, NatWest admitted that its traders perpetrated fraud schemes in the markets for U.S. Treasuries securities and futures contracts and agreed to pay approximately $35 million.

- **Cryptocurrency Fraud** - The Fraud Section's MIMF Unit prosecuted a wide array of frauds in the cryptocurrency markets in FY 2022. To date, MIMF prosecutors have charged eight defendants in six separate cases in high-dollar and high-impact cases, including the largest-known Non-Fungible Token (NFT) scheme charged to date and a fraudulent initial coin offering. As part of this effort, MIMF prosecutors secured the guilty plea of the "Head Trader" for EmpiresX, a purported cryptocurrency platform, in a scheme that took in approximately $100 million from investors. MIMF prosecutors also charged two CEOs of purported cryptocurrency investment platforms with orchestrating investment fraud schemes of international scope. In addition, MIMF prosecutors charged the founder of



Department of Justice
Criminal Division

BitConnect with perpetrating a $2.4 billion global cryptocurrency Ponzi scheme; in that case, $56 million in fraud proceeds were seized in the largest-known single recovery of a cryptocurrency fraud by the United States to date. Separately, the Criminal Division stood up the National Cryptocurrency Enforcement Team (NCET), made up of experts in the Criminal Division who can advise and coordinate on digital asset cases and stood up the Digital Asset Coordinator network across the Department of Justice to ensure that subject matter experts are ready in all litigating components and U.S. Attorneys' Offices to handle the complexities of digital asset cases and that the coordinators have a network of peers whose experience they can draw upon.

- **Foreign Bribery** - The Fraud Section's Foreign Corrupt Practices Act (FCPA) Unit is responsible for investigating and prosecuting violations of the FCPA.

  In FY 2022, the FCPA Unit resolved four corporate cases, resulting in approximately $669.8 million in fines, penalties, and forfeiture, and approximately $1.3 billion in global fines, penalties, forfeiture, and disgorgement; announced charges against 27 individuals; and secured guilty pleas/convictions of 18 individuals.

  In a matter handled by the FCPA Unit, as well as MLARS and the U.S. Attorney's Office for the Southern District of New York, in May 2022 Glencore International AG, a Swiss-based commodities trading and mining company, pleaded guilty to conspiring to violate the FCPA in connection with conduct in seven countries, including Nigeria, the Democratic Republic of the Congo, Ivory Coast, Equatorial Guinea, Cameroon, Brazil, and Venezuela. Pursuant to the resolution, Glencore agreed to plead guilty and to pay a criminal penalty and forfeiture amounting to approximately $700 million, as well as the imposition of an independent compliance monitor. As with many cases in recent years, the DOJ's FCPA Unit coordinated the Glencore resolution with domestic and foreign authorities and credited portions of the criminal penalty and forfeiture; among these authorities are the United Kingdom's Serious Fraud Office, the Brazilian Ministério Público Federal (MPF), as well as the Commodity Futures Trading Commission (CFTC).

  In another corporate matter handled by the FCPA Unit in FY 2022, Stericycle Inc., an international waste management company headquartered in Illinois, entered into a three-year deferred prosecution agreement (DPA) in connection with a two-count criminal information alleging that the company conspired to violate the FCPA in connection with bribe payments to foreign officials at various government agencies and instrumentalities in Brazil, Mexico, and Argentina. As part of the scheme, the company paid hundreds of bribes totaling $10.5 million and earned at least $21.5 million in profits. The DPA also requires the company to retain a compliance monitor for a period of two years in order to continue to enhance the company's compliance program and controls. Stericycle agreed to pay $52.5 million pursuant to the DOJ resolution, of which the Department is crediting payments the company makes pursuant to resolutions with Brazilian authorities. In addition, Stericycle resolved a related investigation by the SEC.

  Also in FY 2022, after an eight-week trial in the Eastern District of New York, a jury convicted Roger Ng, a former managing director of various subsidiaries at Goldman Sachs, of all three counts for his participation in an egregious bribery, money laundering, and embezzlement scheme relating to 1MDB, Malaysia's state-owned fund that was created to pursue investment and development projects for the economic benefit of Malaysia and its people. During the trial, prosecutors from the Fraud Section, the Eastern District of New York, and the Money Laundering and Asset Recovery Section, presented evidence of how Ng and his co-conspirators laundered billions of dollars that were fraudulently diverted



**Department of Justice**
Criminal Division

from 1MDB and paid bribes of more than $1 billion to senior government officials in Malaysia and the United Arab Emirates to assist Goldman Sachs in winning certain lucrative bond transactions. Through emails and bank records obtained during the investigation, prosecutors also presented evidence that Ng personally made approximately $35 million as a result of the scheme.

*Performance and Resource Tables*

### PERFORMANCE MEASURE TABLE
#### Decision Unit: Enforcing Federal Criminal Laws

| Performance Report and Performance Plan Targets | | Applicable Strategic Objective(s) | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Actual | Actual | Actual | Actual | Target | Actual | Target | Target |
| **Performance Measures** | Number of Legislative and Policy Analysis Matters Completed | 1.1, 1.2, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 3.1, 3.2, 3.3, 4.1, 4.2 | 7,851 | 8,269 | 9,607 | 11,773 | 8,826 | 12,439 | 10,569 | 10,569 |
| | Number of Programmatic Coordination Activities | | 18,137 | 17,149 | 17,646 | 28,442 | 15,113 | 29,848 | 25,727 | 25,727 |
| | Number of Legal Advisory Matters | | 27,653 | 36,996 | 41,235 | 32,501 | 32,202 | 30,549 | 31,103 | 31,103 |
| | Number of Training Sessions/Presentations | | 5,234 | 4,525 | 7,187 | 5,799 | 4,330 | 5,074 | 4,392 | 4,392 |
| | Number of Mandatory Reviews Completed | | 28,060 | 29,227 | 35,360 | 38,166 | 35,218 | 39,210 | 42,490 | 42,490 |
| | Favorably Resolved[1] Criminal Prosecutions | | 99% | 99% | 96% | 100% | 90% | 90% | 90% | 90% |
| | Favorable Resolved[1] Civil Prosecutions | | 100% | 100% | 100% | 100% | 80% | 80% | 80% | 80% |
| **Key Performance Indicators** | The number of criminal government program fraud cases where the proactive use of data led to the opening of an investigation by the Criminal Division. | 1.1 | N/A | N/A | N/A | N/A | N/A | 50 | 50 | 50 |
| | The number of U.S. Attorney's Offices that received proactive data leads in criminal government fraud cases from the Criminal Division. | 1.1 | N/A | N/A | N/A | N/A | N/A | 45 | 45 | 45 |
| | Percent of Federal violent crime defendants' cases favorably resolved | 2.3 | 94% | 100% | 97% | 100% | 90% | 97% | 90% | 90% |
| | Percent of cases prosecuting threats of violence and intimidation against election officials that are favorably resolved. | 3.1 | N/A | N/A | N/A | N/A | 75% | 100% | 75% | 75% |
| | Percent of corporate criminal resolutions containing compliance reporting obligations that are evaluated by DOJ at least annually. | 4.2 | N/A | N/A | N/A | N/A | 95% | 100% | 95% | 95% |
| | Percent of corporate criminal cases in which individual responsibility was evaluated. | 4.2 | N/A | N/A | N/A | N/A | 95% | 100% | 95% | 95% |

[1]Defendants whose cases were favorably resolved include those defendants whose cases resulted in court judgments favorable to the government, such as convictions after trial or guilty pleas. Favorable resolution is measured at the defendant level and reported at the conviction stage of the case.



Department of Justice
Criminal Division

## Performance, Resources, and Strategies

The Criminal Division utilizes a number of strategies and resources to achieve its mission of enforcing federal criminal law, detecting criminal misconduct, obtaining restitution for victims, and strengthening the rule of law. To evaluate the Division's progress toward achieving its mission, it utilizes output and workload measures across its three primary activity areas – prosecutions and investigations, expert guidance and legal advice, and law enforcement tools. These metrics track performance in categories such as criminal and civil litigation, appellate work, legal and policy advising, training events, and mandatory reviews.

## Performance Plan and Report for Outcomes

### Prosecutions and Investigations

The Division leads complex investigations and brings and tries significant prosecutions. Many of these prosecutions are of national significance, require international coordination, have precedent-setting implications, and involve the coordination of cross-jurisdictional investigations.

**Workload Measure: Number of Prosecutions Closed**
The Division prioritizes resolving prosecutions efficiently and favorably, taking into account all facts and circumstances, including the scope of criminal misconduct and an offender's history and characteristics. This metric illustrates the number of open prosecutions that are closed during each fiscal year and provides a snapshot of the Division's workload. While the Division has experienced fluctuations in its number



of prosecutions in recent years, its prosecutors have handled increasingly complex cases that often involve multiple jurisdictions and international conduct, factors that are not accounted for by the mere number of cases. In FY 2022, the Division did not meet its target.

**Outcome Measure: Criminal Prosecutions Favorably Resolved**
The Department's long-term outcome goal for its litigating divisions, including the Criminal Division, is the percentage of criminal and civil prosecutions favorably resolved during the Fiscal Year.[8] This measures the effectiveness of the Division's core law enforcement efforts. The goals are 90 percent for criminal cases and 80 percent for civil cases. The Division has consistently



[8] Favorable resolution is measured at the defendant level and reported at the conviction stage of the case.



met or exceeded these goals. In FY 2022, the Division exceeded both outcome goals (99% for criminal and 100% for civil).

## Expert Guidance and Legal Advice

The Division also provides expert guidance and legal advice on significant legislative and criminal rule proposals, analyzes Department-wide and government-wide law enforcement policy, conducts training for prosecutors and agents, and engages in programmatic coordination across the country.

