UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Docket No. 21-cr-30028-MGM |
| ) | |
| ) | |
| BENJAMIN SHACAR ) | |
| ) | |
| ) | |

MOTION TO SUPPRESS STATEMENTS AND
REQUEST FOR EVIDENTIARY HEARING

Defendant, Benjamin Shacar, respectfully moves to suppress all statements that he made to law enforcement on March 24, 2021. The Court should hold an evidentiary hearing to assess whether the government can meet its burden to show that his statements were voluntary and thus admissible. *See United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003) ("The government bears the burden of proving a valid waiver [of *Miranda* rights] by a preponderance of the evidence.").

## Background

Mr. Shacar was arrested on March 24, 2021, incident to the execution of a search warrant at his residence in Pittsfield, Massachusetts. The indictment, returned on April 15, 2021, charges Mr. Shacar with ten counts of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). The "receipt" charges carry a mandatory minimum sentence of 5 years imprisonment upon conviction.

### A. Origin of underlying investigation

In August 2019, a foreign law enforcement agency (hereinafter, "FLA") known to U.S. law enforcement and with a history of providing reliable, accurate information in the past, notified U.S. law enforcement that the FLA had determined that on May 2, 2019, IP address 24.194.90.108 was used to access online child sexual abuse and exploitation material via a

1

website that the FLA named and described as the TARGET WEBSITE. The FLA described the website as facilitating 'the sharing of child sexual abuse and exploitation material stipulating only girls aged 5-13. Users were required to enter a username and password, but these were only valid for that single login session' and provided further documentation naming the website as the TARGET WEBSITE, which the FLA referred to by its actual name. U.S. law enforcement sent a subpoena to Charter Communications for subscriber information related to the suspect user IP address. Charter Communications provided law enforcement with a physical address – 18 Maple Street, Pittsfield, MA 01201 associated with the IP address as well as the customer name – Benjamin Shacar.

A warrant to search Mr. Shacar's home was issued on March 22, 2021. The search warrant application was based upon an affidavit signed by the case agent, HSI Special Agent Daniel Yon.

### B. Search and Interrogation

Yon and at least five other law enforcement personnel from the Department of Homeland Security, the Massachusetts State Police and Pittsfield Police executed the search beginning around 8:00 a.m. on March 24, 2021. Mr. Shacar was sleeping with his wife in their bed on the second floor of his house. Also present in the house was Mr. Shacar's stepson, aged 18, a minor daughter, and a minor son. Ex. A (Declaration of Benjamin Shacar ("Shacar Decl.")), ¶2. He awoke to the sound of the proximity alarms from his home security system. *Id.* ¶ 3. Upon viewing the monitors of the home security system which were located in the bedroom, Mr. Shacar saw someone he did not recognize walking through his dining room. *Id*. ¶3. He did not hear the doorbell ringing or knocking on the door.

While dressed only in his pajama bottoms, Mr. Shacar got out of bed and started going downstairs to the first floor. About halfway down the stairs he encountered two officers wearing police uniforms. One of the officers shown a light in his face. *Id*. ¶4. The two officers grabbed him by the arm and took him downstairs to the dining room. *Id.* ¶5. Additional officers came into the home after Mr. Shacar was in the dining room. *Id.* ¶6. Mr. Shacar's wife and children were brought into the dining room as well and told by the officers that they were not allowed to leave the dining room area. *Id.* ¶7.

Mr. and Mrs. Shacar and their children waited in the dining room while the officers

searched the home. Both Mr. Shacar and his wife asked what was going on and were told "We will get to that." *Id.* ¶8. Mrs. Shacar asked the officers if they could use the telephone to call an attorney and the officers refused her request. *Id*. ¶9. After speaking with his employer over his cellphone, the officers took Mr. Shacar's phone away from him. *Id*. ¶10.

Law enforcement officers separated Mr. and Mrs. Shacar. Mr. Shacar was told to go to his stepson's room, located on the first floor, by Agent Yon. *Id.* ¶12. Mrs. Shacar was interviewed by agents Dindinger and Haimila. Mrs. Shacar described a second floor common area at the residence with two computer workstations, indicating her computer was on the right side of the workstation area near the window and Mr. Shacar's computer was adjacent to her computer on the left side. Mrs. Shacar the dark web and accessed it to download music. She indicated she had Bit Torrent installed on her computer and had also accessed the dark web site Pirate Bay. She further stated that she had no knowledge of her husband accessing the dark web or using Bit Torrent. Mrs. Shacar went on to tell the agents that she had no knowledge of Mr. Shacar downloading or viewing child pornography content and that she never witnessed or had knowledge of unusual behavior on the part of her husband directed towards their children. Mrs. Shacar indicated a friend had stayed at their residence sometime last year, but she did not believe her friend would have been involved in downloading child pornography.

