UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL No. 21-cr-30028-MGM |
| v. | |
| BENJAMIN SHACAR, | |
| Defendant. | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S "MOTION TO SUPPRESS
STATEMENTS AND REQUEST FOR AN EVIDENTIARY HEARING" (DOC. 144)**

The United States of America, by and through its attorneys, United States Attorney
Leah B. Foley, and Assistant United States Attorney Thomas A. Barnico, Jr., hereby opposes
the Defendant's Motion to Suppress Statements. As factual background for this opposition,
the government relies upon the attached recording of law enforcement's interview with the
defendant on March 24, 2021. Exhibit A, Audio Recording of Law Enforcement Interview with
Benjamin Shacar on March 24, 2021 (herein, "Exhibit A"). For the reasons stated below, the
defendant's motion should be DENIED without a further evidentiary hearing.

**I.  PROCEDURAL AND FACTUAL BACKGROUND**

The defendant is charged with ten counts of receipt of child pornography in violation of
18 U.S.C. § 2252A(a)(2)(A) and one count of possession of child pornography in violation of
18 U.S.C. § 2252A(a)(5)(B).  As part of the investigation that precipitated these charges,
investigators executed a search warrant at the defendant's home on March 24, 2021 at 18 Maple
Street, Pittsfield, MA. [Doc. 2-1 ¶ 43]. 18 Maple Street is the top floor apartment in a two-story
home. [Doc. 2-1 ¶ 48]. 16 Maple Street is the bottom floor apartment in the same two-story
home. *Id.* The defendant, his wife, and three children reside on both floors and are the only

residents at 16 and 18 Maple Street. *Id.* The defendant and his wife have a bedroom in the second-floor apartment (18 Maple Street) and his children have bedrooms in the first-floor apartment (16 Maple Street). *Id.* The first-floor apartment (16 Maple Street) was not searched. *Id.*

At approximately 8:00 a.m. on March 24, 2021, the defendant woke up to the sound of "proximity alarms" from his home security system. [Doc. 144-1] Defendant's Declaration in Support of Motion ¶ 3 (herein, "defendant's declaration" or "Def. Decl."). He was asleep with his wife in their bed on the second floor (18 Maple Street). *Id.* ¶ 2. His stepson (18), daughter (12) and son (11) were sleeping on the first floor (16 Maple Street). *Id.* The defendant looked at his home security system monitors and saw someone he did not recognize walking through the dining area on the first floor. *Id.* He got out of bed and immediately headed downstairs. *Id.*

As the defendant descended the stairs to the first floor, he encountered two uniformed and armed law enforcement agents. *Id.* ¶ 4. One agent shined a flashlight at him but neither agent unholstered their firearms. *See id.* The two officers escorted him down to the dining area on the first floor. *Id.* Approximately four more uniformed and armed agents entered the home, but none raised their firearms at the defendant or his family. *See id.* ¶¶ 4-6. The agents gathered the defendant's wife and children in the first-floor dining area with him. *Id.* His children – who had just woken up – looked tired and confused. *Id.* ¶¶ 2, 7.

HSI Special Agent Daniel Yon and Task Force Officer Tara Kelliher interviewed the defendant in his stepson's first-floor bedroom, outside of the presence of the defendant's wife and young children. *Id.* ¶ 12; Mot. at 3. The interview was recorded. Exhibit A. The interview began with the agents introducing themselves, confirming the defendant's identity, and making small talk about the neighboring property. Exhibit A: 00:00:00 – 00:04:34. TFO Kelliher wished the

defendant a happy belated birthday and the defendant joked and laughed about getting older. *Id.* SA Yon commiserated with that sentiment. *Id.* SA Yon asked the defendant how long he and his wife had lived in the home and the defendant said he had lived there for twelve years, but his wife's family have owned the property for decades. *Id.* SA Yon told the defendant that the agents had a search warrant for the property, the defendant, and the defendant's wife. *Id.*