**Workload Measure: Legislative and Policy Analysis Matters Completed**
This measure includes legislative reviews, policy and data analysis projects, policy guidance provided, and other activities completed by the Division on behalf of partners such as the U.S. Attorneys' Offices. The target is determined annually based on the number of requests for assistance expected and consideration of Division resources. Between FY 2017 and FY 2022, the Division has exceeded its target each year.



## Law Enforcement Tools

The Division plays a central role in the Department's mission by approving and overseeing the use of the most sophisticated and critical law enforcement tools. This includes the approval of all requests for Title III surveillance, securing the return of fugitives from abroad, and obtaining evidence from other countries integral to criminal prosecutions and investigations.

**Workload Measure: Mandatory Reviews of Law Enforcement Tools Completed**
The Division serves as the Department's "nerve center" for many critical operational matters. It is the Division's responsibility to ensure that investigators are effectively and appropriately using available sensitive law enforcement tools. This is done by reviewing the proposed use of tens of thousands of law enforcement tools on behalf of the Department each year. With the



exception of FY 2020, from FY 2017 to FY 2022 the Division exceeded its target number of mandatory reviews, that is, investigations or prosecutions in which federal review is required, such as Title III surveillance, each year. The number of reviews dropped slightly in FY 2020 due to the COVID-19



**Department of Justice**
Criminal Division

pandemic. It is expected that shifts in Department priorities, such as an increased focus on computer-related crime, could result in increased reviews.

## Strategies to Accomplish Mission

The Criminal Division's mission is to protect the American people from serious criminal activity, including transnational criminal organizations, cybercrime, child exploitation, fraud, gangs, corruption, and money laundering. To meet this mission and the performance goals described above, the Division plans to leverage its resources strategically to maximize the impact of its investigative, prosecutorial, advising, and law enforcement activities.

The Division will employ several strategies:

- <u>Utilize centralized headquarters to promote favorable case resolutions and ensure cost savings:</u>  The Division's role as a centralized hub for critical law enforcement functions allows it to support law enforcement partners in offices throughout the U.S. and foreign counterparts across the world. This structure allows the Division the flexibility necessary to quickly mobilize staff and provide guidance to address criminal threats as they develop. As its workload shifts in response to the changing nature and globalization of crime, the Division plans to leverage this structure to continue resolving complex prosecutions and investigations favorably and efficiently.

- <u>Directing resources toward law enforcement priorities and expert guidance areas:</u>  While prosecuting and investigating cases comprised an estimated 48% of the Division's work in FY 2022, expert advising and law enforcement activities were also significant, comprising 40% and 12% respectively. Several of the Division's pressing internal and external challenges and the backlog of mutual legal assistance requests inhibit the Division's effectiveness in these important areas. Maintaining OIA's capacity to continue reducing the mutual legal assistance request backlog and OEO's resources for reviewing Title III applications for electronic surveillance in a timely manner will assist the Division in meeting its performance targets.

## Priority Goals

The Criminal Division contributes to activities that support one of the Department's FY 2022 – FY 2023 Agency Priority Goals.

***Strategic Objective 2.4:  Enhance Cybersecurity and Fight Cybercrime***

<u>Combat Ransomware Attacks</u>:  Ransomware attacks cause financial losses and other harms to target governments, critical infrastructure, and industry.  The Department will enhance its efforts to combat ransomware attacks by: (1) increasing the percentage of reported ransomware incidents from which cases are opened, added to existing cases, conducted investigative actions, or resolved within 72 hours to 65%; and (2) increasing the number of ransomware seizure and forfeiture orders by 10%.

The Division plays a critical role in the Department's efforts to combat cyber threats, and identify, disrupt, and prosecute malicious cyber actors. CCIPS leads the Department's work on cybercrime, cybersecurity, intellectual property theft, and obtaining electronic evidence.  The Section's work enhances the Department's ability to keep pace with four explosive growth areas described further below – cybercrime, cybersecurity, intellectual property theft, and obtaining electronic evidence. MLARS, meanwhile, is at the forefront of the Department's efforts to trace, seize, and forfeit the proceeds of crime—including



cybercrime—and to hold to account the money launderers who assist criminal actors, cyber and otherwise, in moving and secreting their illicit gains. MLARS and CCIPS together have led the Department's efforts to assess and respond—through criminal enforcement as well as proposals for legal and regulatory reform—to the explosive growth in the use of cryptocurrencies by criminal actors of all stripes, including the most significant ransomware actors.

*Performance and Resource Tables by Program Activities*

| PERFORMANCE AND RESOURCES TABLE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Decision Unit: Enforcing Federal Criminal Law** | | | | | | | | | | |
| **RESOURCES** | | Target | | Actual | | Projected | | Changes | | Requested (Total) | |
| | | FY 2022 | | FY 2022 | | FY 2023 | | Current Services Adjustments and FY 2024 Program Changes | | FY 2024 Request | |
| **Total Costs and FTE** | | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| | | 1,199 | $205,290 | 1,073 | $204,290 | 1,229 | $228,042 | 72 | $28,613 | 1,301 | $256,655 |
| TYPE | PERFORMANCE | FY 2022 | | FY 2022 | | FY 2023 | | Current Services Adjustments and FY 2024 Program Changes | | FY 2024 Request | |
| Program Activity | 1. Prosecutions and Investigations | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| | | 589 | $100,797 | 527 | $100,306 | 610 | $113,109 | 34 | $13,706 | 623 | $122,938 |
| Workload | Prosecutions Opened | 427 | | 374 | | 363 | | 44 | | 407 | |
| | Prosecutions Closed | 198 | | 137 | | 220 | | 27 | | 247 | |
| | Prosecutions Pending | 2,878 | | 2,905 | | 3,048 | | 369 | | 3,417 | |
| | Appellate Work Opened | 1,002 | | 1,990 | | 1,060 | | 128 | | 1,188 | |
| | Appellate Work Closed | 953 | | 1,658 | | 1,060 | | 128 | | 1,188 | |
| | Appellate Work Pending | 841 | | 1,404 | | 1,404 | | 170 | | 1,574 | |
| | Investigations Opened | 877 | | 972 | | 794 | | 96 | | 890 | |
| | Investigations Closed | 590 | | 567 | | 616 | | 75 | | 691 | |
| | Investigations Pending | 1,558 | | 3,336 | | 3,514 | | 426 | | 3,940 | |

### PERFORMANCE AND RESOURCES TABLE

#### Decision Unit: Enforcing Federal Criminal Law

| RESOURCES | | Target | | Actual | | Projected | | Changes | | Requested (Total) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FY 2022 | | FY 2022 | | FY 2023 | | Current Services Adjustments and FY 2024 Program Changes | | FY 2024 Request | |
| Program Activity | 2. Expert Guidance and Legal Advice | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| | | 464 | $79,447 | 415 | $79,060 | 473 | $87,796 | 29 | $11,531 | 524 | $103,432 |
| Workload | Number of Legislative and Policy Analysis Matters Completed | 8,826 | | 12,439 | | 10,569 | | 1,388 | | 11,957 | |
| Workload | Number of Programmatic Coordination Activities | 15,113 | | 29,848 | | 25,727 | | 3,379 | | 29,106 | |
| Workload | Number of Legal Advisory Matters Completed | 32,202 | | 30,549 | | 31,103 | | 4,085 | | 35,188 | |
| Workload | Number of Training Sessions/Presentations | 4,330 | | 5,074 | | 4,392 | | 577 | | 4,969 | |
| Program Activity | 3. Law Enforcement Tools | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| | | 146 | $25,045 | 131 | $24,923 | 146 | $27,137 | 8 | $3,376 | 154 | $30,285 |
| Workload | Number of Mandatory Reviews Completed | 35,218 | | 39,210 | | 42,490 | | 5,287 | | 47,777 | |
| Workload | Favorably Resolved Criminal Prosecutions | 90% | | 99% | | 90% | | 0% | | 90% | |
| Workload | Favorable Resolved Civil Prosecutions | 80% | | 100% | | 80% | | 0% | | 80% | |

Data Definition, Validation, Verification, and Limitations: Definitions: Prosecutions and Investigations: This program activity includes cases or investigatory matters in which the Criminal Division has sole or shared responsibility. The case breakouts include cases from the following Sections/Offices: Fraud Section, Public Integrity Section, Computer Crime and Intellectual Property Section, Child Exploitation and Obscenity Section, Organized Crime and Gang Section, Narcotic and Dangerous Drug Section, Money Laundering and Asset Recovery Section, Human Rights and Special Prosecutions Section, and Capital Case Section. Appeals: Appellate Section. Expert Guidance & Legal Advice: This program activity includes oral and written advice and training to federal, state, local, and foreign law enforcement officials; coordination and support of investigations, prosecutions, and programs at the national, international and multi-district levels; and oral and written analysis of legislation and policy issues, development of legislative proposals, advice and briefing to Departmental and external policy makers, and participation in inter-agency policy coordination and discussions. Law Enforcement Tools: This program activity includes the work the Division does in specific areas of criminal law in reviewing and approving the use of law enforcement tools throughout the law enforcement community. Validation: The Division's management quarterly validates performance information to ensure date integrity.



**Department of Justice**
Criminal Division

## Program Increases by Item

| | |
|---|---|
| Item Name: | **Combat Key Drivers of Violent Crime** |
| Strategic Goal: | Strategic Goal 2: Keep Our Country Safe |
| Strategic Objective: | 2.3 Combat Violent Crime and Gun Violence |
| Budget Decision Unit(s): | Enforce Federal Criminal Laws |
| Organizational Program: | Criminal Division |

Program Increase: Positions 15 Agt/Atty 14  FTE 8 Dollars $2,250,000

Description of Item

The Criminal Division requests **$2,250,000 and 15 positions** to Combat the Key Drivers of Violent Crime. This enhancement is in support of the Department's Strategic Objective to Combat Violent Crime and Gun Violence. The work funded by this request specifically supports the Department's efforts towards (1) fighting violent crime and gun violence throughout the country; and (2) combatting the most prolific and dangerous human smuggling and trafficking groups operating in Mexico, Guatemala, El Salvador, and Honduras.