After going to his stepson's room, Agent Yon told Mr. Shacar that he needed to sign papers which would allow the officers to search 16 Maple Street[1], the cars and the other buildings on the premises. Agent Yon told Mr. Shacar that if he did not sign the papers, the officers would make everyone sit there all day while the officers obtained a search warrant for those places. *Id.* ¶13. Agent Yon had Mr. Shacar sign two documents. *Id*. Mr. Shacar believed that officers would detain his entire family unless he signed the documents, so he signed the documents. *Id.* Mr. Shacar asked more than once as to why the officers were there and was told it was not important and that they would get to that. *Id.* ¶14.

Mr. Shacar was interviewed by Agents Yon and HSI Task Force Officer (TFO) Tara Kelliher beginning at 8:30 a.m. in his stepson's bedroom located within the residence. There were still many law enforcement officers present in the household at this time rummaging through the household. Agents did not disclose that Mr. Shacar was not under arrest and that he was free to

---

[1] The search warrant described the premises as "[t]he entire property located at 18 Maple Street, Pittsfield, MA 01201, including the residential building, any outbuildings, and any appurtenances thereto (the SUBJECT PREMISES). The actual address for the this location is 16-18 Maple Street, Pittsfield, MA.

leave should he wish to do so. Agent Yon started reading from a piece of paper and asked Mr. Shacar if he understood, to which Mr. Shacar indicated that he did. *Id.* ¶15. Agent Yon told Mr. Shacar that if Mr. Shacar did not speak to him, the officers would arrest all the adults in the house and place all of the children in DCF custody. *Id.* Agent Yon also told Mr. Shacar that he would not be able to see his children. *Id.* At that point Mr. Shacar felt that he had no choice but to speak with the officers so as to avoid multiple arrests and DCF involvement with his minor children. Agent Yon told Mr. Shacar that things would be easier for him if he spoke with the officers. *Id.* The officers indicated that they wanted to speak with him regarding the presence of child pornography materials within the household. Faced with the prospect of both he and his wife losing custody of their children, Mr. Shacar agreed to speak with the agents. *Id.* ¶.

According to Agent Yon, Mr. Shacar proceeded to explain the number of devices in the household and to whom they belonged. He admitted to visiting the dark web and accessed the dark web through the TOR program or the onion router. Mr. Shacar indicated that he was familiar with child pornography and that it was something he had been struggling with. He explained that he goes through periods where he abstains from it but does not know how he can ask for help with it. He stated that he had been struggling with it since he was younger, and that he was in therapy for issues related to it. He described childhood trauma and that in the late 1990's he was exposed because certain sites were not filtered out the way that they are today. Mr. Shacar indicated that he had been viewing child pornography on the dark web for approximately the last four or five years. He admitted to viewing child pornography in May of 2019. He indicated that he used the peer networking software LimeWire[2] in the past to download child pornography. Mr. Shacar admitted to accessing chatrooms where child pornography materials were shared. He also volunteered that a flash drive that contains child pornography was hidden in the upstairs kitchen above a lone cabinet.

**Argument**

A "person questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom in any significant way must first receive *Miranda* warnings." *United States v. Mittel-Cary*, 493 F.3d 36, 39 (1st Cir. 2007) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) and *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)) (internal quotation marks omitted). Here, Mr. Shacar was *de facto* in law enforcement custody during the search and

interrogation, even before he was formally placed under arrest. *See id*. As Mr. Shacar was in law enforcement custody, the officers provided him with *Miranda* warnings.

The admission of "[a]n involuntary statement violates due process. The voluntariness of an admission depends on `whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances." *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990). In this case, the officers threatened Mr. Shacar with the arrest of his wife and stepson and the removal of the minor children to DCF custody. These threats so overwhelmed Mr. Shacar's will that his statements to the officers were not voluntary. Accordingly, the Court should suppress all of Mr. Shacar's statements.

### I.     Mr. Shacar was *de facto* in custody from the beginning of the search

In "cases short of formal arrest, an inquiring court uses a two-part test to see if a person is in custody for *Miranda* purposes: first, the court examines the circumstances surrounding the questioning and then it sees whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest." *United States v. Johnson*, No. 19-cr-10129-LTS, 2019 U.S. Dist. LEXIS 29461, *26 (D. Mass. Feb. 25, 2019) (quoting *United States v. Guerrier*, 669 F. 3d 1, 6 (1st Cir. 2011)). The determination requires "considering the totality of the circumstances." *Mittell-Carey*, 493 F. 3d at 39.