Next, SA Yon advised the defendant of his *Miranda* rights. Exhibit A: 00:04:30 – 00:06:25. SA Yon first read the defendant his *Miranda* rights in their entirety. *Id.* Then SA Yon told the defendant he was going to read the *Miranda* rights again and asked the defendant to acknowledge he understood each right after it was read to him. *Id.* SA Yon then proceeded to Mirandize the defendant again, pausing after each right and asking the defendant if he understood. *Id.* The defendant confirmed that he understood each of his *Miranda* rights. *Id.* SA Yon then asked the defendant if he still wished to talk with the agents. *Id.* The defendant responded affirmatively and proceeded to answer questions. *Id.*

After the defendant waived his *Miranda* rights, SA Yon asked the defendant if he was comfortable. Exhibit 1: 00:06:25 – 00:07:39. The defendant laughed and said, "I'm freezing bro." *Id.* SA Yon said that he wanted the defendant to be comfortable and offered to retrieve clothing for the defendant. *Id.* The defendant requested his jacket from the stairwell. *Id.* He declined SA Yon's offer to get him other clothing and footwear. *Id.* The defendant asked if he was allowed to "vape" in his own home, referring to smoking an electronic cigarette. *Id.* SA Yon said yes. *Id.* The defendant then requested that agents retrieve his cell phone and e-cigarette, which he said he left upstairs next to his computer. *Id.* TFO Kelliher agreed and an agent retrieved these belongings for the defendant. *Id.* The defendant then asked SA Yon if he could text his employer about his current situation and notify him of his upcoming absence from work. *Id.* Agents held onto the defendant's

phone (an electronic device within the scope of items to be seized pursuant to the search warrant) as the defendant sent his employer a voice-to-text message regarding his absence. Exhibit A: 00:15:20 – 00:17:40. Later in the interview, the defendant's phone rang, and the defendant remarked that someone from work was calling. Exhibit A: 00:46:00 – 00:49:00. The defendant's phone rang again, and agents physically accepted the call, and the defendant verbally confirmed with the caller/coworker he would not be at work. *Id.*

SA Yon explained that the agents had a search warrant for 18 Maple Street, but that the warrant did not specifically include 16 Maple Street. Exhibit A: 00:18:40 – 00:24:00. SA Yon told the defendant that he can proceed in two ways. *Id.* First, SA Yon could seek to have the warrant amended to include 16 Maple Street, which could take a considerable amount of time. *Id.* Second, the defendant could consent to the search of 16 Maple Street. *Id.* The defendant said, "whichever." *Id.* SA Yon then showed the defendant the search warrant and discussed it with the defendant. *Id.* The defendant asked the agents what the charges were and what the agents' accusations against him were. *Id.* SA Yon told him that the agents weren't accusing him of anything – they were following a tip that led them to an IP address associated with the defendant's home and were there to search his home for evidence. *Id.* They continued to talk about the defendant's electronics in the home, technology generally, video game streaming, internet browsing activity, computer/Wi-Fi security, and the defendant's use of the dark web. Exhibit A: 0024:00 – 00:37:45. The conversation remained friendly and non-threatening. *Id.*

SA Yon then asked the defendant again whether he would consent to the agent's search of the first floor (16 Maple Street). Exhibit A: 00:42:18 – 00:44:00. SA Yon explained that he can arrange to have the warrant amended by the judge if the defendant does not consent. *Id.* The defendant interjected and said, "then we'll just be here all day." *Id.* SA Yon reiterated that the

defendant had the option not to consent to the search of 16 Maple Street and that he "didn't want to talk [the defendant] into anything." *Id.* The defendant then reviewed and signed the consent to search forms, giving agents permission to search 16 Maple Street. *Id.* Ultimately, 16 Maple Street was not searched. [Doc. 2-1 ¶ 48].