Justification

The Criminal Division is a leader in the Department's fight against Racketeer Influence and Corrupt Organizations (RICO) and violent crimes. It investigates large and complex violent criminal cases throughout the country, including some of the most high-profile violent and gun related crimes committed in recent years. Reducing violent crime in any community requires strategic and concerted attention in four key areas: prevention, intervention, enforcement, and re-entry. The Criminal Division has committed to bringing together the resources within the Department to address these vital components of any successful anti-violent crime initiative. In order for the Division to meet this need, additional personnel are essential to carry out our mission in engaging with the communities we serve to identify and disrupt the most violent offenders. This enhancement will support the Division's efforts to combat violent crime in the following areas.

On September 29, 2022, the Division's Assistant Attorney General Kenneth Polite announced that the Division, in partnership with the U.S. Attorney's Office for the Southern District of Texas and law enforcement partners, will stand up a targeted initiative to fight violent crime in Houston. These partners will surge the tools and resources they use to investigate and prosecute violent crime nationally, including the use of RICO charges, and apply those tools to gangs who are terrorizing communities in Houston. In addition to other partners within the Department, this effort will employ a data-driven approach to identify and prosecute the "worst of the worst" gangs and gang members who are disproportionately responsible for violent crime in underserved communities in Houston. With additional funding, the Division would be able to expand these efforts beyond Houston to other U.S. cities where violent crime is at a crisis point. This community-based, high-intensity effort is how we build trust in the neighborhoods across America that are besieged by violent crime.



**Department of Justice**
Criminal Division

*Litigation and RICO Reviews*

The Criminal Division investigates and prosecutes complex violent crime cases throughout the country and advises the Department leadership on matters including legislation, crime prevention, and expert training, and frequently coordinates interagency and multi-district enforcement efforts. These results are attributable in large part to the Criminal Division's Organized Crime and Gang Section's (OCGS) expertise. Successfully identifying, investigating, and prosecuting these sorts of complex cases requires thoughtful strategic planning as well as considerable resources in the form of personnel and other investigative and litigation support. Thus, OCGS litigation resources are critically strained. The Section has been forced to decline to take new cases that are at its core mission, such as cases targeting gang trafficking in firearms and committing drive-by shootings and other gun-related crimes. To fully meet the current demands on its resources, and to address the increased workload that must come with the Department's emphasis on gun-related violent crime, OCGS requires additional litigators.

RICO reviews are absolutely critical to the investigation and prosecution of cases across the Criminal Division. This enhancement would provide the necessary resources to meet the current demands resulting from the Department's emphasis on gun-related crime. As noted above, the Criminal Division is experiencing an ever-increasing volume of multi-defendant cases involving systematic violent crime, specifically gun violence, in districts requiring significant travel time to provide assistance. The unit reviews for approval all criminal and civil actions using the RICO statutes, as well as all criminal prosecutions using the Violent Crimes in Aid of Racketeering (VICAR) statute. For proposed RICO indictments, the unit reviewed the following number of cases for each of the following calendar years:

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023[9] |
|------|------|------|------|------|------|------|------|
| 144 | 162 | 149 | 143 | 120 | 137 | 123 | 12 |

For proposed VICAR indictments, the unit reviewed the following number of cases for each of the following calendar years:

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023[10] |
|------|------|------|------|------|------|------|------|
| 117 | 141 | 149 | 115 | 108 | 113 | 95 | 12 |

The unit also serves as the policy arm of OCGS, reviewing Title III applications, speeches, legislative proposals, Congressional testimony, sentencing guidelines proposals, and talking points, as well as developing and reviewing legislative and policy proposals, and responding to citizen and Congressional correspondence and questions from prosecutors in the field. Members of this unit serve as Department experts on RICO and VICAR law and routinely provide complex training and give expert advice and assistance to federal prosecutors across the country at various stages of the prosecution.

RICO unit attorneys also provide valuable litigation support during an ever-increasing number of trials that include an OCGS litigator. As the trials conducted by OCGS increase, the proportion of RICO unit resources employed for litigation support has increased significantly.

Recent jurisprudence place additional strain on the Criminal Division's capacity to adequately address violent crime issues in its investigations by increasing the number of federal violent crime cases requiring review. The Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), established that only the federal government or tribal council have the authority to try criminal acts perpetrated on tribal

---

[9] As of January 2023.
[10] As of January 2023.



**Department of Justice**
Criminal Division

lands. OCGS has devoted considerable resources to assist the United States Attorney's Office (USAO) for the Eastern District of Oklahoma to address the tsunami of violent crime cases for which it is now responsible as a result of this ruling. Indeed, since beginning its assistance to the USAO because of the *McGirt* decision, OCGS has indicted over 45 murder cases, many of them involving the use of the firearm. Given its limited size and resources, this influx of serious violent crime cases involving firearms, coupled with its significant responsibilities to combat national gang violence and organized crime, have significantly strained OCGS resources.

*Appellate Workload*

The Division's Appellate Section (APP) has handled and continues to handle a substantial volume of significant violent crime appeals. Recent examples include *United States v. Dylann Roof*, the prosecution of the Charleston church shooter; *United States v. Dzhokhar Tsarnaev*, the Boston Marathon bombing case; *United States v. Thomas Steven Sanders*, involving the kidnapping and murder of a 12-year-old girl; *United States v. Wesley Coonce & Charles Hall*, involving two federal inmates who brutally murdered a fellow inmate in the prison health unit; *United States v. Cruz-Ramirez, et al.*, prosecutions of members of the MS-13 gang in San Francisco who were convicted of a variety of violent offenses, including multiple murders and violent assaults; *United States v. James Michael Wells*, involving a double homicide by a member of the U.S. Coast Guard who shot two co-workers at a Coast Guard station on Kodiak Island, Alaska; and *United States v. Kentrevion Watkins, et al.*, a RICO and VICAR prosecution of a Peoria, Illinois, gang known as the Bomb Squad. These cases—particularly the multiple-defendant gang prosecutions—tend to involve lengthy trials and byzantine procedural histories and require significant expenditures of time by APP attorneys.

In addition, over the last 15 months, APP's portfolio has expanded to include a larger role in counseling Department leadership and advising investigators in high-profile cases. The section has become involved in several of those matters at the request of the Attorney General. For example, APP has been tasked with providing extensive support to the investigations and prosecutions arising out of the assault on the U.S. Capitol on January 6, 2021. Almost half of the section's attorneys are currently on full- or part-time details related to those and other matters. In addition, federal courts throughout the country are experiencing a surge in trial proceedings that had been on hold as a result of the COVID-19 pandemic, resulting in an anticipated increase in the numbers of appeals and Supreme Court certiorari petitions that the Section will be called upon to handle in coming years. Additional attorney positions are necessary to allow APP to fulfill its expanding mission.

*Reviewing the Use of Sensitive Law Enforcement Tools Used in Violent Crime Cases*

The Division serves as the Department's "nerve center" for many critical legal and operational matters. It is the Division's responsibility to ensure that investigators are effectively and appropriately using available sensitive law enforcement tools. The Division's Office of Enforcement Operations (OEO) is responsible for facilitating the approval of many sensitive investigative and trial tools and techniques that are critical to the successful investigation and prosecution of violent crime cases.

For example, through its Special Operations Unit (SOU), OEO is responsible for oversight of the Federal Witness Security Program (WitSec), which protects cooperating defendants and witnesses so they are available to prosecutors. Through SOU, OEO also manages the S Nonimmigrant Visa Program, which helps prosecutors keep foreign national cooperators in the United States so that they are available to prosecutors; and the Department's imposition of Special Administrative Measures governing the conditions of confinement for certain high-risk federal inmates convicted of violent or terrorism-related crimes. WitSec anticipates a steady growth in applications as courts continue to resume trials and continue to see



an increase in applications for gang members, most notably MS-13 members. WitSec applications are also increasingly raising more complex issues, such as immigration-related questions, and therefore require more time to process. By statute, WitSec manages movement and access to these critical witnesses while providing for their basic life needs, including attending to their psychological well-being and social adjustment. Thus, managing the WitSec aspect of a criminal prosecution can be extraordinarily complex and meeting the protective and other needs of the participants requires the cooperation of and collaboration with as many as two dozen entities.

The S Nonimmigrant Visa Program is available for foreign national witnesses and cooperating defendants who will face deportation before prosecutors are able to successfully bring to justice some of the world's most dangerous and violent criminals. OEO navigates the complex immigration system for prosecutors so that their witnesses may stay legally in the United States to help further violent crime and other criminal prosecutions and investigations that cannot be advanced without them.

Special Administrative Measures (SAM) are special restrictions that the Attorney General may place on federal prisoners, whether pre-trial or post-trial, intended to limit inmate communications that are likely to facilitate serious acts of violence or terrorism, or are likely to facilitate the disclosure of classified information. SAM are authorized for a period of one year and must be renewed annually, if necessary. As such, the SAM program has a constant, ever-increasing caseload, as OEO attorneys work with USAOs, the Bureau of Prisons, and the U.S. Marshals Service to effectuate SAM. OEO also provides legal advice to Department leadership concerning SAM policy and provides case-specific guidance regarding challenges to SAM provisions. OEO routinely works with the districts in which SAM inmates are housed as challenges to SAM are filed in those districts.