"Though by no means an exhaustive list," the First Circuit "has identified four factors which ought to be considered . . . including whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed on the suspect, and the duration and character of the interrogation." *Id*. (internal citations omitted); *see also Johnson*, 2019 U.S. Dist. LEXIS 29461 at *29-*30 (applying factors enumerated in *Mittel-Carey*).

To be sure, the fact that the interrogation took place in Mr. Shacar's home "generally presents a less intimidating atmosphere than, say, a police station." *Id*. However, both *Mittel-Carey* and *Johnson* were cases where, as here, suspects were interrogated at home incident to execution of search warrants issued in child pornography investigations. In both cases, the reviewing courts found that the defendants were *de facto* in custody for *Miranda* purposes. This

Court should reach the same result.

In *Mittel-Carey*, the First Circuit noted several "dispositive" facts underling its holding, including:

> "(1) the early hour of the search and interrogation (6:25 AM); (2) the presence of eight officers in the home; (3) that the defendant was confronted with an unholstered gun in his darkened bedroom; (4) the physical control the agents maintained over the defendant at all times; (5) the length of the interrogation (ninety minutes to two hours); and (6) the coercive statements made by the interrogating agent, which seemed designed to elicit cooperation while carefully avoiding giving the defendant *Miranda* warnings.

493 F.3d at 40.

> Among the six facts in *Mittel-Carey* that the First Circuit found dispositive, "the element that carrie[d] the most weight [wa]s the level of physical control that the agents exercised over the defendant during the search and interrogation." The defendant had been "ordered to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom." Accordingly, "[w]hile an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, the level of physical control the agents exercised over [the defendant] in this case weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home."

*Johnson*, 2019 U.S. Dist. LEXIS at *28-29 (quoting *Mittel-Carey*, 493 F.3d at 40).

Applying these considerations here, a "reasonable person in [Mr. Shacar's] circumstances would have understood himself to be in custody." *Id*. at *29. "While the interrogation occurred within [Mr. Shacar's] home, a fact weighing against a finding of custody, the agents exercised immediate and total control over both [Mr. Shacar's] home and [Mr. Shacar] himself." *Id*. In addition, the officers exercised immediate and total control over all occupants in the home. They arrived early in the morning. *Id*. "At least [six] armed officers were already in and around the house when Mr. Shacar came downstairs from his bedroom. *Id*. "Thereafter, over the next [hour and a half], the agents executing the search exploited [the] cozy

6

confines of [Mr. Shacar's] small home and invaded [his] personal space." *Id*. at 29-30 (internal citation omitted). Mr. Shacar "remained dressed only in" his pajama bottoms. *Id*. at 30.

As in *Johnson*, the "totality of the officers' actions in this case imposed physical control – the factor that the First Circuit found strongest in the *Mittel-Carey* custody analysis – making the custodial nature of [Mr. Shacar's] interrogation particularly apparent." *Id*. at *30. In the early morning hours, a contingent of armed officers" entered Mr. Shacar's home . . . did not permit him to move about his home . . . recorded his interrogation – or not, as they saw fit. . . and, for a substantial period of time, including . . . all of the interrogation, kept him mostly undressed, wearing only" the pajama bottoms he was wearing while sleeping. *Id*. at *31. "Because of this level of physical control, [Mr. Shacar] recognized what the objective facts made clear – he could not and would not leave without the officers' permission." *Id.* Theoretically, at least, Mr. Shacar "could have stood up during his interrogation, shirtless in [a bath robe] with [nothing on] his feet, without his phone, wallet or car keys . . . and walked out the back door in to the raw" late March morning. Id. at *32. "But no reasonable person in [Mr. Shacar's] position would do that, because a reasonable person in [Mr. Shacar's] position would have believed that he was in custody, 'comparable to a formal arrest,' and therefore not free to leave." Id. (internal citation omitted). Mr. Shacar therefore was de facto in custody from the inception of the search through his formal arrest.