Next, SA Yon left the defendant and TFO Kelliher in the stepson's bedroom to make a phone call. Exhibit A: 00:44:00 – 01:00:00. The defendant and TFO Kelliher talked about grocery store prices, children's homework assignments, and the school system in Pittsfield. *Id.* When SA Yon returned, he explained that the violations listed in the search warrant were related to child pornography and asked the defendant if he knew anything about that. Exhibit A: 01:00:01. The defendant said, "unfortunately yes" and proceeded to make multiple incriminating statements - including that he had been visiting child pornography websites since 2016, that he used his computer to access the "dark web" to view and obtain child pornography, and that he had a thumb drive on top of his family's kitchen cabinet that contained child pornography. [Doc. 2-1 ¶¶ 49-54]. Agents previewed the thumb drive and found approximately 80 child pornography videos. *Id.* at ¶¶ 51-52.

The agents' demeanor throughout the interview was friendly, professional, and accommodating. The defendant spoke rationally, calmly, and intelligently throughout the interview. At no point during the interview did the defendant cease answering questions, request to consult with an attorney, demand an attorney be present, or otherwise terminate questioning. Furthermore, at no point did the agents make any threats against the defendant or his family or use any other type of coercive interrogation tactic.

After the interview, the defendant was arrested and charged by complaint. [Doc. 2 at 1]. He was subsequently indicted for the above offenses on April 15, 2021, [Doc. 14]. The

defendant filed the instant Motion to Suppress and Supporting Memorandum on January 29, 2025. [Doc. 144]. The defendant argues that his interview with federal law enforcement in his home was a custodial interrogation and that his statements were not made voluntarily. In support of his argument, the defendant filed a declaration that he signed under the penalties of perjury on January 28th, 2025. [Doc. 144-1].

## II. ARGUMENT

The defendant's motion should be denied because (A) the defendant was not in custody, (B) agents read the defendant his *Miranda* rights and he waived those rights, and (C) the defendant's statements were made voluntarily. Furthermore, the defendant's motion to suppress should be denied without a further evidentiary hearing because no material facts are in dispute. The recording of the interview (Exhibit A) resolves any factual disputes raised by the defendant's self-serving declaration, written nearly four years after his arrest.

### A.    The defendant was not in custody.

The court in *Miranda v. Arizona* held that custody occurs when the defendant "has been taken into custody or otherwise been deprived of his freedom of action in any significant way." 384 U.S. 436, 444 (1966).  The custody test is usually described in these terms:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).

In determining custody, the "only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."  *Berkemer v. McCarty*, 468 U.S. 420,

442 (1984). The relevant question in the custody analysis is whether "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Melo*, 954 F.3d 334, 339 (1st Cir. 2020) (interview not a custodial interrogation where two armed officers interviewed defendant in his own house, were cordial to defendant and allowed defendant's attorney to participate by phone) (internal citations and quotation marks omitted). The First Circuit has enumerated a non-exhaustive list of factors to consider, including "[1] whether the suspect was questioned in familiar or at least neutral surroundings, [2] the number of law enforcement officers present at the scene, [3] the degree of physical restraint placed upon the suspect, and [4] the duration and character of the interrogation." *Id.* at 340 (internal citations and quotation marks omitted). Each of these four factors are discussed below:

*First,* SA Yon and TFO Kelliher interviewed the defendant in a familiar setting and at a reasonable time – the defendant's own home at around 8:00 a.m. The First Circuit has held that questioning conducted in "familiar or at least neutral surroundings," like the defendant's home, weighs against a finding of custody. *See United States v. Hughes*, 640 F.3d 428, 435-36 (1st Cir. 2011); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007).

*Second,* only two agents interviewed the defendant. The defendant argues that six armed agents exercised control over him, his family, and his home. Mot. at 6. However, the First Circuit has made clear that the total number of agents in the home executing a search warrant is not determinative. *See United States v. Monson,* 72 F.4th 1, 11 (1st Cir. 2023); *Hughes*, 640 F.3d at 435. Instead, the number of agents present when questioning the defendant is significant. *Id*. Here, only SA Yon and TFO Kelliher questioned the defendant.

*Third,* agents did not physically restrain the defendant during the interview. "[T]he

degree of physical restraint placed upon the suspect," has been identified by the First Circuit as "carr[ying] the most weight."  *Mittel-Carey*, 493 F.3d at 40.  The defendant argues that agents controlled his actions and movements in such a way that he was "*de facto*" under formal arrest. *See* Mot. at 5-7. In support, the defendant claims that the agents separated him from his family, took his phone, refused to let him change out of his pajamas, and deprived him of food and water. *Id*. The interview recording, however, disproves these claims.