OEO's Policy and Statutory Enforcement Unit (PSEU) is responsible for facilitating numerous tools and techniques critical to the fruitful investigations and successful prosecutions of violent crimes. Such matters include, among others, the immunization of witnesses, the closure of courtrooms when necessary to prevent imminent threat to the safety of a witness or the integrity of an investigation, and the initiation or continuation of a federal prosecution where a prior prosecution has left a federal interest demonstrably unvindicated (*Petite* policy requests). Most often, these tools are employed in the investigation and prosecution of violent crimes, including gang-related murders, assaults, and robberies; firearms offenses; and drug trafficking. As the government emerges from the pandemic and investigations and trials return to normal capacity, the general demand on PSEU's resources is expected to increase.

PSEU also administers the Department's News Media Policy, including handling consultations and facilitating requests from members of the Department to interview members of the news media or to use compulsory legal process to obtain information from or records of news media members. PSEU has seen a dramatic increase in consultations and requests from law enforcement agencies and prosecutors regarding the News Media Policy as applied to the investigation and prosecution of violent crimes, especially in relation to events of civil unrest, the siege of the U.S. Capitol on January 6, 2021, and law enforcement efforts to counter domestic violent extremism. The National Security Division's creation of a new unit to address domestic violent extremism will undoubtedly increase the demand on PSEU for News Media Policy matters. Moreover, the volume of news media-related consultations and requests in all subject matter areas has increased with the proliferation of new methods to communicate information. The Attorney General's July 2021 Memorandum regarding the News Media Policy, providing for additional restrictions and conditions for approval of the use of compulsory legal process regarding members of the news media, has further increased the quantity and complexity of PSEU's critical work in this area.

The Division's critical and unique role in ensuring consistency across districts and continuity over time, as well as the even-handled application of statutes, is key to the success of the Department's work and



**Department of Justice**
Criminal Division

additional resources are needed to address the increase in violent crime, while continuing to address demand in other areas of criminal investigation and prosecution.

*Case Examples*

The following are recent case examples of the Division's efforts in successfully prosecuting complex violent crime cases:

- On February 15, 2022, a federal grand jury in the Northern District of Mississippi returned a four-count indictment charging 18 defendants with RICO conspiracy, including murder, VICAR kidnapping, narcotics conspiracy, and money laundering for their criminal activities on behalf of the Simon City Royals gang, a gang aligned with the Gangster Disciples.

- On March 21, 2022, a federal grand jury in the Middle District of North Carolina returned an indictment charging 14 defendants with being leaders, members, and associates of the 9-Trey Gangsters Bloods set operating in the Greensboro metropolitan area and connected to the larger 9-Trey Gangsters organization operating throughout the eastern and southern United States. The indictment charged 14 defendants with racketeering offenses including murder, attempted murder, robbery, extortion, and witness tampering.

- On March 22, 2022, after slightly over a day of deliberations, the jury returned guilty verdicts as to all counts – including RICO Conspiracy, VICAR Murder and VICAR Assault – for all three defendants in *United States v. Paul Girard, et al.* (U.S.V.I.). The defendants were charged with being members and associates of a local street gang responsible for multiple murders, robberies, and other crimes of violence in St. Croix, United States Virgin Islands.

- On April 20, 2022, a grand jury in the Eastern District of Virginia indicted four defendants, charging them with RICO conspiracy, VICAR murder, and related crimes for their knowing participation in the affairs of the transnational criminal organization La Mara Salvatrucha, or MS-13. Evidence presented established that on or about November 23, 2014, the defendants murdered Ramon Delgado-Bernal, believing him a rival gang member.

- On April 27, 2022, the prosecution team unsealed a 33-count indictment charging RICO conspiracy, VICAR Murder, VICAR attempted murder, VICAR assault, narcotics conspiracy, and associated firearms charges against 31 defendants in *United States v. Johnny Martinez, et. al* (C.D. Cal.). The defendants were all members and associates of the Orange County Mexican Mafia ("La Eme"), a powerful umbrella gang that controlled numerous other Southern California gangs. Often working from inside state prison, the defendants levied taxes to allow drug sales to occur in territories they controlled outside of prison, ordered intimidation of witnesses and suspected cooperators, ordered murders, and controlled the drug trade inside and outside of prison.

- On May 2, 2022, the jury returned guilty verdicts on all 37 counts against the six defendants in *United States v. Filthy Fuhrer, et al.* (D. Ak). The defendants, who are leaders, members, and associates of the 1488s, a prison-based white supremacist gang operating in Alaska and the Pacific Northwest, were charged with RICO conspiracy and VICAR murder, kidnapping, and assault related to a series of violent acts in furtherance of the gang's criminal activities. Between January 24–26, 2023, the each of the defendants were sentenced to life imprisonment.

- On September 16, 2022, the jury returned guilty verdicts against all six defendants in *United States v. James Frazier, et al.* (M.D. Tenn.). The defendants, who are leaders, members, and associates



of the Mongols, a violent national motorcycle gang, were charged with RICO conspiracy and VICAR murder, kidnapping, and narcotics trafficking related to a series of violent acts in furtherance of the gang's criminal activities.

- On September 29, 2022, the jury returned guilty verdicts against all three defendants in *United States v. Luis Flores-Reyes, Jairo Jacome & Brayan Contreras-Avalos* (D. Md.). The defendants were charged with RICO conspiracy, VICAR murder, and related crimes, all concerning the defendants' criminal activities on behalf of the Sailors clique of La Mara Salvatrucha, or MS-13. The defendants were charged with committing a series of racketeering acts, including multiple murders, attempted murders, narcotics trafficking, extortion, and obstruction of justice.

- On December 16, 2022, the jury returned guilty verdicts as to all three defendants in *United States v. Jose Domingo Ordonez-Zometa, a/k/a "Felon," et al.* (D. Md.). The defendants were charged with RICO conspiracy, murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, and obstruction of justice. The defendants were charged with being leaders, members, and associates of La Mara Salvatrucha, or MS-13, who committed a gang murder.

Impact on Performance

This enhancement request will allow the Criminal Division to better accomplish Strategic Goal 2, Keep Our Country Safe, from the Department's Strategic Plan. Specifically, the request will support the Department's Strategic Objective 2.3, Combat Violent Crime and Gun Violence.

This objective will also support the Department's efforts to combat violent crime as shown in the DOJ Key Performance Indicator (KPI) "percent of federal violent crime defendants' cases favorably resolved." This KPI supports the Department's strategy to Target the Most Significant Violent Crime Problems.

**Funding**

1. **Base Funding**

| FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/Atty | FTE | Amount ($000) | Pos | Agt/Atty | FTE | Amount ($000) | Pos | Agt/Atty | FTE | Amount ($000) |
| 83 | 59 | 83 | $21,624 | 83 | 59 | 83 | $22,220 | 83 | 59 | 83 | $22,852 |



Department of Justice
Criminal Division

2. **Personnel Increase Cost Summary**

| Type of Position/Series | FY 2024 Request ($000) | Positions Requested | Full Year Modular Cost per Position ($000) | FY 2024 1st Year Adjustments | Annualizations ($000) | | | |
| | | | | | 2nd Year | 3rd Year | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
|---|---|---|---|---|---|---|---|---|
| Attorneys (0905) | $2,054 | 14 | $268 | $147 | $149 | $7 | $2,086 | $103 |
| Clerical and Office Svcs (0300-0399) | $73 | 1 | $123 | $73 | $257 | $72 | $257 | $72 |
| **Total Personnel** | **$2,127** | **15** | **$391** | **$220** | **$406** | **$79** | **$2,343** | **$175** |

3. **Non-Personnel Increase/Reduction Cost Summary**

The non-personnel funds are for travel and training expenses as trial and case volumes return to normal capacity.  OEO conducts regular training sessions on matters they are responsible for with U.S. Attorneys' Offices as requested.

| Non-Personnel Item | FY 2024 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
| | | | | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
|---|---|---|---|---|---|
| Travel and Training | $123 | $123 | 1 | $0 | $0 |
| **Total Non-Personnel** | **$123** | **$123** | **1** | **$0** | **$0** |

4. **Justification for Non-Personnel Annualizations**

N/A



Department of Justice
Criminal Division

5. **Total Request for this Item**

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | Count | Agt/ Atty | FTE | Personnel | Non-Personnel | Total | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Current Services | 83 | 59 | 83 | $22,857 | 0 | $22,857 | 0 | 0 |
| Increases | 15 | 14 | 8 | $2,127 | $123 | $2,250 | $2,343 | $175 |
| Grand Total | 98 | 73 | 91 | $24,984 | $123 | $25,107 | $2,343 | $175 |

6. **Affected Crosscuts**

Gangs
Indian Country
Violent Crime



**Department of Justice**
Criminal Division

| | |
|---|---|
| **Item Name:** | **Support International Human Rights and Joint Task Force Alpha** |
| Strategic Goal: | Goal 2: Keep Our Country Safe |
| Strategic Objective: | Objective 2.1 Protect National Security<br>Objective 2.6 Protect Vulnerable Communities |
| Budget Decision Unit(s): | Enforce Federal Criminal Laws |
| Organizational Program: | Criminal Division |

Program Increase: Positions <u>57</u> Atty <u>36</u> FTE <u>29</u> Dollars <u>$10,000,000</u>

Description of Item

The Criminal Division requests **57 positions (36 attorneys), 29 FTE, and $10,000,000** for additional resources to bolster the Division's Human Rights and Special Prosecutions Section (HRSP) and the Division's role in, and work on, Joint Task Force Alpha (JTFA). These additional resources will enhance the enforcement of U.S. immigration laws, especially human smuggling laws, and the War Crimes Act. This request supports the Department's effort to Keep Our Country Safe, which is one of the goals of the FY 2022 - 2026 Department of Justice (DOJ) Strategic Plan. Specifically, prosecuting war crimes and human smuggling networks directly supports the Administration's efforts to protect the national security of the United States and protect vulnerable populations.