## II. Mr. Shacar's statements were not made voluntarily

Admission of an involuntary statement is a violation of the Due Process clause. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). A voluntary statement is "the product of a rational intellect and a free will." *Mincey v. Arizona*, 437 US 385, 398 (1978) The government has the burden of proving the voluntariness of the consent on which it relies. *United States v. Woodrum*, 202 F.3d 1, 9 (1st Cir 2000). The touchstone of involuntariness is "whether the will of the defendant [was] overborne," *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986) (quoting *Procunier v. Atchley*, 400 U.S. 446, 453, (1971)) (further citations omitted), which requires a court to consider the totality of the circumstances, *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011)."Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep,

7

bathroom facilities) imposed upon the suspect." *Hughes*, 640 F.3d at 438 (citations omitted). When questioning takes place in a "more familiar or neutral" setting, such as in a suspect's own home, the interview is less likely to be deemed coercive. *United States v. Rondeau*, No. 20-cr-40049, 2022 WL 4084311, at *7 (D. Mass. Sept. 6, 2022) (citing *Beckwith v. United States*, 425 U.S. 341, 347 (1976)). A "defendant's mental state or condition . . is never dispositive of the inquiry into constitutional voluntariness." *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir.2006) (citing *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) and United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir.2000)). An assessment of voluntariness has "always depended on" the actions of the officers or agents. *Id*.; see also *Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); *United States v. Boskic*, 545F.3d 69, 78 (1st Cir. 2008) ("[o]nly confessions procured by coercive official tactics should be excluded as involuntary")(quoting *United States v. Byram*, 145 F.3d 405, 407 (1st Cir. 1998)).

      In determining "whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances", a court must consider "(1) the 'nature of the police activity;' and (2) 'the defendant's situation.'" *United States v. Ashworth,* No. 19-cr-10477MLW *(*D. Mass. June 13, 2023). In assessing whether police activity coerced the defendant, a court may consider "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities)." *Id.* The defendant's relevant "attributes" may include "his age, education, intelligence, and mental state." *Id.*

      In this case, although the interview took place in Mr. Shacar's home, officers separated him from his wife and children. He was dressed in pajama bottoms and not allowed to change into more suitable clothing. His cellphone was taken away by the officers. He was required to follow the instructions of law enforcement officers who had entered the home, including being ordered to move to another room for an interview. Multiple officers had barged into the home without warning in the early morning hours. The interview took place over the course of an hour and a half. Prior to the interrogation, the officers threatened him with the arrest of his wife and stepson and the removal of his minor child by the Department of Children and Families. "Coercion may be readily applied by way of implied threats and promises, just as it is by express threats and promises." *See Commonwealth v. DiGiambattista*, 442 Mass. 423, 435-436 (2004).

Threats concerning a person's loved one may impinge on the voluntariness of a defendant's confession. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (defendant's statement involuntary when induced by threats that financial aid to infant children would be discontinued and children taken from her if she failed to confess). In addition, "concern for one's family may be as significant in inducing an involuntary confession as a concern for oneself." See also *Commonwealth v. Hunt*, 12 Mass. App. Ct. 841, 844-845 (1981). Mr. Shacar contends that the issue is whether the government has met its burden to prove that the police tactics were not "so manipulative ... that they deprived him of his ability to make an unconstrained, autonomous decision to confess." *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993). All of these factors served to overcome Mr. Shacar's will and force him to speak with the agents.

## Conclusion

Mr. Shacar was subject to a custodial interrogation on the morning of March 24, 2021. Although law officers interrogated him in his own home, the officers exerted a significant amount of physical control over him during the interview. Mr. Shacar was taken downstairs to the dining room of his home by officers. He was ordered not to leave that area. He was clad only in his pajama bottoms. His cellphone was taken from him, and he was separated from his wife and children when officers ordered him into his stepson's room for questioning.

The statements attributed to Mr. Shacar were not made voluntarily. In addition to the factors listed above, the officers told Mr. Shacar that if he did not speak with the officers, his wife and stepson would be arrested, and his minor children would be taken from the home and place in DCF custody. In addition, Mr. Shacar was told he would not be able to see his children. The coercive nature of the police interrogation was such that Mr. Shacar's will was overborne, thus making his statements involuntary.

For these reasons, Mr. Shacar's statements should be suppressed.

Dated: January 29, 2025

                         Respectfully submitted,

                         BENJAMIN SHACAR

                         /s/ William J. O'Neil
                         WILLIAM J. O'NEIL
                         Attorney for the Defendant
                         280 N. Main St., Ste. 6
                         East Longmeadow, MA 01028
                         (413) 224-2694
                         BBO#:548445

**CERTIFICATE OF SERVICE**

I hereby certify that true copies of this document will be served on the registered parties through the ECF system on this date, January 29, 2025.

                         /s/ William J. O'Neil
                         William J. O'Neil
                         280 N. Main Street, Ste. 6
                         E. Longmeadow, MA 01028
                         (413) 224-2694
                         BBO#: 548445