The agents interviewed the defendant in his stepson's bedroom on the first floor – steps away from where his family was gathered in the common area. The stepson's bedroom afforded some privacy away from the defendant's wife and minor children to discuss the disturbing issue of child pornography. The agents retrieved the defendant's phone, jacket, and e-cigarette for him. They allowed him to "vape," communicate with his employer and coworker, and offered to retrieve footwear for him. Agents even got the defendant a seltzer water which he thanked the agents for and opened. The agents never told the defendant he was not free to leave or move about the home. And the agents never handcuffed or otherwise physically restrained the defendant.

Before and during the search, the defendant was not subject to the kind of physical control found in *Mittel-Carey* that led to the finding of custody.  In *Mittel-Carey*, the defendant was "confronted with an unholstered firearm in his darkened bedroom" at 6:25 a.m. and agents made coercive statements designed to elicit cooperation and avoid *Miranda* warnings. *Mittel-Carey*, 493 F.3d at 38-40. Here, the agents entered the home at about 8:00 a.m., did not brandish their firearms, did not make coercive statements, and Mirandized the defendant.  Furthermore, in *Mittel-Carey* the defendant's movements were controlled at "all times," whereas the defendant here was interviewed privately away from his wife and children.  While the defendant

was not told explicitly that he was free to leave, he was not told that he had to stay. *See United States v. Nishnianidze*, 342 F.3d 6, 13-14 (1st Cir. 2003) (no custody despite subject not being told he was free to leave). Moreover, he was told during the *Miranda* warnings that he had the right to remain silent and to stop the questioning at any time. These affirmative statements would emphasize what the lack of handcuffs and physical restraints already conveyed, i.e., that he was not under arrest or subject to police control.

*Fourth,* the interview lasted only two hours and twenty minutes and was respectful and accommodating in tone. Although the interview lasted two hours and twenty minutes - which is longer than the interview conducted in *Mittel-Carey* (90 to 120 minutes) - there were at least two lengthy breaks. The First Circuit has held that similar interview lengths were not unreasonable. *See Hughes*, 640 F.3d at 437 (noting "relatively short duration of the interview"—90 minutes); *Nishnianidze*, 342 F.3d at 14 (noting 45-minute interview was "not exceptionally long").

More importantly, the easy conversation between the agents and the defendant is inconsistent with the notion that the reasonable person would have felt pressure, much less physical control. *See Hughes*, 640 F.3d at 437 ("relaxed and non-confrontational" tone of the interview militated against finding of custody); *United States v. Swan*, 842 F.3d 28, 33 (1st Cir. 2016) (90-minute interview "characterized by 'a generally even-tone back and forth'" favored finding of no custody). The defendant argues that the agents threatened to detain him and his family in the home if he did not consent to the search of the first floor. On the contrary, the interview recording reveals that SA Yon made no such threat – directly or impliedly – and instead made it abundantly clear to the defendant that it was his choice to consent. Similarly, the defendant argues that the agents threatened to arrest him, his wife and his son and put his

minor children in DCF custody if he did not waive his *Miranda* rights and answer questions. Once again, however, the recording of the interview tells a completely different story.

SA Yon read and then reread the defendant his Miranda rights and had the defendant verbally confirm he understood each right. He then asked the defendant if he wished to answer questions, and the defendant responded in the affirmative. Throughout the interview the agents took measures to ensure the defendant was comfortable. They offered to get him other clothing and footwear. They retrieved his phone, e-cigarette and jacket for him. They even gave him a seltzer water. The agents spoke with the defendant about computers generally, Pittsfield's school system, his children's homework, grocery store prices, work schedules, and coworkers. They laughed and joked with him on several occasions. At no point did agents raise their voices, make threats, or otherwise intimidate and coerce the defendant.

Weighing the above factors regarding the nature of the interrogation, the Court should find that the defendant was not in custody for purposes of *Miranda*.