Justification

HRSP leads the Department's prosecution of international migrant smuggling networks and war crimes and other international human rights crimes. HRSP's work also includes prosecutions of human rights violators who have committed atrocities in other countries, and then committed immigration and naturalization fraud by unlawfully gaining entrance into the United States and (in some cases) later obtaining U.S. citizenship or permanent status. HRSP co-leads JTFA, a task force initiative announced by the Attorney General in 2021 to confront and combat the most prolific and dangerous human smuggling and trafficking groups operating in Mexico and the Northern Triangle countries of Guatemala, El Salvador, and Honduras.

*Human Rights and Special Prosecutions Section (HRSP)*

Russia's aggressive war in Ukraine has led to a massive number of alleged war crimes. The extent can be seen in the Office of the Prosecutor General of Ukraine's opening of over 66,000 investigations concerning violations of international humanitarian law. This impacts the Criminal Division and HRSP in three ways. First, as the Russo-Ukrainian war persists, American citizen civilians continue to be mistreated or killed in what may be war crimes. Until January 5, 2023, the U.S. federal war crimes statute provided jurisdiction over war crimes involving U.S. citizen victims, and HRSP will prosecute these crimes upon obtaining defendants and sufficient evidence to secure their conviction. Since January 5, that jurisdiction now extends to any war criminals present in the United States. Already, HRSP's investigations worldwide involving potential charges of war crimes have more than doubled since the onset of the Russian invasion of Ukraine in February of last year. This has substantially increased the



workload of HRSP, and the workload is likely to grow exponentially in the coming fiscal year. Delays caused by HRSP staff shortages would critically disadvantage these prominent and vital efforts. A second new demand signal to the Criminal Division and HRSP is for American contributions to multilateral efforts to hold perpetrators of Russian war crimes accountable. We are witnessing every nation in Europe, and in many places outside of Europe, expressing a firm resolution to investigate all judiciable war crimes occurring in the Russo-Ukrainian war. In addition, international organizations such as Eurojust, the United Nations, and the Organization for Security and Co-operation in Europe (OSCE) have launched their own efforts to document war crimes and assist in the preservation of evidence related to them. The United States can and will participate in these efforts, and the Department must do its part. HRSP stands ready to assist and anticipates the need for enhanced resources in FY 2024 to engage and assist appropriately with the massive dimensions of the alleged crimes and of the multinational documentation and evidence preservation efforts.

Finally, it must not escape mention that over eight million Ukrainians have fled their country since the war began, in addition to nearly six million Ukrainian internally displaced persons. Among the refugees fleeing Ukraine are thousands that have appeared at the U.S. border with Mexico and are being granted humanitarian parole. More than 85,000 Ukrainian refugees have currently been paroled into the United States. At the border, Ukrainians are part of a vast flow of migrants. U.S. Customs and Border Protection has been apprehending over 7,000 non-citizens at the southwest border every day for the past four months.

International smuggling networks are transnational criminal organizations often involved in an array of illegal activity. These smuggling networks funnel persons to the border and take advantage of often desperate and impoverished migrants to maximize profits and minimize the protections provided to the migrants they smuggle. This exploits and endangers thousands of migrants each year, resulting in deaths, injuries, and other forms of serious victimization. In addition to its war crimes and human rights violations work, HRSP focuses on prosecuting smuggling networks across the globe whose criminal activities impact the United States; now is the time to increase our capacity to pursue those efforts.

*Joint Task Force Alpha (JTFA)*

The Division, specifically HRSP, has a vital role in enforcing the federal criminal laws relating to human smuggling and other immigration-related offenses, with a focus on networks that endanger, abuse, or exploit migrants, present national security risks, or engage in other types of transnational organized crime. HRSP represents the Department in multiple interagency initiatives aimed at bringing cases against international human smuggling networks, the most significant of which is its current leadership role on JTFA, a Department of Justice and Department of Homeland Security (DHS) human smuggling and trafficking task force created by the Attorney General in June 2021. JTFA was created to target the most pernicious smugglers and associated networks operating in the Northern Triangle and Mexico impacting the U.S. southwest border, and has produced tremendous results for the Criminal Division and the Department since its inception.

JTFA successfully increased coordination and collaboration between the DOJ, DHS, and other interagency law enforcement participants, including foreign law enforcement partners from El Salvador, Guatemala, Honduras and Mexico, targeted organizations who have the most impact on the U.S., and coordinated significant smuggling indictments and extradition efforts in U.S. Attorneys' Offices across the country.

JTFA's work with its partners has generated significant results, including:



Department of Justice
Criminal Division

- 175 domestic and international arrests, including against leaders, organizers and significant facilitators;
- 79 convictions;
- 55 defendants sentenced, including significant jail sentences imposed;
- Substantial asset forfeiture including hundreds of thousands of dollars in cash, real property, vehicles, firearms and ammunition, and drug seizures; and
- Numerous indictments, pending arrests and extradition requests against foreign leadership targets.

JTFA is comprised of detailees from U.S. Attorneys' Offices on the southwest border, including the Southern District of Texas, Western District of Texas, District of New Mexico, District of Arizona, and the Southern District of California; dedicated support for the program is also provided by the Criminal Division. HRSP leads JTFA and has multiple prosecutors and personnel assigned to its work; other Division sections contribute personnel and expertise to the initiative, including the Office of Prosecutorial Development, Assistance and Training (OPDAT), the Money Laundering and Asset Recovery Section (MLARS), the Narcotic and Dangerous Drug Section (NDDS), the Office of Enforcement Operations (OEO), the Office of International Affairs (OIA), and the Organized Crime and Gang Section (OCGS). JTFA is made possible by substantial law enforcement investment from DHS, FBI, DEA, and other partners.

HRSP has devoted more of its existing personnel and resources to the many ongoing investigations, cases, and high-visibility daily activities of JTFA than any other individual office. Since its creation, multiple members of HRSP's existing management team have dedicated substantial time to leading and supervising its work and other JTFA matters. In addition, the majority of HRSP's line attorneys are assigned to one or more significant JTFA cases and other related projects, along with substantial support from HRSP's historian, paralegals, and administrative staff, despite no additional hires at HRSP to focus on this work since it began. Additional HRSP attorneys and staff are desperately needed to properly resource this priority project for the Department to avoid inflicting long-term harm on HRSP's broader mission.

In addition to its direct prosecution work, HRSP provides guidance and support to United States Attorneys' Offices (USAOs) and law enforcement nationwide. HRSP provided legal advice and assistance in 187 instances in FY 2022 and in 240 instances in FY 2021. HRSP provides training and guidance to Assistant United States Attorneys (AUSAs), DHS personnel, and State Department visa fraud investigators. HRSP provided 58 presentations or courses to perform this type of work in FY 2021 and hosted 44 trainings in FY 2022. Further, HRSP identifies and works on strategies for improving the government's ability to advance human rights prosecutions and identify, prosecute, and eliminate immigration fraud. HRSP also examines legislative, regulatory and policy fixes in the smuggling arena. HRSP documented 845 instances of legislative and policy analysis in its portfolio in FY 2022 and 1,065 instances in FY 2021. Additional staff to address the uptick in this resource-intensive growth area would allow HRSP to handle more cases, pursue new leads with law enforcement partners, and more effectively assist the USAOs in prosecuting extraterritorial crime.

Resource Enhancements

With additional resources, HRSP would be able to do the following:

*Increase Capacity for Investigations and Prosecutions*

- HRSP would be able to do more investigations and prosecutions, such as the case against the leader of a Pakistani smuggling network, *United States v. Sharafat Ali Khan*. The network



had smuggled significant numbers of Pakistani and Afghani nationals to the United States , some of whom were deemed to have presented national security threats. The main target was a Brazil-based Pakistani who coordinated the smuggling of persons on commercial aircraft through Dubai to Brazil, and then overland through South and Central America and Mexico using a series of human smuggling associates as well as fraudulent passports and other illegal documents. The United States worked closely with Brazilian authorities to obtain information and evidence against the smuggler, who then fled Brazil and tried to return to his native Pakistan. While transiting through Qatar, Qatari authorities arrested the smuggler based on the U.S. Interpol Red Notice, and Qatar agreed to extradite him to the United States, notwithstanding the absence of an extradition treaty. The defendant ultimately pleaded guilty and was sentenced to prison in the United States.

### Pursue Cases Focused on Violence that Organized Crime Smuggling Networks Generate

- In addition to its national security focused cases, HRSP would also be able to do more cases focused on the violence that organized crime smuggling networks generate, such as HRSP's case against three Colombians and an Ecuadorian charged with human smuggling, *United States v. Rivera Weir, et al.* The defendants, while transporting three Cuban U.S.-bound migrants from Colombia to Panama, raped a female migrant and murdered her and one of the male migrants. The third migrant was able to escape before being killed. Three of the defendants were extradited, pleaded guilty, and were sentenced to prison terms of 50 years, 45 years, and 8 years in the United States.

### Increase Cases Against War Criminals and Human Rights Abusers

- HRSP would also be able to pursue more cases against war criminals and other human rights abusers who have lied about their past to obtain U.S. immigration benefits. Since the U.S. war crimes statute (18 U.S.C. § 2441) provides jurisdiction in federal district courts over war crimes committed against U.S. citizens anywhere in the world, HRSP has an urgent need to investigate and prosecute alleged war crimes that have occurred in Ukraine and are unfortunately expected to continue to occur there in the coming months and beyond and take significant resources to investigate. A January 2023 amendment to the war crimes statute gives the court broader jurisdiction, specifically over any war criminal who is present in our country, regardless of the nationality of the victim or the offender. With the passing of this important bill, HRSP has an even greater opportunity to hold war criminals accountable and to ensure that the United States is not a safe haven.