**B.     Even if the defendant was in custody, he waived his *Miranda* rights.[1]**

A criminal defendant may knowingly, intelligently, and voluntarily waive his *Miranda* rights and answer questions without an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The relinquishment of the defendant's right to remain silent "must have been voluntary [and] . . . free of intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In addition, the "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

---

[1] The defendant does not directly argue that his *Miranda* waiver was not made knowingly, intelligently, and voluntarily. However, the defendant alleges that SA Yon coerced him into waiving his *Miranda* rights using threats. Def. Decl. ¶ 15. Additionally, it is the Government's burden to show by a preponderance of the evidence that the defendant waived *Miranda*. As such, the Government includes this section to address the defendant's allegations and meet its burden.

These inquiries are judged based on the "totality of the circumstances." *Id.*; *United States v. Bezanson-Perkins*, 390 F.3d 34, 40 (1st Cir. 2004). While it is the government's burden to show by a preponderance of the evidence that the defendant waived his Miranda rights, *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986), an express waiver—written or oral—is not required. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Guzman*, 603 F.3d 99, 106 (1st Cir. 2010). "A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions." *United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014).

Unlike the defendants in *Mittel-Carey* and *United States v. Johnson*, 2019 U.S. Dist. LEXIS 29461, *26 (D. Mass. Feb. 25, 2019), the agents here read the defendant his *Miranda* rights, confirmed that he understood each one, and asked him if he wanted to continue to speak with them. The defendant confirmed that he did. There is no factual dispute – the defendant admits as much. *See* Mot. at 5 ("As Mr. Shacar was in law enforcement custody, the officers provided him with *Miranda* warnings."); Def. Decl. ¶ 15 ("Agent Yon started reading from a piece of paper. He asked me if I understood. I told [him] that I did.").

The defendant, however, alleges that after SA Yon read the defendant his rights, he threatened the defendant and his family, stating "[t]his is what's going to happen. If you don't talk, we're going to arrest all the adults in the house and place all the children in DCF custody." *Id*. The defendant alleges that SA Yon told him he would not be able to see his kids if he did not talk. *Id*. The defendant explained that given these threats he "felt I had to talk to them or else my wife would be arrested and my kids removed from the home." *Id*. The defendant is correct that such a brazen threat would be a compelling factor for the Court to consider in determining the voluntariness of a *Miranda* waiver. *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). However,

11

the interview recording reveals that these threats were never made. Free of any physical or verbal coercion, the defendant knowingly and voluntarily waived his *Miranda* rights by confirming that he wished to continue speaking with the agents and proceeding to do so.

### C.    The defendant's statements were voluntary.

The voluntariness of a statement under the Fifth Amendment is judged by the "totality of the circumstances." *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991). Only if the Defendant's "will has been overborne and his capacity for self-determination critically impaired, [does] the use of his confession offend[] due process." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). Evaluating the voluntariness of a statement requires weighing "the officer's tactics with the unique background of each individual suspect," to establish "whether the government's conduct overtook the will of the defendant." *United States v. Hufstetler*, 782 F.3d 19, 22 (1st Cir. 2015). "Only confessions procured by coercive official tactics should be excluded as involuntary." *United States v. Boskic*, 545 F.3d 69, 78 (1st Cir. 2008) (internal quotation marks omitted).

The defendant argues that the agents' coercive tactics "deprived him of his ability to make an unconstrained, autonomous decision to confess" (quoting *United States v. Walton*, 10 F.3d 1024, 1030 (3rd Cir. 1993)) and thus his statements were involuntary and should be suppressed. Mot. at 8. In support, the defendant relies on the same claims discussed and debunked above. *See* Mot. at 8-9; Def. Decl. (agents did not allow him to change clothes, took his cell phone away, deprived him of water, did not allow him to see the warrant, and separated him from his family). The interview recording tells a different story entirely. Agents asked the defendant if he was comfortable and retrieved the defendant's phone, e-cigarette, and clothing. They allowed the defendant to communicate with his employer and coworker on his cellphone

- despite having a search warrant justifying its seizure. They provided him with water. Agents showed the defendant the search warrant and allowed him time to review it. And lastly the agents informed the defendant of his *Miranda* rights and had him confirm that he understood each.