### Provide Additional Resources to Joint Task Force Alpha

- HRSP would be able to continue its work leading and pursuing the work of JTFA, have sufficient staff to assign to many new matters and leads that are regularly referred to it for action and engagement, and generate more of the successes it has already contributed to, including:
  - The sentencing of a Bangladeshi national to 46 months in prison for his role in a scheme to smuggle undocumented individuals from Mexico into the United States;
  - The takedown of a prolific transnational human smuggling organization operating in Nogales, Sonora, along the U.S.-Mexico border;
  - The sentencing of a Cuban national to 38-years in prison for using his border ranch as a criminal corridor to further his drug trafficking and human smuggling activities;
  - The indictment of eight defendants on charges of human smuggling and drug smuggling for their involvement in an international scheme to smuggle 24 undocumented individuals and cocaine from Honduras into Louisiana via boat;



o   The indictment of three Guatemalan nationals arrested as part of a large U.S.-Guatemala coordinated international takedown who are pending extradition to the U.S. and were involved in a human smuggling conspiracy that resulted in the death of a young female migrant during the course of her smuggling after reaching the United States; and

o   The takedown of a human smuggling, transport, and harboring network based in South Texas responsible for moving hundreds of migrants over a number of years under extremely dangerous conditions, including in unventilated tractor-trailers. With additional resources dedicated to JTFA efforts, the Division would be able to continue its work leading and pursuing the mission of JTFA and increase time and resources to expand its success, such as the successful sentencing of two human smuggling coordinators charged with harboring over 100 illegal aliens with the intent to smuggle them across the U.S.-Mexico border. The additional resources will provide U.S.-based and overseas positions offering direct, in-person support to agencies participating on JTFA and increase the Department's participation and leadership within the JTFA team.

<u>Accomplishments</u>

- In July 2022, a federal grand jury indicted two men charged in a fatal tractor-trailer incident that caused the death of 50 adults and three minor children and injured 10 adults and one minor child. Homero Zamorano Jr., 46, of Pasadena, Texas, and Christian Martinez, 28, of Palestine, Texas, were charged in a federal indictment with one count of conspiracy to transport illegal aliens resulting in death; one count of transportation of illegal aliens resulting in death; one count of conspiracy to transport aliens resulting in serious bodily injury and placing lives in jeopardy; and one count of transportation of illegal aliens resulting in serious bodily injury and placing lives in jeopardy, all in violation of Title 8, United States Code, Section 1324.

- In March 2022, Mexico's Attorney General's Office's "Fiscalía General de la Republica" (FGR) conducted a significant enforcement operation to dismantle a prolific transnational human smuggling organization operating in Nogales, Sonora, along the U.S.-Mexico border. its success was the result of extensive bilateral cooperation between the United States and Mexico. The targeted human smuggling organization is alleged to be responsible for illegally smuggling large numbers of individuals from Mexico, Central America and South America into Arizona and other locations in the United States. The foreign enforcement operation included the execution of six arrest warrants in Mexico for smuggling coordinators; in the related domestic case involving this organization, dozens of smuggling arrests and convictions in Arizona have been handled by JTFA prosecutors.

<u>Impact on Performance</u>

The proposed resources would enhance the Division's ability, and that of its law enforcement partners, to identify potential witnesses and targets for a variety of cases, including war crimes and human smuggling networks. There would also be an increase in identifiable leads for investigation. The requested resources would work towards increasing investigation and prosecution capacity, providing training to AUSAs, DHS attorneys, and DHS and State Department agents, overseeing HRSP's work in the interagency process and resulting prosecutions, supporting legislative and policy efforts to improve enforcement in a coordinated manner throughout the country, and increasing time and resources dedicated to the Division's work towards JTFA.



**Department of Justice**
Criminal Division

Prosecuting war crimes and human smuggling networks are vital to the national security of the United States (DOJ Strategic Objective 2.1) and are undertaken to protect vulnerable populations (DOJ Strategic Objective 2.6). Victims of war crimes, refugees, and undocumented migrants are among the most vulnerable populations worldwide, and HRSP will vigorously seek justice and hold accountable those responsible for their victimization, deaths, and other unlawful harm. HRSP's mandate to pursue these high-priority and high-profile cases puts a noticeable strain on the Division's personnel and resources; without additional resources, HRSP's ability to maintain its workload and represent the Department in international anti-smuggling and human rights efforts is unsustainable.

Funding

1. **Base Funding**

| FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 Current Services* | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/Atty | FTE | Amount ($000) | Pos | Agt/Atty | FTE | Amount ($000) | Pos | Agt/Atty | FTE | Amount ($000) |
| 48 | 31 | 48 | $13,194 | 48 | 31 | 48 | $13,582 | 48 | 31 | 48 | $13,981 |

2. **Personnel Increase Cost Summary**

| Type of Position/Series | FY 2024 Request ($000) | Positions Requested | Full Year Modular Cost per Position ($000) | FY 2024 1st Year Adjustments | Annualizations ($000) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | 2nd Year | 3rd Year | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Attorneys (0905) | $5,292 | 36 | $268 | $147 | $149 | $7 | $298 | $15 |
| Social Science, Psychology, Welfare (0100-0199) | $117 | 1 | $208 | $117 | $113 | $44 | $226 | $88 |
| Paralegal (0950) | $730 | 10 | $122 | $73 | $57 | $72 | $570 | $720 |
| Personnel Management (0200-0260) | $468 | 4 | $208 | $117 | $113 | $44 | $452 | $176 |
| Information Technology Management (2210-2299) | $234 | 2 | $208 | $117 | $113 | $44 | $226 | $88 |
| Clerical and Office Services (0300-0399) | $256 | 4 | $104 | $64 | $37 | $24 | $148 | $96 |
| Total Personnel | $7,097 | 57 | $1,118 | $635 | $582 | $235 | $1,920 | $1,183 |



Department of Justice
Criminal Division

3. **Non-Personnel Increase/Reduction Cost Summary**

| Non-Personnel Item | FY 2024 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
|---|---|---|---|---|---|
| | | | | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Travel | $503 | N/A | 1 | $0 | $0 |
| Litigation Support | $1,100 | N/A | 1 | $0 | $0 |
| Data Analytics | $1,300 | N/A | 1 | $0 | $0 |
| **Total Non-Personnel** | **$2,903** | **N/A** | **0** | **$0** | **$0** |

4. **Justification for Non-Personnel Annualizations**

The requested non-personnel funds needed travel, litigation support and data analytics necessary for investigations and prosecutions.

5. **Total Request for this Item**

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | Count | Agt/ Atty | FTE | Personnel | Non-Personnel | Total | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Current Services | 48 | 31 | 48 | $13,981 | $0 | $13,981 | $0 | $0 |
| Increases | 57 | 36 | 29 | $7,097 | $2,903 | $10,000 | $1,902 | $1,183 |
| **Grand Total** | **105** | **67** | **77** | **$21,078** | **$2,903** | **$23,981** | **$1,902** | **$1,183** |

6. **Affected Crosscuts**

Human Trafficking
Violent Crime



Department of Justice
Criminal Division

| | |
|---|---|
| **Item Name:** | **Prosecuting Cybercrime and Responding to Criminal Use of Cryptocurrency** |
| Strategic Goal: | Goal 2: Keep Our Country Safe<br>Goal 4: Ensure Economic Opportunity and Fairness for All |
| Strategic Objective: | Objective 2.1 Protect National Security<br>Objective 2.4 Enhance Cybersecurity and Fight Cybercrime<br>Objective 4.2 Combat Corruption, Financial Crime, and Fraud |
| Budget Decision Unit(s): | Enforce Federal Criminal Laws |
| Organizational Program: | Criminal Division |

Program Increase: Positions **26** Atty **14** FTE **13** Dollars **$4,000,000**

Description of Item

The Criminal Division requests **26 positions (14 attorneys), 13 FTE, and $4,000,000** for the Computer Crime and Intellectual Property Section (CCIPS) and Money Laundering and Asset Recovery Section (MLARS) in order to enhance ongoing work against ransomware, other financially motivated cybercrimes, and cybercrimes against individuals, as well as ongoing investigations and prosecutions of intellectual property crimes, critical electronic evidence issues, and whole-of-government cybersecurity initiatives.

Additionally, MLARS is at the helm of the Department's efforts to trace, seize, and forfeit the proceeds of crime—including cybercrime—in order to hold money launderers who assist criminal actors, cyber and otherwise, accountable in moving and secreting their illicit gains. MLARS also leads investigations and prosecutions against financial institutions, including their officers, managers, and employees, whose actions threaten the integrity of the individual institution or the wider financial system.

Together MLARS and CCIPS have led the Department's efforts to assess and respond—through criminal enforcement as well as proposals for legal and regulatory reform—to explosive growth in the use of cryptocurrencies by criminal actors of all stripes, including the most significant ransomware actors. While this enhancement request comes from Criminal Division, if granted it will provide significant, long-term benefits to the U.S. Attorneys' Offices (USAOs) and to law enforcement agency partners (LEAs), not just because of the longstanding collaborative relationships that CCIPS and MLARS both have with USAOs and LEAs on significant investigations and prosecutions, but also because of the central role both sections play in serving as training and consultation resources to the field. In sum, this enhancement will provide CCIPS and MLARS with resources that will allow them to serve as force multipliers for our partners in the USAOs and LEAs.

Furthermore, this enhancement would allow CCIPS to implement several of the initiatives already announced or expected to be announced by the Deputy Attorney General following the implementation of the recently issued Comprehensive Cyber Review. These initiatives include (a) enhancing the Department's ability to plan for and rapidly react to ransomware and other cybercrime threats; (b) improving the Department's overall response to swatting, cyberstalking, and other cybercrimes against individuals; (c) improving support for international investigations, particularly involving Europe through



a dedicated Department position; and (d) providing for ongoing funding of the Cyber Fellows program. While some of these initiatives were funded through the end of FY 2023 through emergency funding relating to the ongoing Ukraine crisis, the requested additional resources would regularize and fund ongoing work.