The defendant also argues that his statements were not voluntary because the agents threatened to arrest the defendant, his wife and stepson and place his children in DCF custody. As discussed above, the interview recording demonstrates that such a threat never happened. To the extent that the defendant claims that the threat occurred "prior to the interrogation" (Mot. at 8), this sequence of events is unsupported by the defendant's own declaration. *See* Def. Decl. p. 15 (stating that SA Yon Mirandized the defendant and then made the threats). Furthermore, the agents were professional, respectful, and conversational throughout the entirety of the interview. In fact, the defendant joked and laughed with the agents throughout and made no inquiries regarding the supposedly threatened arrest and removal of his family members. It requires a significant stretch of the imagination to believe that such a threat was uttered and then the defendant and agents engaged as they did in the recorded interview.

The defendant makes many allegations regarding the coercive nature of the interview and the agents' actions. The interview recording, however, reveals that these allegations are at best the result of a lapse in memory over the passage of four years. At worst, they are self-serving misrepresentations and fabrications. The defendant's statements were voluntary and thus should not be suppressed.

### D.    The defendant's motion should be dismissed without an evidentiary hearing.

A criminal defendant is not entitled to an evidentiary hearing for a motion to suppress. *United States v. Cintron*, 724 F.3d 32, 36 (1st Cir. 2013). "A hearing is required only if the movant

makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor would entitle him to the requested relief." *Id.* (internal quotations omitted). To make this showing "[t]he defendant must allege facts, sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Lewis*, 40 F.3d 1325, 1332 (1st Cir. 1994) (internal quotations omitted).

"The district court is not limited to the four corners of the defendant's motions, affidavit, and exhibits in assessing the weight to give the defendant's affidavit. The district court can rely on information that it has obtained from previous motions and from other sources […] in determining whether an affidavit should be credited." *Cintron*, 724 F.3d at 38 (upholding the district court's rejection of the defendant's affidavit as a "last minute, self-serving change in strategy"). Ultimately, "the decision of whether to conduct an evidentiary hearing is left to the sound discretion of the district court." *United States v. Brown*, 621 F.3d 48, 57 (1st Cir. 2010).

The Court should deny the defendant's motion without an evidentiary hearing because the defendant has failed to make a sufficient threshold showing that material facts are in doubt or disputed. *See Cintron*, 724 F.3d at 36. To be sure, the defendant's declaration attempts to put material facts in dispute. For instance, he claims that agents refused to let him see the search warrant, deprived him of water, threatened him, forced him to sign consent to search forms, denied him use of his phone, and forced him to answer questions in his pajamas. However, as discussed above, all these allegations are debunked by the recorded interview. As such, the defendant has failed to allege facts that are "sufficiently definite, specific, detailed, and nonconjectural" that would "enable the court to conclude that a substantial claim is presented."

*See Lewis*, 40 F.3d at 1332. The Court should deny the defendant's motion without an evidentiary hearing.

## <u>Conclusion</u>

For all the reasons stated above, the defendant's motion to suppress statements should be DENIED without an evidentiary hearing.


                                    Respectfully Submitted,

                                    LEAH B. FOLEY
                                    United States Attorney

Date: February 26, 2025       By:   */s/ Thomas A. Barnico, Jr.*
                                    Thomas A. Barnico, Jr. (BBO#696929)
                                    Assistant United States Attorney
                                    United States Attorney's Office
                                    300 State Street, Suite 230
                                    Springfield, MA 01105

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas A. Barnico, Jr., hereby certify that the foregoing was filed through the Electronic Court filing system on February 26, 2025 and it will be sent electronically to the registered participants as identified on the Notice of Electronic filing.


Date: February 26, 2025                          <u>*/s/ Thomas A. Barnico, Jr.*</u>
                                                 Thomas A. Barnico, Jr.
                                                 Assistant United States Attorney