Through bolstering the Division's capacity to meet this critically important workload, this request would directly benefit other components and strengthen the Department's effort to uphold the rule of law and keep our country safe, which are strategic goals specifically identified by the Attorney General as two of the top funding priorities for FY 2024. Specifically, this enhancement would combat cybercrime and would also make progress toward the strategic goal of ensuring economic opportunity and fairness for all.

Justification

*Computer Crime and Intellectual Property Section*

CCIPS leads the Department's work on cybercrime, cybersecurity, intellectual property theft, and obtaining electronic evidence. No other Department litigating component works on more computer intrusion cases, ransomware cases, cryptocurrency cases, or botnet cases. CCIPS's groundbreaking prosecutions provide an evidentiary basis for other federal agencies such as the Treasury, Commerce, and Defense Departments to deploy their authorities, including sanctions against malicious actors, in furtherance of a whole-of-government strategy. In addition, CCIPS builds the Department's capacity to handle more cyber cases by developing operational support around the world on cybercrime and digital evidence to better protect Americans from foreign-based crime; developing and coordinating evidence legislation, policies, and litigation; and promoting public-private cybersecurity partnerships at the highest levels of the country's most important industries.

Over the last year, and at the direction of the Office of the Deputy Attorney General, CCIPS has significantly increased its participation in ransomware investigations, placing an attorney on essentially every ongoing investigation. At a recent announcement of a successful disruption of Hive ransomware, the Attorney General said that the Department would spare no expense in bringing ransomware criminals to justice.[11] This enhancement will help the Criminal Division fulfill that pledge.

Meanwhile, CCIPS's work in obtaining electronic evidence—especially its expertise in obtaining geolocation information and social networking posts from major providers—has proven crucial in the ongoing investigation of the assaults and riot at the U.S. Capitol on January 6, 2021. More recently, it has provided assistance to investigators and prosecutors relating to crimes committed in connection with the ongoing invasion of Ukraine by Russia. CCIPS attorneys are also national experts in investigating and prosecuting internet stalking, swatting, and other cybercrimes against individuals, and are regularly called upon to partner and train on these issues.

The new attorney positions in CCIPS will include three Cyber Fellows positions, as part of a newly created initiative ordered by Deputy Attorney General Lisa Monaco in May 2021,[12] the Cyber Fellowship program, which is designed to develop a new generation of prosecutors and attorneys equipped to handle emerging cyber threats. The three Cyber Fellows will handle a broad range of the cyber cases handled by the Department and gain a comprehensive understanding of the Department's response to emerging and critical national security threats. Fellows will acquire the experience necessary to investigate and

---

[11] https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-disruption-hive-ransomware-variant
[12] Deputy Attorney General Lisa Monaco Announces Creation of New Cyber Fellows Positions | OPA | Department of Justice



**Department of Justice**
Criminal Division

prosecute state-sponsored cyber threats; transnational criminal groups; infrastructure and ransomware attacks; and the use of cryptocurrency and money laundering to finance and profit from cyber-based crimes.

This request also includes support for the Cyber Operations International Liaison (COIL), which is being considered for potential placement overseas. The COIL will work with U.S. prosecutors and international partners to facilitate coordinated multilateral operations against top-tier cyber actors. This position will work in conjunction with the existing International Computer Hacking and Intellectual Property (ICHIP) attorneys, supporting CCIPS's work in building and advancing relationships with European law enforcement authorities.

As CCIPS is increasingly called upon to address Department priorities, additional funding will increase the section's ability to effectively partner internally and externally.

Despite CCIPS remaining roughly the same size over the past 12 years, the problems of ransomware, computer intrusions, and cryptocurrency have exploded. CCIPS faces increasing demand by USAOs for CCIPS's partnership on novel and complex cases, in addition to increased incidences of cybercrimes.

The Department cannot keep pace with growing cyber security and cryptocurrency threats without increasing its investment in CCIPS that has, for 25 years, been the Department's center of expertise in investigating and prosecuting complicated national and international cyber cases. There are regular proposals in Congress to create cyber training and support centers that would largely replicate the work CCIPS has already been successfully accomplishing for over two decades, despite a flat budget. Increased investment in CCIPS would enhance proven initiatives: the Cybersecurity Unit; work on cryptocurrencies; Computer Fraud and Abuse Act and Economic Espionage Act consultations; and prosecution initiatives targeting dark markets, cyberstalking, and protection of personal information. Finally, CCIPS could continue to serve as a force multiplier for the USAOs, providing unmatched cybercrime, intellectual property crime, and electronic evidence support to cases across the country.

To meet these increased workload demands within CCIPS, **19 positions (11 attorneys)** are requested.

*Money Laundering and Asset Recovery Section*

MLARS is also in need of additional resources due to increased workload, specifically in its Bank Integrity Unit (BIU). The BIU investigates and prosecutes complex, multi-district, and international criminal cases involving financial institutions and individuals who violate money laundering statutes, the Bank Secrecy Act, U.S. economic sanctions, and other related statutes. BIU prosecutions have also contributed meaningfully to changes in the industry, including changes to the Bank Secrecy Act, anti-money laundering, and sanctions compliance programs in response to the criminal wrongdoing outlined in its corporate resolutions. These changes increase the safety and security of the U.S. financial system, safeguard financial institutions, prevent crime, and protect victims.

Since its inception in 2010, the BIU trial attorney staff has remained at essentially the same levels, consisting of 10–12 trial attorneys who investigate and prosecute some of the most complex financial institution matters in the Department. These prosecutions have tangible impact on the U.S. financial sector and on victims of crime.

In order to support the rising number of complex cryptocurrency cases, the BIU has obligated three full-time trial attorneys with cryptocurrency expertise to the National Cryptocurrency Enforcement Team



(NCET) and realigned staff in the BIU to account for the changes. In addition to their cryptocurrency matters, these attorneys carry additional NCET duties, including training and providing guidance to others in the field. Cryptocurrency matters and their other NCET responsibilities take up 100% of these attorneys' responsibilities, and they are therefore unavailable to join new non-cryptocurrency financial institution investigations. Public reports count as many as a million victims of cybercrime every day, including individuals affected by theft of their sensitive personal and financial information. Meanwhile, technology has evolved, requiring the Department—and the Criminal Division—to build new expertise in cryptocurrency, cybersecurity, and electronic evidence gathering techniques. Despite the significant growth in the number of cryptocurrency investigations, the realignment of BIU's NCET trial attorneys solely to cryptocurrency matters, and the continued demand for MLARS partnership from USAO offices in financial institution and cryptocurrency matters, staffing levels for the BIU remain the same.

BIU attorneys investigate a broad array of financial institutions—from traditional banks to money services businesses including cryptocurrency exchanges—and cutting-edge financial technology companies. Therefore, a mix of staff resources is needed to appropriately address these cases. In addition, the BIU's investigations require experienced analysts who can trace complex financial transactions, including on the blockchain, analyze those transactions in conjunction with the available evidence, and identify perpetrators and proceeds of criminal activity. Finally, litigation support resources, including staff who can manage vast quantities of data and evidence, process that evidence quickly into a usable format, troubleshoot potential issues with certain types of production, and efficiently use available software or identify additional software to assist with analysis of evidence and case management are essential to the BIU's mission.

This request is for **7 positions (3 attorneys)** for MLARS.

The request also includes **$300,000 for litigation support**. Each of the BIU's cases involves voluminous document productions and a significant amount of data. Obtaining, processing, maintaining, and analyzing that information quickly and efficiently is key to the success of the BIU's mission. Litigation support resources are critical to the BIU's casework, including software solutions for document review, data analysis, and financial tracing such as blockchain review and analysis, and hardware solutions that allow BIU to effectively maintain and access large data sets and share those data sets with investigative teams. This request will be used to support non-personnel resources such as licenses for software solutions to assist in evidence review, tracing, and case management, as well as hardware to support the BIU's ability to obtain, maintain, and review large amounts of electronic evidence.

*Accomplishments*

CCIPS's and MLARS's collaborative efforts with internal and external stakeholders have led to major accomplishments. The funding sought will help ensure that such accomplishments continue and grow in number and scope.

Among the accomplishments to date:

- In January 2023, the Department announced its months-long disruption campaign against the Hive ransomware group that targeted more than 1,500 victims in over 80 countries, including hospitals, school districts, financial firms, and critical infrastructure. The disruption campaign allowed law enforcement to secretly access Hive's servers, collect keys, and avert victims paying over $130 million in demanded ransoms before taking down the Hive infrastructure. Public reporting of ransomware prevalence indicates that ransomware payments were down overall in



Department of Justice
Criminal Division

2022 and that Hive specifically generated significantly less revenue during the disruption operation in the last half of 2022.[13]

- CCIPS lawyers have pioneered or popularized several new, innovative investigative techniques to meet the growing challenges of encryption, TOR, and virtual currencies. In the last five years, these new techniques include geofences, AdTech warrants, subpoenas to virtual currency exchanges, and virtual currency tracing. Assistant U.S. Attorneys (AUSAs) investigating the Department's highest-profile cases have frequently consulted with CCIPS experts on these techniques, particularly those investigating crimes arising out of the pandemic and the violent extremism during the last year. CCIPS's efforts in these areas have produced tangible results, including the seizure, domestically and abroad, of billions of dollars in cryptocurrency related to criminal activity.

- In the last three years, the BIU has resolved eight corporate criminal investigations and charged thirty-five individuals in a variety of criminal schemes, nearly all of whom have pleaded guilty. The BIU's chief engaged in one of the most high-profile white-collar trials in 2022, with the full support of the BIU and other MLARS resources prior to and during trial, leading to the conviction on all counts of former Goldman Sachs banker Roger Ng in the Eastern District of New York.

- In January 2021, CCIPS and the FBI acted to disable the Emotet botnet, responsible for the mass distribution of ransomware. In a separate action in the same month, CCIPS and the FBI disrupted the NetWalker ransomware. CCIPS has been involved in similar activities since 2011—in fact, CCIPS attorneys pioneered the concept of using legal authorities to disrupt or take down online criminal infrastructure, such as botnets.

- In April 2022, CCIPS helped coordinate an international operation that resulted in the takedown of the Hydra Market (Hydra), the seizure of cryptocurrency wallets containing $25 million worth of bitcoin, and the indictment of Dmitry Pavlov, a Russian national alleged to be responsible for administering Hydra's technical infrastructure. Hydra was the world's largest and longest-running darknet market at the time of the takedown, accounting for an estimated 80% of all darknet market-related cryptocurrency transactions for a range of illicit goods and services, including illegal drugs, stolen financial information, fraudulent identification documents, and money laundering and mixing services. A Chainalysis report on darknet markets issued in February 2023 linked the Hydra disruption to a more than 50% reduction in darknet market revenues from the previous year.[14]

- In roughly the past year, the BIU has opened over 20 new financial institution investigations, including four cryptocurrency focused investigations. Since 2020, the BIU has opened over 40 new investigations including assisting with combating pandemic-related fraud. Since its inception, despite limited attorney staff, the BIU has resolved corporate criminal investigations resulting in nearly $18 billion in criminal monetary penalties and forfeiture. Since 2017, BIU has obtained over $8 billion in corporate criminal penalties and forfeiture with over $2.2 billion of that total made available to victims. In the Western Union case alone, over $350 million has been remitted to over 142,000 victims of fraud to date.

---

[13] https://blog.chainalysis.com/reports/crypto-ransomware-revenue-down-as-victims-refuse-to-pay/
[14] https://blog.chainalysis.com/reports/how-darknet-markets-fought-for-users-in-wake-of-hydra-collapse-2022/



- In December 2022, the BIU, working with the U.S. Attorney's Office for the Southern District of New York and the FBI, successfully prosecuted Danske Bank for its fraud on U.S. banks. Danske Bank pleaded guilty to bank fraud and agreed to forfeit approximately $2 billion as a result of its fraud. Danske Bank defrauded U.S. banks regarding Danske Bank Estonia's customers and anti-money laundering controls in order to gain access to U.S. banks and the U.S. financial system for its high-risk customers.

- CCIPS answered the Department's call to train new AUSAs hired in the last administration. During the last year, CCIPS trained hundreds of AUSAs in the basics of the Electronic Communications Privacy Act, the Fourth Amendment, and Internet technology, among other topics.

- CCIPS regularly works with interagency partners on cybersecurity matters, including close work with the Department of Homeland Security's (DHS) Cybersecurity and Infrastructure Security Agency (CISA) on the interpretation of the Cybersecurity Information Sharing Act of 2015, as well as work with the Department of Defense (DOD) on classified matters. This work has grown substantially due both the growth of other agencies' cyber teams and new statutes that have required DOJ participation in interagency task forces and the drafting of regulations. In addition, CCIPS has participated in the White House-led Counter Ransomware Initiative, a group of more than 30 countries working on five separate lines of effort to address ransomware.

CCIPS also partners with USAOs on numerous prosecutions each year, including many of the Department's most significant:

- In October 2022, CCIPS, in partnership with the Middle District of Florida, announced that Canadian national Sebastian Vachon-Desjardins received a 20-year prison sentence for his participation in a sophisticated form of ransomware known as NetWalker. NetWalker ransomware targeted dozens of victims all over the world, including companies, municipalities, hospitals, law enforcement, emergency services, school districts, colleges, and universities. Attacks specifically targeted the healthcare sector during the COVID-19 pandemic, taking advantage of the global crisis to extort victims.

- In 2021, CCIPS worked with the Northern District of California USAO and MLARS to seize and recover a ransom payment worth approximately $2.3 million at the time of seizure. These funds represented the proceeds of a May 8, 2022, ransom payment to individuals in a group known as DarkSide, which had targeted Colonial Pipeline, the operator of one of the major refined product pipelines that moves gasoline, diesel, and jet fuel from the Gulf Coast to the East Coast market.

- In early 2022, CCIPS and the District of Columbia USAO, working with several law enforcement agencies, successfully seized bitcoin then valued at approximately $3.6 billion that had been stolen from the Bitfinex virtual currency exchange in 2016 and charged two individuals with conspiring to launder the proceeds from that theft.

Impact on Performance

Through bolstering the Division's capacity to meet this critically important workload, this request would strengthen the Department's ability to make progress in its strategic goals to **uphold the rule of law, keep our country safe, and ensure economic opportunity and fairness for all** and which other components in the Department would directly benefit from. Specifically, the request would support



**Department of Justice**
Criminal Division

Objective 2.1 Protect National Security, Objective 2.4 Enhance Cybersecurity and Fight Cybercrime and Objective 4.2 Combat Corruption, Financial Crime, and Fraud.

The May 12, 2021, Executive Order on Improving the Nation's Cybersecurity states that "the Federal Government needs to make bold changes and significant investments in order to defend the vital institutions that underpin the American way of life." Given the scale of cyber issues facing the nation and the impact CCIPS has, investment in this area is overdue. Each additional Criminal Division attorney, laboratory professional, and related support position dedicated to CCIPS will have a widespread impact on the Department's ability to successfully prosecute cyber criminals, use digital evidence, and share information with the private sector. Because these issues arise in almost every district nationwide in a wide variety of cases, further investment in a central group to lead the response effort increases efficiency in each district solving similar problems on its own.

CCIPS's importance to the Department's cyber efforts is highlighted by the section's contributions to the Department's mission risk mitigation efforts in the areas of cybercrime, dark web trafficking, cybersecurity, collaboration, and partnerships. By training investigators and prosecutors, developing relationships with foreign law enforcement partners, and serving as a center of expertise, an investment in CCIPS will help cyber investigators and prosecutors across the country succeed.

Furthermore, the United States is home to the preeminent financial system, which attracts business and capital from all over the world in large part due to the security our system offers. U.S. banks are well-regulated, insured, and safe. Maintaining the safety and soundness of that system allows the US to continue to lead the financial system and offer companies and individuals a secure place to conduct business and maintain capital. When financial institutions—including not only U.S. banks but also cryptocurrency entities doing business in the United States and myriad other types of business organizations— and their employees commit crimes, they not only threaten the integrity of individual financial institutions but also the U.S. financial system as a whole. The BIU directly addresses this threat. Financial institutions are also frequently the first line of defense against crime – criminals almost always require a financial institution to deliver the proceeds of their crime. The BIU's focus on financial institutions, including those that have anti-money laundering programs and a culture of compliance with the Bank Secrecy Act, protects the U.S. financial system and sends a message to other financial institutions on how they can comply with the law and strengthen the U.S. financial system.

The requested increase will enable both CCIPS and MLARS to appropriately staff large, complex investigations involving global financial institutions and cyber security, ensuring the Department will achieve its strategic goals and objectives.

**Department of Justice**
Criminal Division

Funding

1. <u>Base Funding</u>

| FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/Atty | FTE | Amount ($000) | Pos | Agt/Atty | FTE | Amount ($000) | Pos | Agt/Atty | FTE | Amount ($000) |
| 76 | 55 | 76 | $20,792 | 77 | 56 | 77 | $21,474 | 77 | 56 | 77 | $24,863 |

2. <u>Personnel Increase Cost Summary</u>

| Type of Position/Series | FY 2024 Request ($000) | Positions Requested | Full Year Modular Cost per Position ($000) | FY 2024 1st Year Adjustments | Annualizations ($000) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | 2nd Year | 3rd Year | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Domestic Attorneys (0905) | $1,907 | 13 | $268 | $147 | $149 | $7 | $1,935 | $96 |
| Foreign Attorneys (0905) | $267 | 1 | $448 | $267 | $212 | $8 | $212 | $8 |
| Paralegals / Other Law (0900-0999) | $510 | 7 | $122 | $73 | $57 | $72 | $401 | $506 |
| General Investigative (1800-1899) | $364 | 5 | $122 | $73 | $57 | $72 | $286 | $361 |
| **Total Personnel** | **$3,048** | **26** | **$961** | **$560** | **$475** | **$159** | **$2,834** | **$971** |



**Department of Justice**
Criminal Division

### 3. Non-Personnel Increase/Reduction Cost Summary

The non-personnel funds are intended for travel and litigation support expenses as trial and case volumes return to normal capacity. Funding also provides the necessary one-time infrastructure improvements to aid ongoing investigations and prosecutions that the CCIPS Cyber Lab supports.

| Non-Personnel Item | FY 2024 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
|---|---|---|---|---|---|
| | | | | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Cyber Lab | $500 | $500 | 1 | $0 | $0 |
| Litigation Support | $300 | $300 | 1 | $0 | $0 |
| Travel | $152 | $152 | 1 | $0 | $0 |
| **Total Non-Personnel** | **$952** | **$952** | **3** | **$0** | **$0** |

### 4. Justification for Non-Personnel Annualizations

N/A

### 5. Total Request for this Item

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | Count | Agt/ Atty | FTE | Personnel | Non-Personnel | Total | FY 2025 (net change from 2024) | FY 2026 (net change from 2025) |
| Current Services | 77 | 56 | 77 | $24,863 | $0 | $24,863 | $0 | $0 |
| Increases | 26 | 14 | 13 | $3,048 | $952 | $4,000 | $2,843 | $971 |
| **Grand Total** | **103** | **40** | **90** | **$27,911** | **$952** | **$28,863** | **$2,843** | **$971** |

### 6. Affected Crosscuts

Computer Intrusions and Cyber Attacks - Criminal Motivations
Other Cyber Crime
Other Transnational Crime